UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO GOMEZ RUIZ, et al., | Case No. 1:26-cv-02546 JLT CDB |
| Plaintiffs, | ORDER DENYING MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL |
| v. | (Doc. 86) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Defendants, | |
| CORECIVIC, INC., | |
| Intervenor Defendant. | |

## I.   INTRODUCTION

Intervenor Defendant CoreCivic, Inc. moves to stay the preliminary injunction imposed by the transferor court through a series of orders issued February 10, March 27, and March 30, 2026, (Docs. 72, 111, 112, collectively "PI Order") addressing conditions of confinement at U.S. Immigration and Customs Enforcement's California City Detention Facility, which CoreCivic owns and operates. (*See generally* Doc. 15.) Having considered the numerous briefs related to the stay request (*e.g.*, Docs. 86, 105, 110, 135, 139, 143; *see also* Doc. 82-1) as well as the entire record, the motion is **DENIED**.

1

## II.   BACKGROUND

The Court incorporates the background from its recent order granting CoreCivic's limited motion for intervention as of right. (Doc. 144.) Of particular import here, the PI Order requires Defendants to: "(1) ensure constitutionally adequate medical care ([Doc. 72,] ¶ 1)[1]; (2) provide access to an independent, third-party 'External Monitor' for a period of 120 days (*id*. ¶ 2); (3) ensure that detained individuals have timely and confidential access to attorneys through in-person, contact legal visits and calls (*id*. ¶ 3)[2]; and (4) provide free temperature-appropriate clothing and at least one hour of outdoor recreation time per day (*id*. ¶ 4)." (Doc. 111 at 4.) In addition, on March 30, 2026, Judge Chesney entered an order appointing Muthusamy Anandkumar as an external monitor regarding compliance with the Court's preliminary injunction. (Doc. 112.)

## III.   STANDARD OF DECISION

When evaluating whether to stay a preliminary injunction pending appeal, courts in this Circuit apply the *Nken* test, which considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 422, 434 (2009) (internal quotation and citation omitted); *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (applying *Nken* factors to evaluate whether to stay a preliminary injunction).

---

[1] More specifically regarding medical care, the Court directed Federal Defendants to ensure: adequate health care staffing; comprehensive, documented medical intake screening, performed by a "qualified medical provider" within 12 hours of a person's arrival; thorough Initial Appraisals performed timely by a primary care provider; timely approval and access to medical specialists; timely and responsive emergency services; continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to scheduled provider appointments, and consistent provision of medication; timely access to prescribed medications; and a responsive "sick call" request system. (Doc. 72 at 3.)

[2] Regarding access to counsel, the Court ordered Federal Defendants to ensure: in-person legal visitation seven days per week from 8:00 a.m. to 8:00 p.m., in private and confidential settings, with each legal visit lasting up to three hours in length; contact attorney visits that do not take place through a pane of glass, absent documented security grounds to deny such contact; scheduling of confidential legal calls with legal representatives of up to 90 minutes each, to take place within two business days of a request; and provision of written information regarding protocols for attorney-client communication to all individuals detained at California City. (Doc. 72 at 4.)

2

The first two factors of the test "are the most critical." *Id*.

Courts often use a sliding scale approach and evaluate the first two factors, weighing the likelihood of success and the possibility of irreparable injury to the movant in the absence of a stay. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011); *Leiva-Perez v. Holder*, 640 F.3d 962, 965-68 (9th Cir. 2011) (per curiam) (applying same sliding scale approach to *Nken* factors). On the first prong, likelihood of success, the party requesting the stay does not have to demonstrate that it is more likely than not that they will win on the merits. *Id*. at 966. However, "[i]t is not enough that the chance of success on the merits be better than negligible," and "more than a mere possibility of relief is required." *Nken*, 556 U.S. at 434 (internal quotations omitted). Courts routinely use a variety of formulations to evaluate whether the movant has shown a sufficient possibility of success, such as "reasonable probability," "fair prospect," "substantial case on the merits," or that "serious legal questions are raised." *Leiva-Perez*, 640 F.3d at 967–68 (internal quotations and citations omitted).

For the second prong, the movant must show that irreparable harm is probable absent a stay. *Leiva-Perez*, 640 F.3d at 968 ("In other words, [a movant's] burden with regard to irreparable harm is higher than it is on the likelihood of success prong, as she must show that an irreparable injury is the more probable or likely outcome."). "[S]imply showing some possibility of irreparable injury" does not suffice. *Nken*, 556 U.S. at 434 (internal quotations omitted). The Court reaches the last two factors only after the first two are satisfied. *Doe # 1*, 957 F.3d at 1058. If the stay request "has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the [movant's] proof regarding the other stay factors." *Leiva-Perez*, 640 F.3d at 965 (citing *Nken*, 556 U.S. at 433–34). Courts therefore often start by considering irreparable harm. *See Doe #1*, 957 F.3d at 1058.

## IV.   DISCUSSION

On this record, the analysis begins and ends with the irreparable harm prong, because CoreCivic, which has dedicated only a few paragraphs in each of its briefs to the subject, has not demonstrated any irreparable harm is likely. CoreCivic's arguments related to irreparable harm focus on asserted operational disruptions and costs associated with implementing the PI Order.

**A.    Past Harms**

Some of the harms articulated by CoreCivic have already come to pass. For example:

- CoreCivic complains of having to reconfigure the legal visitation schedule to comply with the PI Order, a task that "took" one of its staff members approximately eight man-hours to accomplish. (*See* Doc. 82-1, Mar. 2, 2026 Declaration of Christopher Chestnut, ¶ 69.) There is no suggestion that this task involves an ongoing expenditure of time or resources.

- CoreCivic subdivided its four existing legal visitation rooms to facilitate additional contact visits at a total project cost of $28,775 (Doc. 143-1, May 11, 2026 Declaration of Christopher Chestnut), ¶ 9.) That total cost did not include electrical work, which was incorporated in a separate project budget. (*Id*., ¶ 10.) Yet it is undisputed that the entire project was completed at the end of March 2026. (*Id*., ¶ 9.)

- To accommodate the PI Order's requirement for 90-minute legal calls, CoreCivic separated its existing 10 virtual attorney visits (VAV) booths, which were originally in one area, into two areas and added two additional booths. (*Id*., ¶¶ 12–16.) The project, which was also completed at the end of April 2026, cost $64,468.33. (*Id*., ¶ 15.)

The requested stay would not avoid or reverse these past harms. *See Doe #1*, 957 F.3d 1059 (relevant irreparable injury is that which is "likely to occur during the period before the appeal is decided"). Thus, they are not relevant here.

**B.    Anticipated Monetary Harm**

CoreCivic also anticipates incurring additional costs to comply with the PI Order, which the Court takes at face value for purposes of this analysis. These anticipated costs include:

- PI Order ¶ 1(b) requires that each arriving detainee receive "a comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours." CoreCivic appears to be assuming that the use of the term "qualified medical provider" means a Nurse Practitioner (NP). (Doc. 82-1, ¶ 34.) Based on this assumption, CoreCivic estimates that it will need to expend approximately $900,000 per year to hire an additional five Nurse Practitioners to adequately staff that role (*Id*., ¶ 47.) If CoreCivic is unable to quickly recruit these additional NPs, it may have to fill the positions with

overtime assignments at even greater cost. (*Id.*, ¶ 48.)[3]

- In addition, PI Order ¶ 1(a) more generally requires "adequate health care staff[ing]," which CoreCivic asserts is likely to lead to additional staffing costs because implementation will be based on the subjective opinion of a monitor. (*Id.*, ¶ 49.)

- To comply with the Court's Order requiring 90-minute legal calls, CoreCivic estimates it will need to staff an additional 2.5 officers at an approximate cost of $260,208 per year. (Doc. 143-1, ¶ 17.) Thus far, it has increased staffing related to legal calls by one additional officer, at an approximate cost of $104,083.20 per year, but CoreCivic indicates staffing "may need to be further increased when the Facility reaches full capacity." (*Id.*, ¶ 17.)

- In addition, CoreCivic indicates it is "required to staff the contact visitation area with an additional officer, at an approximate cost of $104,083.20 per year due to the need to visually monitor the additional four contact visitation rooms." (*Id.*, ¶ 11.)

Even assuming these figures are accurate and further assuming there may be additional costs imposed as the PI Order is implemented, CoreCivic fails to address a fundamental question: whether CoreCivic ultimately will be required to bear these costs. As the Court discussed when addressing CoreCivic's motion to intervene, CoreCivic has now revealed portions of its contract it deemed pertinent to the Court's inquiry into "which contractual party bears the costs of implementing operational changes imposed by the Court's preliminary injunction order." (*See* Doc. 141 (Minute Order calling for supplemental filings).)

> The present record now indicates the agreement to be an "indefinite delivery indefinite quantity (IDIQ) contract" pursuant to which CoreCivic is compensated a fixed amount for the "Facility Operating Charge," and a per diem rate based on the number of detainees. (Doc. 143-2 at 6–7.) The contract further provides that CoreCivic "shall furnish all personnel, management, equipment, supplies, training, certification, accreditation, and services necessary for performance of all aspects of the contract," and "[u]nless explicitly stated otherwise, [CoreCivic] is responsible for all costs associated with

---

[3] Though CoreCivic's declarant, Warden Chestnut, expresses concern that CoreCivic may not be able to hire a sufficient number of NPs and/or their training may take time (Doc. 82-1, ¶¶ 47, 48), this concern remains hypothetical. Regardless, even if these roles will have to be filled temporarily at higher, overtime rates, the legal analysis herein remains unchanged.

and incurred as part of providing the services outlined in this contract." (Doc. 143-2 at 9.) The agreement also provides:

> Should a change in the applicable standards and laws identified in this contract result in a documentable financial impact on the contractor, the contractor must notify the CO within 30 calendar days of receipt of the change and **both contractor and Government will negotiate best course of action**, either 1) a waiver to the Standards or, 2) negotiate a prospective change in the bed day or other rates. Please note, any change in compensation rate will be prospective, beginning on the date the change is effective.

(*Id.* (emphasis in original))

(Doc. 144 at 13–14 (footnote omitted).)

For purposes of intervention, the Court found that "by providing for a re-negotiation process, rather than indemnification, the provisions present some degree of risk that CoreCivic will not be fully reimbursed for compliance costs incurred." (*Id.* at 14 (emphasis added).) But the threshold is higher for this motion to stay, which requires a showing that "irreparable injury is the more probable or likely outcome." *Leiva-Perez*, 640 F.3d at 968. CoreCivic indicates that it has not yet sought reimbursement under the above-quoted contract provision, suggesting it has not done so "because the February 10, 2026 and March 30, 2026 Orders do not change the applicable standards (i.e., the 2025 National Detention Standards) or the law." (Doc. 143 at 11.) But CoreCivic fails to explain this debatable interpretation of the contract language and does not suggest it will altogether forego any effort to renegotiate its contract rates to recoup expenditures incurred to ensure compliance with a PI Order directed at Federal Defendants. The Court takes no position on how any such efforts might resolve, and only finds here that CoreCivic has failed to demonstrate that it is likely to ultimately bear these costs.

### 1.    Anticipated Operational Interruptions

CoreCivic also anticipates that ongoing compliance with the PI order will cause some additional operational disruption. For example, during the upcoming visit to the Facility by the Court-appointed monitor, CoreCivic indicates that it will have to allocate security staff to accompany the monitor (Doc. 143-1, ¶ 18); CoreCivic may need to allocate additional security staff to transport detainees to and from interview rooms if the monitor elects to speak with detainees (*id.*, ¶ 19); the use of space to facilitate those meetings may interrupt other uses of those

rooms (*id*., ¶ 20); and if the monitor elects to meet with health care staff and related administrative staff, those individuals will be unable to complete their duties for the duration of the interviews. (*Id*., ¶ 21.)[4]

Even assuming these asserted harms rise beyond *de minimis* impacts, any associated disruptions could be avoided by bringing additional staff on duty for the brief duration of the monitor's visit.[5] Given the Court's reasoning in the section above, CoreCivic has failed to demonstrate why it is unlikely to be able to recoup the costs of such staffing needs.

### C.      Asserted Due Process Violation

Finally, CoreCivic argues that it suffers ongoing, irreparable constitutional harm because the PI Order imposed upon it obligations to implement policy and procedural changes when it was not a party to the case without due process of law. (Doc. 86 at 26; *see also* Doc. 135 at 28.) In support of this argument, CoreCivic cites *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Though *Monterey Mechanical* reiterates the well-established proposition that a "an alleged constitutional infringement will often alone constitute irreparable harm," *id*., it is otherwise unhelpful to CoreCivic's cause. *Monterey Mechanical* concerned a <u>party</u> that alleged it lost out on a state contract because of unconstitutional discrimination in the bidding process, a form of harm the Ninth Circuit found sufficient to support the imposition of preliminary injunctive relief. *Id*. at 704–705, 715. Nothing in that case supports CoreCivic's assertion that its due process rights were or are being violated by the PI Order.

Moreover, the Court notes that the PI Order does not expressly name CoreCivic and instead enjoins only the actions of Federal Defendants. (*See* Doc. 72.) CoreCivic fails to acknowledge this or discuss caselaw addressing the circumstances in which a nonparty may be

---

[4] CoreCivic also mentions that prior to the PI Order, it "offered female detainees the choice whether to participate in recreation in the indoor gym or the outdoor recreation yard, and they generally preferred to use the indoor gym," but to comply with the PI Order's requirements regarding outdoor recreation it is "no longer offering detainees the option of recreation in the indoor gym." (Doc. 82-1, ¶ 54.) To the extent CoreCivic is suggesting this constitutes irreparable harm, the harm is not to CoreCivic, so will not be considered for purposes of establishing irreparable harm to movant.

[5] Though the availability of visitation rooms cannot be remedied simply by adding staff, again the Court fails to appreciate how the unavailability of those rooms impacts <u>CoreCivic</u> in any material way.

bound by an injunction. *See Consumer Fin. Prot. Bureau v. Howard L., P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (summarizing relevant Ninth Circuit authority by explaining: "An injunction binds a non-party only if it has actual notice, and either abets the enjoined party in violating the injunction or is 'legally identified' with the enjoined party. A finding of legal identity may be based on either the non-party's close affiliation with the enjoined party prior to the injunction, or its status as a successor to the enjoined party after the injunction issued.") (internal citations and quotations omitted). The Court will not manufacture arguments for CoreCivic to support this theory of harm.

Relatedly, CoreCivic argues that the harm it asserts is "compounded by the fact that the preliminary injunction subjects CoreCivic to supervision by an external monitor with unfettered discretion to determine compliance with its overbroad and vague terms." (Doc. 86 at 26.) In a general sense, this appears to be an attempt to import into the irreparable harm analysis a concept that relates to likelihood of success. CoreCivic argues elsewhere that the PI Order violates Federal Rule of Civil Procedure 65 because the Order's "use of undefined and vague terms, such as 'adequate,' 'thorough,' 'timely,' and 'responsive,' grants unfettered discretion to the monitor to subjectively define and enforce" the Order. (Doc. 86 at 23.) Even assuming CoreCivic's Rule 65 argument is correct, the mere presence of uncertainty does not amount to irreparable harm given that procedural mechanisms remain available to obtain clarification.

## V.    CONCLUSION AND ORDER

Because CoreCivic has failed to demonstrate probable or likely irreparable harm, its motion to stay operation of the PI Order pending appeal is **DENIED**.

IT IS SO ORDERED.

Dated:    **May 14, 2026**

_____
UNITED STATES DISTRICT JUDGE