# EXHIBIT A

**REPORT OF THE EXTERNAL MONITOR**
**ON MEDICAL CARE AT CALIFORNIA CITY DETENTION FACILITY**

Submitted by
Muthusamy Anandkumar, MD, MBA, CHCQM, CCHP

Date: July 2026

1

Executive Summary:

This report presents the External Monitor's independent assessment of health care at the California City Detention Facility. As directed by the Court's March 30, 2026, appointment order, it assesses compliance with the February 10 Order and the provision of constitutionally adequate health care and makes recommendations for remedial actions.

The February 10 Order set out eight basic components of a functional health care system:
   a. adequate health care staffing;
   b. comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival;
   c. thorough Initial Appraisals performed timely by a primary care provider;
   d. timely approval and access to medical specialists;
   e. timely and responsive emergency services;
   f. continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to scheduled provider appointments, and consistent provision of medication;
   g. timely access to prescribed medications; and
   h. a responsive "sick call" request system.

Each of these components was assessed, along with related areas of care that bear directly on the adequacy of health care, including chronic disease management, mental health care, dental care, medical care for patients with disabilities and special needs, and infectious disease management.

This is a system-level assessment. Individual records and events were reviewed to understand how care is delivered across the facility, not to make findings about any individual patient's care or any individual staff member's performance. The assessment is based on patient health records, facility documents, an on-site inspection, and interviews with staff and patients, as detailed in the methodology section. Consistent with the appointment order, this report contains no patient identifiers; the individuals interviewed and the medical records reviewed are identified in a separate confidential appendix.

Throughout this process, counsel remained responsive and helpful, including by coordinating document requests, clarifying information, and arranging the on-site visit. During the visit, facility leadership responded constructively to requests. The External Monitor also met with several staff, each of whom appeared to care deeply about their work and the patients they serve. Many appeared to be doing their best with the resources and systems available to them.

This facility houses individuals with serious and complex medical and mental health conditions, including active cancer and acute psychiatric illness. Given the needs of this population, the facility must have a reliable healthcare system capable of identifying patient needs early, continuing treatment initiated before arrival when that treatment is clearly documented in transfer records, responding to requests for care in a timely manner, completing adequate clinical assessments, and providing appropriate treatment.

Based on the review, the facility lacks a reliable system to consistently provide adequate health care, placing individuals at serious risk of both immediate and long-term harm. The clinical documentation reflected a recurring pattern of delayed identification of patient needs, delayed or missed assessments, delayed or inadequate treatment, missed or delayed medication administration, and gaps in follow-up care. This pattern indicates broader problems in the facility's health care delivery system rather than occasional lapses in care.

These concerns appear to be part of broader operational limitations. The facility does not appear to have adequate staffing, stable on-site management, sufficient clinical and operational oversight, or an effective quality assurance process to identify and promptly address care-related problems. These elements are necessary to manage the health care needs of this patient population. Staff did not consistently receive adequate orientation and training, including training on facility policies and procedures and on the use of the electronic medical record. Staff were also pulled from orientation before completing it to cover clinical duties because of staffing shortages. As a result, staff who had not been fully trained were themselves training new staff. Given the number of patients and the seriousness of their medical and mental health needs, these substantial gaps contribute to an unsafe environment.

For each area of clinical service, this report identifies recommendations to address the current gaps in care. It also identifies monitoring metrics that should be reviewed in near real time to determine whether care is provided in a timely and consistent manner and in accordance with established procedures and clinical expectations. These metrics should include a daily shift report, informed by appropriate data, that identifies pending work, overdue tasks, unresolved patient-care issues, and items requiring follow-up by the next shift or facility leadership. Metrics are important because they allow the facility to identify breakdowns as they occur, recognize patterns, take timely corrective action, and identify additional issues that may require attention as these gaps are addressed. Because the facility uses an electronic medical record system, developing reports to track these

metrics should be feasible and should allow leadership to monitor performance more effectively and reduce the risk of patient harm. Although the facility reports monitoring these indicators daily and weekly, it remains unclear why gaps in care persist and how identified issues are escalated, addressed, and resolved.

The parties were provided with the draft report and appendix on July 10, 2026, given 14 days to submit written comments, and the comments received were considered before the report was finalized.

Assessment Methodology:
Health care in a correctional facility should be aligned with sound clinical practice and delivered through a reliable system that identifies, assesses, treats, monitors, and follows up on immediate serious health needs, as well as conditions capable of escalating into a significant risk of harm, pain, or suffering. Healthcare decisions must be made by qualified healthcare professionals based on clinical need and independent professional judgment. Accordingly, the facility must provide or arrange timely access to clinical evaluations, medications, diagnostics, emergency services, specialty referrals, medical accommodations, and continuity of care when clinically indicated. Any modification of, or departure from, generally accepted treatment guidelines must be clinically justified, never based on administrative convenience or custody status alone, and clearly documented in the patient's health record.

The facility was assessed against the eight components ordered by the Court, and the provision of constitutionally adequate health care.

For purposes of this report, each component reviewed is rated as either Compliance or Non-Compliance.

Compliance - a component is rated Compliance when the information reviewed indicates that, for each element of that component, an adequate process appears to be in place; the element appears to be carried out in practice for the patients to whom it applies; and the facility has a reliable way to identify problems and correct them promptly, as generally reflected in the available records, observations, or interviews.

Non-Compliance - a component is rated Non-Compliance when, as to one or more elements, the information reviewed does not adequately demonstrate that an adequate process is in place, does not adequately demonstrate that the element is being carried out in practice for the patients to whom it applies, or does not adequately demonstrate that

4

the facility has a reliable way to identify problems and correct them promptly, as generally reflected in the available records, observations, or interviews.

Electronic Health Record Review:
Read-only access to the electronic health record (EHR) was provided during the review period. A request was made to view the pending worklists in the EHR. The facility did not provide that access, stating that it was unable to do so because viewing the pending work lists would have required a higher level of access than read-only. As an alternative, the facility was asked to display the pending work lists via screen share, and the facility accommodated the request.

Documents:
The Monitor requested a list of documents and data for review. The materials requested are listed below.

1. General information related to the facility and the health care program. (Received).
2. Health care policies and procedures. Include any SOPs and guidelines used by the staff. (Received).
3. Patient lists related to particular diagnoses (include patient identifiers, date of admission, housing location, age, current status - active, released, etc). Detainees enrolled in chronic care clinics: Include the diagnosis or medical conditions; Date enrolled. (Partial information received).
4. Prescriptions: Include the name of the medication; Reason for medication. Including patients on Diabetic meds, BP meds, HIV meds, Cardiac meds, Blood Thinners, transplant meds, prednisone, insulin, warfarin, hydroxyurea, Plavix, methotrexate, biologics, and tumor necrosis factor (TNF) inhibitors, Eliquis, sulfasalazine, steroid inhaler, Epogen, and furosemide. (Partial information received).
5. List of critical lab results in the last 6 months. (Partial information received).
6. Detainees in medical observation/housing - Reason for medical observation/housing, level of care. (Partial information received).
7. Pending orders: Pending Labs; diagnostics; Appointments; Referrals, including the name of the order, date of order, reason for order, and current status of order. (Partial information received).
8. Emergency room visits include reason for visit, mode of transportation, ER visit vs. admission? (Partial information received).

9.  Specialty care visits, and off-site visits and returns; Date of referral, date of visit/Order, name of the specialty or procedure, and current status of the referral/order. This includes all specialty referrals and any orders, such as MRI, CT, etc., that need an off-site visit. (all pending visits plus any completed/canceled/ rescheduled, or closed in the last 6 months). Include the priority level of the request and the reason for the request. (Partial information received).

10. Rosters of health care staff and current schedules, by position. Include filled positions, vacancies, positions/ titles, and vacancies – days open. (Received).

11. The facility's medication/drug formulary and documentation of non-formulary requests and approvals/denials. (Received).

12. List of medications ordered and denied in the last 6 months. (Partial information received).

13. The tool or criteria used to approve or deny referrals to specialists. (Not available).

14. Utilization management logs or other records documenting approval, denials, and deferrals (including alternative treatment plans). Including the reason. (Partial information received).

15. Logs of suicide watch placements, attempted suicides, and self-harm incidents. Include case reviews; all M&Ms; All meeting minutes; and Corrective Action Plans with date of identification, due date, and current status. (Partial information received).

16. Sick call requests and health care grievances/appeals, and the facility's responses, including tablet and paper submissions, for all patients during a 30-day period, and for specific patients, upon the External Monitor's request, when the relevant documents are not in the EHRS. (Partial information received).

17. List of all orders that are not pending and not done (canceled, released, etc. ), including the reason it was not done. Patient ID, Order Name, Priority, Order date, Date of Order closed, canceled, etc. (Not available).

18. Updated/ Current: Budgeted versus actual staffing by position. Current vacancies including the duration of each vacancy. Recent staffing changes, including new hires, resignations, and open postings. (Partial information received).

19. List of all current detainees, including each individual's date and time of arrival at the facility.  (Partial information received).

20. CQI / admin meeting minutes, reports, and data (timeliness, quality, count, etc). (Partial information received).

21. Any updated SOPs, policies, or procedures with their effective dates.  (Received).

22. Updated specialty referral list. (Received).

23. Any additional information the team would like to share, demonstrating recent changes, or improvements. (Not available).

6

Note: For items marked "Partial information received," the responses generally indicated that no existing report or centralized log was available containing all requested data points, and that certain additional information, where available, would need to be derived from individual patient medical records. For items marked "Not available," the responses generally indicated that the requested information was unavailable, was not provided to the Monitor, or that the information provided did not include all components of the requested information. This did not limit the assessment, which was adequately conducted with the available information.
Items 18 – 23 were requested near the close of the draft report to evaluate any recent changes since the last submission.

141 medical records were reviewed. The case list has been provided to counsel for the parties as a confidential appendix to this report.

On-Site Visit
A three-day on-site visit was conducted on May 18, 19, and 20, 2026.
During the site visit, the locations reviewed included:
- Booking area
- Intake health screening area
- Male housing units
- Female housing units
- Restricted housing unit
- Clinic/exam rooms
- Medical supplies
- Dental clinic
- Radiology area
- Laboratory
- Negative pressure rooms
- Medical/observation unit
- Pharmacy
- Clinic area located in the gym
- Space planned for a future clinic
- Kitchen
- Laundry area
- Medication pass room

Interviews:

40 patient interviews, including 11 female patients.

Patients who wished to speak with the Monitor were interviewed, and the facility provided a confidential space for the interviews. The interviews over the three days were conducted in a visitation booth. A more suitable room adjacent to the housing units was available and was briefly used for an interview. I asked whether the remaining interviews could continue in that room; however, the facility directed that they be conducted in the visitation booth. The acoustics in the booth were poor, with a noticeable echo. While the booth may be adequate for brief visits, the interviews lasted several hours, and the setting was not well-suited to interviews of that length.

Remote language interpretation (a language line) was provided for the interviews. The facility made appropriate efforts to support reliable interpretation; however, the connection was poor and disconnected several times during the interviews, resulting in long wait times. This did not appear to stem from the facility's equipment or network, but rather from an issue on the interpretation vendor's side. These interruptions affected the interviews on several occasions; nonetheless, the interviews were completed and sufficient information was gathered to make an adequate assessment. Facility medical staff indicated that difficulties with the interpretation service were a known, recurring issue in their experience.

One patient who had requested to speak with the Monitor was not available during the on-site visit. Following that request, the facility arranged for the patient to be interviewed via virtual meeting after the visit. The interview was initially arranged in a gym room that did not allow for privacy; at that point, it was moved to a separate room. It is unclear whether adequate privacy was maintained during the interview, as a staff member entered the room briefly without notice while the interview was in progress. The interview was completed, and sufficient information was gathered.

The staff were interviewed during the on-site visit. The interviews were conducted privately. Staff were cooperative and responsive, sharing their experiences and answering questions about their work.

The staff members listed below were interviewed. Some individuals represented more than one of the roles identified below because they were formally assigned to multiple roles, were providing temporary coverage, or were sufficiently familiar with the responsibilities of a vacant position to speak on its behalf.

8

- Co-Health Service Administrator (Co-HSA) - this role is shared by two individuals who alternate weekly.
- Infection Control – covered by Co-HSA
- Disability Compliance Coordinator – covered by Co-HSA
- Director of Nursing – covered by Co-HSA since the person is on leave.
- Dental Staff – Dentist
- Dental Staff – Dental Assistant
- Mental Health Staff – Psychologist
- Mental Health Nurse Practitioner
- Sick Call Nurse
- Health Care Liaison from Custody – Asst. Chief of Security
- PREA Coordinator – also the Assistant warden
- Medical Physician – Regional Medical Director
- Off-site/ referral coordinator
- Medication Administration Staff
- Pharmacy Staff
- Transport team
- Grievance Coordinator (Detention Counselor/Acting Grievance Coordinator)
- CQI Coordinator – was represented by Regional Medical Director
- Custody Staff assigned to restrictive housing and mental health units

Assessment:

| Summary | |
|---|---|
| **Components** | **Assessment:** |
| a.  Adequate health care staffing. | Non-compliance |
| b.  Comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival. | Non-compliance |
| c.  Thorough Initial Appraisals performed timely by a primary care provider. | Non-compliance |
| d.  Timely approval and access to medical specialists. | Non-compliance |
| e.  Timely and responsive emergency services. | Non-compliance |
| f.  Continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to the scheduled provider appointments, and consistent provision of medication. | Non-compliance |
| Mental Health Care | Non-compliance |
| Chronic Disease Management | Non-compliance |
| Dental and Oral Care | Non-compliance |
| Medical care for patients with Special Needs and Disabilities | Non-compliance |
| Infectious Disease | Non-compliance |
| g.  Timely access to prescribed medications. | Non-compliance |
| h.  A responsive "sick call" request system. | Non-compliance |

10

a.  Adequate health care staffing.

Adequate staffing is the foundation for safe and effective healthcare delivery. Care should be provided by staff who are properly trained, licensed, and working within the appropriate roles. Having the right staff available helps ensure that health concerns are assessed, prioritized, and addressed in a timely manner. It also supports continuity of care, reduces delays, and promotes consistency and safety across services.

Staffing is adequate when a facility has enough qualified staff and appropriate coverage to meet patients' clinical needs. Adequacy also depends on whether staff are trained in the facility's policies and procedures, supervised and supported in their work, and subject to appropriate performance oversight. In that sense, staffing adequacy is not only about whether the necessary staff are present and qualified, but also whether they are prepared, supported, and monitored in delivering the care patients require.

Staff reported that when the facility opened, it was intended to house individuals in good health and were told that it was staff on that basis. In practice, however, the facility received a large volume of patients, including patients with complex medical conditions, and the medical team was not adequately prepared to manage this population.

Staffing shortages appear to be an ongoing concern. Because of staffing shortages, some staff were moved to clinical duties before finishing orientation, and staff who were not yet fully trained are left training others. To cover areas of greatest need, staff get reassigned from their regular services to priority areas. Staff from other facilities were at times brought in to help address backlogs and delays; however, this appears to have functioned as a short-term measure rather than a sustained staffing solution. Staffing remains a challenge, and the facility is unable to consistently meet patients' clinical needs.

Supervisory coverage also appears limited and inconsistent. Supervisory support is provided on a rotating basis by leaders from other facilities when needed, with no single, consistent supervisor serving as a reliable point of contact for staff. This limits the daily guidance, oversight, and support available to staff in carrying out their duties.

The facility reported receiving regional and corporate level oversight, including support from Regional Medical Director, Regional Health Services Director, and Managing Director for Health Services, all of whom visit the facility regularly and participate in Teams meetings.

11

The frontline medical staff was professional, engaged, and committed to caring for this population. However, staffing shortages, high patient volume, and heavy workloads limited their ability to consistently provide the level of care patients required. Although staff appeared motivated to deliver appropriate care, available staffing did not appear sufficient to meet the clinical demands placed on the facility.

Concerns relating to staff performance and behavior did not consistently appear to be addressed. The limited supervisory structure and ongoing staffing shortages may contribute to this.

The facility reports that background clearances are pending for 25 medical staff members.

Risk of Harm: Inadequate staffing is creating a serious risk of delayed clinical care and increasing the likelihood of preventable harm.

Assessment: Non-compliance

Recommendations:
1. Conduct a staffing analysis right away to determine how many staff are needed and what types of staff are needed to provide timely and adequate care for the current patient population.
2. Continue monitoring the daily pending work queue and adjust staffing assignments based on clinical priority.
3. Provide steady, consistent on-site supervision for each discipline/service. This will help ensure staff are guided, supported, and held accountable.
4. Track timeliness of service for each healthcare program, demand and workload levels, and quality-of-care audit results. Use these measures to determine whether staffing is keeping pace with demand while maintaining quality and safety. Use the results to identify and close staffing gaps.
5. Strengthen the existing daily shift-report process by using reported data to identify pending and overdue tasks, assign responsibility, escalate unresolved items, and adjust staffing assignments to prevent delays in care.
6. Ask staff for input on workload and operational challenges. Include this input when evaluating whether staffing is adequate.
7. Quality Assurance and Performance Improvement (QAPI)
   a. Track actual staffing levels by each shift for each area or service and compare them with the approved written staffing plan.

b. Track and report compliance with the approved staffing plan, with the objective of maintaining at least 90% compliance overall and at least 95% compliance in designated critical and high-risk areas on each shift, while meeting established timeliness, quality, and safety targets.

c. Review staffing compliance by shift and service during leadership meetings, including coverage gaps, interim coverage plans, recruitment efforts, and corrective actions.

d. Maintain a staffing matrix that identifies approved positions, filled positions, vacancies, permanent and temporary staff, vacancy duration, and time to fill each position.

b. <u>Comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival.</u>

Expected Practice: Medical intake screening is important because it is the first opportunity for the medical team to identify a patient's health and accommodation needs upon arrival. It should be completed as early as possible so that acute and chronic health concerns are recognized, care is prioritized, and needed treatment, monitoring, referrals, housing placement, and accommodations can begin without delay. This is especially important because patients may arrive with active symptoms, ongoing treatment plans, or conditions that need immediate attention. When these needs are identified at intake, medications and treatments can be continued, symptomatic patients can be seen promptly, and referrals can be made to the appropriate services, including medical, dental, mental health, or women's health care.

Screening should be done in a setting with enough privacy to protect confidentiality and encourage candid disclosure of health information. A complete intake screening includes asking appropriate health screening questions, reviewing available paperwork, including any transfer summary, and requesting outside medical records when needed. It also includes observations of the individual, such as appearance, behavior, level of consciousness, and any visible signs of injury, trauma, intoxication, or withdrawal. It further covers testing and other assessments, such as tuberculosis testing, pregnancy testing, blood glucose testing, and vital signs. Effective screening identifies serious medical conditions, chronic illnesses, contagious diseases, mental health concerns, suicide risk, substance use or withdrawal, disabilities, medications, allergies, and other important needs.

Prompt and thorough screening also helps safe decision-making. Based on the information gathered, a qualified medical provider can determine the appropriate priority level (degree of clinical urgency based on the presenting symptoms, health condition, and medical needs), make referrals, order follow-up care, initiate treatment when appropriate, and decide whether high-risk patients require ongoing monitoring. Screening also helps determine safe and appropriate housing or accommodations, such as respiratory isolation, suicide watch, ADA-accessible housing, bottom bunk placement, special diets, or other supports needed to protect the patient's health and safety. Screening is adequate when it is comprehensive, properly documented, and performed by a qualified medical provider within 12 hours of a person's arrival, as required by the Order, and when it leads to appropriate follow-up action based on the findings.

Findings:
The intake screening tool used at this facility did not appear to be comprehensive. It did not include the level of detail or the specific questions needed to reliably identify the range of conditions relevant to the patient population. When a screening tool misses these categories, urgent or serious conditions may go unrecognized at intake, delaying necessary care and allowing treatable conditions to worsen. Identifying health care problems at intake is safer and more effective than addressing them later, after the patient may already have experienced deterioration, delayed treatment, or inappropriate housing.

Intake screening was performed by licensed vocational nurses (LVNs) and registered nurses (RNs), depending on availability. Based on the duties described, the receiving screening function appears to extend beyond standardized data collection and may involve clinical judgment requiring a staff member with a broader scope of licensure than an LVN. No medical staff were assigned to or present in the intake area. Instead, the intake custody team notified medical staff when a new arrival required screening, and an available nurse was sent to conduct the screening. The facility reported that a nurse meets incoming detainees at the transport vehicle to conduct an initial screening before entry into the intake area. The Order requires that intake screening be performed by a qualified medical provider.

Review of the transfer document did not appear to be consistently acknowledged in the intake screening record. The medications listed in the transfer document did not match the medications documented in the intake screening, and the discrepancy was not explained. When patients arrived from another facility with active medications or prescriptions, the intake record often did not indicate whether those medications would be continued or, if they were not, the reason for discontinuation. Inconsistent reconciliation of transfer

14

information and medications increases the risk of treatment interruptions or discontinuations, medication errors, and gaps in care for patients with established, ongoing medical needs.

Escalation to a higher level of care did not appear to occur consistently when clinically indicated, and a physician was not consistently contacted when the patient's condition warranted it.

A documented arrival time to the facility for each detainee was requested. The facility provided the "in" time, defined as when staff began the intake process, which is not necessarily the time of arrival. This suggests that a discrete arrival time may not be captured in the facility's records. Because an actual arrival time to the facility was not available, the 12-hour interval from arrival to screening could not be reliably calculated.

The use of interpreter services during intake screening was not consistently documented. It was noted that interpreter services were not used during screening when later documentation indicated that interpreter services were needed during a medical encounter. Conducting intake screening without a needed interpreter, or without documenting the patient's language needs and the interpretation provided, creates a risk that symptoms, history, and urgent concerns will be miscommunicated or missed, leading to inaccurate screening and delayed care for patients with limited English proficiency.

The facility does not appear to have reliable access to interpretation services. During the on-site visit, technical issues were experienced during patient interviews, including several dropped calls and extended waits to obtain an interpreter. Medical staff acknowledged experiencing similar issues when providing patient care. It is possible that these access problems contribute to the inconsistent use of interpreter services during medical encounters.

The current intake screening template contains prefilled information, which makes it difficult to identify the patient's actual responses, including positive findings, from default or pre-populated questions and guiding statements. This creates a risk that significant positive findings will be overlooked by other clinical staff who rely on the screening record to make subsequent clinical decisions. The intake screening documents contained unanswered questions, leaving screenings incomplete and making it difficult to determine whether a condition had been assessed and ruled out, or had not been addressed. Screening items should be documented with a clear response, such as Yes, No, Not Applicable, or Unable to Determine, so that each item is accounted for. Unanswered

15

screening items pose a risk that a relevant condition may not have been evaluated. The screening documentation also does not include a summary of the pertinent findings and the actions taken in response to the findings, making it harder to quickly identify a patient's health care needs and confirm that appropriate follow-up occurred.

Risk of Harm: Inadequate intake screening can result in serious medical problems being missed and can delay or interrupt needed care, increasing the risk that a person's condition worsens or that preventable harm occurs.

Assessment: Non-compliance

Recommendations:
1. Ensure intake screening is performed by a qualified medical provider as required by the Order.
2. Pending screening, individuals should be housed where they can be appropriately observed until a qualified medical provider determines they are clinically stable.
3. Revise the intake screening tool so it is comprehensive and assesses each relevant condition through specific, targeted questions rather than broad or general inquiries, ensuring that all conditions relevant to the patient population are directly addressed and documented.
4. Redesign the screening template so that the patient's actual responses and any positive findings are clearly distinguishable from prefilled information or template information.
5. Require that every screening item be documented with a clear response: Yes, No, Not Applicable, or Unable to Determine, with no items left blank. Details should be included as applicable.
6. Include a summary of the pertinent findings, the assigned priority level, and the actions taken in response to each, including medications, orders, and referrals.
7. Require that all clinical orders resulting from intake be affirmatively entered in the record. An order that does not appear in the record should be understood as an order not entered, rather than assumed to default to a standard outcome.
8. Use interpreter services whenever a patient's language needs indicate, and document the patient's language needs and the interpretation provided, including the language and method of interpretation. Where language needs are uncertain, provide interpretation rather than proceeding without it. Where interpretation is not required, document that determination and the basis for it.
9. Ensure intake screening is conducted in a setting that provides adequate privacy to protect confidentiality and support accurate disclosure.

10. Require reconciliation of the transfer document at intake, including verification of medications against the transfer documents, documentation of any discrepancies, and a clear notation of whether each medication will be continued or, if discontinued, the reason.

11. Establish a clear escalation process so that a physician is contacted when clinically indicated and patients are referred to a higher level of care without delay.

12. Ensure that screening is completed, with appropriate follow-up actions initiated based on the findings, within 12 hours of arrival as required by the Order. Record the discrete arrival time and screening completion time for each patient so timeliness can be measured.

13. Evaluate the current interpretation service and address any issues with quality, wait times, and reliability to ensure medical staff have consistent access when providing patient care.

14. Quality Assurance and Performance Improvement (QAPI)

    a. Establish an ongoing quality improvement process to monitor intake screening for timeliness, completeness, and clinical appropriateness. This process should include at least a monthly review of a representative sample of records, feedback to staff, and corrective action when gaps are identified.

    b. Monitor the timeliness of intake health screening at least every shift, and adjust staffing as needed.

    c. Track individuals who refused intake health screening and confirm that appropriate safety procedures were followed.


c. <u>Thorough Initial Appraisals performed timely by a primary care provider.</u>

Expected Practice: The Initial Appraisal is a comprehensive health assessment completed by a primary care provider, as required by the Order. The primary care provider reviews the patient's medical conditions, completes a comprehensive clinical assessment, and develops a plan for ongoing care. This process also builds on the intake screening by following up on identified needs and further evaluating the patient's overall health. This includes reviewing the patient's medical history and any records received from other providers or facilities, clarifying incomplete or unclear information, examining the patient, and ordering any necessary tests. Based on this evaluation, the provider determines the treatment plan.

In most cases, the Initial Appraisal is the patient's first encounter with a primary care provider. Its timeliness and comprehensiveness are therefore especially important. When the initial appraisal is not conducted promptly or thoroughly, conditions

17

identified at intake may go without primary care provider evaluation, increasing the risk that urgent or serious conditions go unaddressed.

Findings:

The Initial Appraisal process did not appear to consistently prioritize patients according to the urgency of their clinical needs. In the medical records reviewed, health concerns identified during intake screening were not always addressed during the Initial Appraisal. Findings noted at intake were also not always followed up, further evaluated, or included in the treatment plan.

When important treatment decisions were needed, patients did not always receive additional evaluation by the provider in a timely manner. Laboratory results were not always reviewed to guide clinical care, and treatment decisions were not always based on available information, including vital signs and blood glucose readings.

As a result, the Initial Appraisal did not always provide the level of evaluation needed to guide safe and timely treatment. This created a risk that patients with conditions requiring prompt provider review could have unmet needs, receive delayed treatment, or receive no treatment.

A complete Initial Appraisal includes several parts. When these parts are missing, the evaluation is incomplete, and the record does not show that the patient was fully assessed.

Medical history is the record of the patient's past and current health. It should include the relevant details, both the problems the patient has and the related problems they do not have (pertinent positive and negative findings), because these details help with appropriate diagnosis and treatment. In the records reviewed, the history frequently lacked this level of detail. This creates a risk that important background information was not considered when making treatment decisions.

A Review of Systems is a structured set of questions that covers each body system, such as the heart, lungs, abdomen, and nervous system, to identify symptoms the patient may not have mentioned on their own. It is done because patients do not always report every problem, and asking about each area helps catch issues that would otherwise be missed. In the records reviewed, this review was frequently not documented. As a result, there is a risk that significant symptoms went unidentified.

18

The physical examination during the health appraisal should be comprehensive. In the records reviewed, although the examination template included headers for each body system, the findings under those systems were often documented only as "WNL" which generally means "within normal limits" rather than the specific findings expected for each system, such as lungs clear, abdomen soft, bowel sounds heard, and alert and oriented. For each system examined, the documentation should record the actual clinical findings rather than a general notation. Recording each system as "WNL" alone does not establish a baseline. Without specific findings, the record does not show what was actually examined, and there is no baseline for comparing the patient's condition at future visits. When a patient reports a specific problem, the provider is expected to examine the involved body part. This is the most basic step in evaluating a medical complaint. In some records, no examination was documented for the area related to the patient's reported symptom. This creates a risk that the very problem the patient came in with was not properly evaluated.

Based on the history, Review of Systems, and physical examination, the medical provider should document a clinical assessment of the patient's conditions, assign a priority level, and establish a treatment plan for each condition. Depending on the patient's condition, a complete plan may include, but is not limited to, additional testing or diagnostic workup, specialist referrals, continuation, addition, or adjustment of medications, orders for special needs such as diet or accommodations, an updated problem list, a follow-up plan based on the patient's clinical condition, interim monitoring such as vital signs, weight checks, or wound care, treatment goals for each condition, patient education provided, and the priority level assigned to each order.

In the records reviewed, these elements were not consistently documented by the providers. Without a documented assessment, priority level, and management plan, the initial appraisal does not provide clear direction for the patient's care. This creates a risk that necessary tests, referrals, medication continuation or changes, and follow-up may not be ordered or carried out, and that identified conditions may not be treated.

Risk of Harm: An incomplete or delayed initial appraisal creates a serious risk that patients' conditions are not fully evaluated, that conditions identified at intake go unaddressed, and that necessary treatment and follow-up are not ordered. This increases the risk of clinical deterioration and preventable harm.

Assessment: Non-compliance

19

Recommendations:

1. Ensure that Initial Appraisals are performed by a primary care provider, as required by the Order.
2. Complete the Initial Appraisal in a timely manner after arrival, prioritized according to the urgency of the patient's clinical condition, so that patients with more urgent conditions are evaluated first.
3. Ensure the Initial Appraisal follows up on and addresses the conditions and findings identified during intake screening, including review of available records from other providers or facilities and clarification of any incomplete information.
4. Request outside medical records when clinically indicated.
5. Ensure the Initial appraisal includes a complete clinical evaluation, with a documented medical history with pertinent positive and negative findings, a Review of Systems, and a physical examination of each system, including the area related to any reported symptom.
6. Require that physical examination findings be documented with the specific findings for each system, rather than recorded only as "WNL," so that the examination is verifiable and establishes a clinical baseline.
7. Require that each item in the Initial Appraisal be documented with a clear, affirmative response, with no fields left blank, and that clinical determinations and orders resulting from the appraisal be affirmatively documented.
8. Require that each Initial Appraisal include a documented clinical assessment of the patient's conditions, an assigned level of priority, and a management plan for each condition, addressing diagnostic testing, referrals, continuation or change of medications, special needs and accommodations, an updated problem list, follow-up, and any interim monitoring indicated.
9. Use available clinical data, including laboratory results, vital signs, and other monitoring data, to inform the assessment and treatment plan.
10. Quality Assurance and Performance Improvement (QAPI)
    a. Establish an ongoing quality improvement process to monitor Initial Appraisals for timeliness, completeness, and clinical appropriateness, including at least a monthly review of a representative sample of records, feedback to providers, and corrective action when gaps are identified.
    b. Monitor daily to confirm that Initial Appraisals for patients identified as urgent or high priority are completed without delay.

d.  <u>Timely approval and access to medical specialists.</u>

Expected Practice: Access to specialist care is necessary when a patient's condition requires evaluation or treatment that cannot be provided on-site, such as cardiology, nephrology, orthopedics, oncology, or obstetric care.

According to staff, the referral process involves several steps. A provider identifies the need for a specialty evaluation and submits the referral. The referral is then reviewed and approved by the assigned physician and requires administrative approval from ICE. After approval, the scheduler contacts the specialty clinic to request an appointment. The appointment is scheduled based on the clinic's availability and the urgency level of the referral. As the appointment date approaches, the transport team is notified and arranges transport for the patient to attend the specialty visit. Immediately after the patient returns from the provider visit, the on-site medical staff review the specialist's recommendations, notify the on-site provider as applicable, and incorporate them into the patient's care plan. The onsite provider can agree with the recommended care and order it or document a clinical reason for not following the specialist's recommendations.

Findings:

Based on the assessment, issues were noted in most steps of the referral process. There were delays in referring patients to specialists when a referral was clinically indicated. When referrals were ordered, the correct priority level was not consistently assigned, and in some records, no priority was noted. The absence of a noted priority should not be interpreted as a routine designation. Based on the observations, the "ASAP" designation appeared to be used in two ways. In some cases, it reflected an urgent clinical referral. In other cases, it appeared to be applied to referrals that had already been delayed, in order to move them forward and make up for the earlier delay.

Clinical approval of referrals is performed by the Regional Medical Director, who notifies the referring provider of the reason for denial and recommends alternatives. This communication occurs outside the medical record and is not documented in the patient's chart. As a result, the clinical basis for the denial and the recommended alternatives are not available to other staff involved in the patient's care. The administrative denials are also not documented in the medical record.

Several referrals had an order status of "Hold" or "Need Information," and some requests had a "to be done date" that had passed and were still in the queue. The clear reason for the delay is not documented. Without a documented reason, leadership cannot determine why a referral has stalled, what is needed to move it forward, or whether the delay is

21

clinically appropriate, creating a risk that needed specialty care is delayed without explanation or resolution.

The facility reported that the status of a specialist referral must be determined by reviewing the individual patient's chart. This includes whether the appointment was completed, canceled, rescheduled, or closed due to the patient's release or transfer. Although chart review may provide this information for an individual patient, it does not give on-site clinical and administrative leaders a practical way to monitor referral status across the patient population. It also means the referring provider would have to track each referral they request individually, which is not a reliable way to ensure referrals are completed.

Information about the status of specialty referrals is important to both clinical and administrative leadership. Clinical leaders need to know referral status to ensure that patients receive medically necessary specialty care in a timely manner. This information also allows clinical leaders to consider alternative care options, escalate a referral, or send a patient to the hospital based on the patient's condition. Administrative leaders need information to manage the operational steps involved in completing referrals, including scheduling, transportation, custody coordination, availability of outside appointments, and follow-up.

A tracking mechanism used to oversee the referral process should clearly identify which referrals are active and pending, which have been completed, canceled, rescheduled, or closed, and which are no longer applicable because the patient was released or transferred. Without this information readily available, leadership cannot easily determine whether referrals are moving through the process on time, where delays are occurring, whether operational barriers are affecting access, or whether follow-up action is needed.

The tracking log showed several missed visits. The specific reason was not noted. These cancellations and missed appointments were not consistently communicated to the treating provider. Because there is already a long wait to obtain specialty appointments, a missed appointment further delays the patient's specialty evaluation. This creates a risk that patients wait extended periods for needed care, that their conditions are not reassessed when an appointment is missed, and that time-sensitive problems go unaddressed.

When patients return from specialty visits, the specialist's paperwork is not consistently provided to the facility. When the paperwork is not received or is incomplete, the medical staff do not consistently contact the specialty clinic to obtain it. In addition, the notes

22

written by nursing staff and providers do not consistently acknowledge the specialist's assessment and treatment recommendations, including any medications. This creates a risk that specialist recommendations are not carried out and that prescribed treatments and medications are not implemented.

The following was noted during the site visit. The facility did not appear to have a reliable fax machine. Documents printed and faxed to the off-site provider requesting information were illegible due to poor print quality. In one instance, a fax indicated that 26 pages were sent, but the facility did not receive all 26 pages. The missing pages were not immediately requested for retransmission, resulting in a delay in patient care. Requests for information and communication with off-site providers and health care entities should be reliable and include a dependable follow-up and reconciliation process.

A patient who uses a wheelchair reported being injured during transport to an outside facility for medical care on two separate occasions. Facility staff acknowledged the reported incidents and stated that the patient was taken for further medical assessment after each incident.

Risk of Harm: Delays and breakdowns in the specialty referral process create a serious risk that patients with serious or progressing conditions do not receive timely, necessary specialty evaluation and treatment, so that conditions may go undiagnosed or untreated, prescribed treatment and medications may not be started or continued, and patients may experience avoidable complications and clinical deterioration.

Assessment: Non-compliance

Recommendations:
1. Assign each specialty referral a priority based on the patient's clinical urgency. A referral with no priority noted should not be treated as routine.
2. Maintain a single reliable queue in the system for the pending approval worklist that the clinical approver can use, and make sure all referrals are routed to the correct worklist.
3. Review and approve referrals promptly, with decisions made by a qualified clinician.
4. Document the current status of each specialty referral in the patient's medical record, including whether it is pending, approved, scheduled, completed, canceled, rescheduled, or closed. Update the record as the status changes, noting the date of each change and any corresponding details.

5. Document the reason for any denial or deferral, and any recommended alternative, in the patient's chart. The treating provider should acknowledge the decision and document a modified treatment plan or discuss the case with clinical leadership to support the referral.

6. Schedulers should notify clinical leadership or the ordering provider of any delay in approval or denied referrals and document in the medical record.

7. Establish a reliable way for clinical and administrative leaders to track referral status by priority level across all patients.

8. Notify clinical leadership and document in the medical record when an appointment cannot be scheduled promptly so that other options can be considered.

9. Notify the treating provider when an appointment is canceled or missed so that care can be adjusted and the visit rescheduled.

10. All patients should be seen on return by the clinical staff.

11. Obtain the specialist's discharge paperwork, including the evaluation, treatment plan, and recommendations, after each visit and contact the clinic immediately if it is missing or incomplete.

12. The provider should review and acknowledge each of the specialist's recommendations and either implement them or document a clinical reason for not following them, including an alternative treatment plan.

13. The facility should ensure that patients are transported with appropriate safety measures and assistance based on their clinical condition, mobility status, and level of need, to reduce the risk of preventable injury during transport.

14. Ensure records sent to and received from off-site providers or entities are transmitted reliably and legibly, confirm all pages are received, and reconcile any incomplete transmissions, with follow-up documented.

15. Quality Assurance and Performance Improvement (QAPI)
    a. Monitor the referral process daily using defined metrics, reviewing referrals for delays, missed appointments, and follow-up, and taking corrective action when gaps are identified.
    b. Review performance metrics monthly, including time to clinical and administrative approval; reasons for clinical and administrative denials; the quality of provider referrals; time from referral request to appointment date, by priority level; reasons for missed or canceled appointments; and an audit of nurse and provider notes for clinical documentation and acknowledgment of specialist recommendations.

24

e.  Timely and responsive emergency services.

Expected Practice: A medical emergency is any acute illness, injury, or sudden change in a patient's condition that cannot be safely deferred until the next scheduled sick call or clinic visit. Some emergencies are immediately life-threatening, such as cardiac arrest, overdose, seizures, or attempted suicide. Others may involve a patient who could worsen quickly without prompt care, such as chest pain, very high or low blood glucose, or blood pressure, or increasing difficulty breathing.

Timely and responsive emergency services enable the facility to quickly recognize an acute condition, assess the patient, notify the provider when clinically indicated, complete necessary testing, initiate treatment, and determine the appropriate level of care. This capability should be available at all times. If the provider is on-site, they should evaluate the patient when clinically indicated.

Depending on the patient's condition, staff should either transfer the patient to the hospital using a mode of transport appropriate to the clinical situation or continue on-site monitoring until the patient is stable and cleared. Treatment and monitoring should continue until care is safely handed off to the next clinical team. Reliable acute care services help prevent avoidable deaths, serious complications, and lasting harm.

Findings:
The facility has clinical staff on site 24 hours a day and a provider on call. When a medical or mental health emergency occurs, the on-site medical team is notified and responds.

Medical record review identified several gaps in the emergency care provided. Where care is not documented in the health record, it cannot be confirmed that it occurred. Medical staff do not consistently complete the detailed assessment appropriate to the patient's condition. Providers are not always notified when clinically indicated. Documentation does not consistently show what care was provided while a patient was awaiting hospital transport. The mode of transport and clinical rationale, particularly when non-clinical transport is used, are not clearly documented.

When patients with acute medical conditions are managed on site rather than transferred to a higher level of care, they require timely reassessments to confirm that their condition is improving with treatment. Medical records do not consistently show follow-up reassessments continuing until the patient is stable.

25

Gaps in timely emergency care create a risk of delayed diagnosis, delayed treatment, and clinical deterioration. Serious conditions may be missed or undertreated when patients managed on site do not receive a detailed assessment, clinically indicated provider notification, treatment while awaiting transport, and reassessment. When the mode of transport and clinical rationale are not clearly documented, there is also a risk that patients may be transported in a manner that does not match their acuity, delaying access to emergency-level care. The facility's considerable distance from the nearest hospital further heightens this risk. A long transport time means a patient sent in non-clinical transport may deteriorate en route without medical monitoring, equipment, or the ability to intervene. It also places the non-clinical transport staff in the position of managing a medical situation they are not trained or equipped to handle. For these reasons, matching the mode of transport to the patient's clinical acuity and documenting that decision is especially important at this facility.

When patients leave the facility or return from an outside visit, they are being brought to the medical clinic for nursing evaluation. This is good practice. This step matters because the on-site medical team should review the hospital records to understand the diagnosis, the treatment provided, discharge instructions, medication changes, and follow-up recommendations. These recommendations should then be implemented and documented in the patient's medical record which is not consistently done.

Medical record review does not consistently show that hospital records were received, reviewed, and acknowledged by the medical team. When hospital records are missing, incomplete, or unclear, the medical team should contact the hospital to request the necessary records or additional information. Gaps in reviewing and acting on hospital recommendations increase the risk of missed diagnoses, medication errors, delayed follow-up, clinical deterioration, avoidable hospital readmissions, and preventable harm.

The facility did not appear to have a reliable process for managing withdrawal. Withdrawal monitoring was not consistently documented, and the possibility of withdrawal did not appear to have been considered when acute symptoms were assessed.

The facility has a medical observation unit within the medical clinic, which is used to house patients with acute medical and mental health conditions. When beds in the medical observation unit are not available, these patients are placed in a restricted housing unit rather than transferred to a facility that can provide the needed level of care. Using restricted housing as medical overflow housing is not appropriate.

26

Patients with acute symptoms may also submit a sick call request to notify medical staff of urgent concerns, such as vomiting, abdominal pain, shortness of breath, chest pain, dizziness, or other symptoms that may require prompt evaluation. This is assessed under sick call.

Risk of Harm: Gaps in emergency care create a serious risk that acute conditions may go unrecognized or untreated. Incomplete assessments, missed provider notification, transport that does not match a patient's acuity, and failure to act on hospital recommendations can lead to patient deterioration and preventable harm.

Assessment: Non-compliance

Recommendations:
1. Complete a full assessment for every patient with an emergency or acute condition. The assessment should be appropriate to the patient's symptoms and level of acuity and documented in the health record.
2. Notify the provider whenever clinically indicated. If a provider is on site, the provider should evaluate the patient when clinically indicated.
3. The patient's condition, treatment plan, and follow-up and reassessment plan should be clearly documented.
4. For patients managed on site rather than transferred to a higher level of care, reassess them at appropriate intervals until they are stable and cleared. Each reassessment should be documented.
5. Document all care provided while the patient is awaiting transport to the hospital, including monitoring, treatment, changes in condition, and communication with the receiving facility or transport team.
6. The mode of transport decision and clinical rationale should be documented.
7. When a patient returns from the hospital, obtain and review the hospital records, including the diagnosis, treatment provided, discharge instructions, medication changes, and follow-up recommendations. These instructions should be implemented and documented in the patient's health record.
8. If hospital records are missing, incomplete, or unclear, contact the hospital promptly to request the necessary records or clarification.
9. When a patient returns from the hospital, the provider should review and acknowledge each of the hospital's recommendations and either implement them or document a clinical reason for not following them, including an alternative treatment plan.

27

10. The facility should ensure that patients are transported with appropriate safety measures and assistance based on their clinical condition, mobility status, and level of need, to reduce the risk of preventable injury during transport.
11. Promptly verify any reported enrollment in a medication for opioid use disorder (MOUD) program and consider the patient for continuation of the medication.
12. Place patients at risk of withdrawal on a monitored withdrawal management protocol, with provider evaluation and a documented treatment plan.
13. Patients with acute medical or mental health conditions should be housed in the medical observation unit, where appropriate monitoring and care can be provided. Nonmedical housing units, including restricted housing, should not be used as substitutes for designated medical beds, as this may compromise patient safety.
14. Quality Assurance and Performance Improvement (QAPI)
    a. Review all emergency events daily.
    b. Establish an ongoing quality improvement process to monitor emergency care for timeliness, completeness, and clinical appropriateness. At a minimum, the process should include a monthly review of a representative sample of emergency events, including both patients managed on-site and those transferred to the hospital. Findings should be shared with staff, and corrective action should be taken when gaps are identified. The review should assess time to assessment, completeness of the clinical assessment and documentation, provider notification when clinically indicated, appropriateness of the transport mode based on the patient's condition, reassessment of patients managed on site until stable, and review and implementation of hospital recommendations after the patient returns.

f. <u>Continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to the scheduled provider appointments, and consistent provision of medication.</u>
Assessment: Non-compliance

For purposes of this report, the clinical service areas discussed below are evaluated both within component (f) and as part of the broader assessment of adequate health care.

<u>Mental Health Care</u>

Expected Practice: Qualified mental health professionals should provide all mental health services. Mental health care begins with screening at intake to detect mental health

problems, followed by referral, diagnosis, and treatment. The level of care should match the patient's acuity.

Patients with stable or chronic mental health conditions should receive ongoing treatment, continuation of psychotropic medications without interruption, an individualized treatment plan, medication management and counseling as appropriate, and scheduled follow-up. Records from community providers should be obtained when needed. When symptoms worsen, the patient should be reassessed promptly, with closer monitoring, medication adjustment, and more frequent follow-up, to stabilize the patient and prevent psychiatric decompensation.

Patients in acute crisis, such as acute psychosis or acute suicidal or homicidal ideation, require immediate crisis intervention and management of acute psychiatric symptoms. If the facility manages the patient on-site, the patient should be placed in a safe setting with monitoring appropriate to their risk, up to constant observation, receive crisis intervention and psychotropic medication when indicated, and be seen frequently by a qualified mental health professional until stabilized.

When a patient's psychiatric needs exceed the treatment capacity of the facility, the patient should be referred and admitted to a licensed mental health facility in a timely manner. While the patient waits, they should be safely housed, monitored, and treated, with both ongoing care and transfer efforts documented.

Across all levels, mental health services should include psychotropic medication management when indicated, individual counseling, group counseling, and psychosocial or psychoeducational programs. All care should be documented, with follow-up to confirm the treatment is working. Mental health, medical, and substance use care should be coordinated so that conditions that affect one another are managed together.

Findings:
This facility houses patients with serious mental health conditions. Based on the assessment, the facility lacks the resources to provide adequate mental health care. Staffing shortages make even basic mental health care difficult to deliver. The workload stretches mental health staff and they are often unable to complete adequate assessments or to develop and implement individualized treatment plans.

Based on the assessment, the facility's mental health resources did not appear sufficient for the acuity of its population, including patients with serious mental health conditions. In

29

the records reviewed, assessments were often incomplete, and individualized treatment plans were frequently not developed or implemented. These gaps appeared to reflect limited mental health staffing relative to the number and severity of patients requiring care.

Patients with serious psychiatric conditions are held in single cells on constant observation by custody staff. The health care team appeared to have difficulty managing these patients on-site due to the severity of their conditions.

Patients whose psychiatric needs exceed what the facility can safely manage should be referred to and admitted to inpatient psychiatric care in a timely manner. Instead, these patients remain at the facility without transfer. When such a patient deteriorates and is sent to the local hospital, they are treated and returned to this facility, often with little lasting improvement, and continue to require a level of care the facility is not equipped to provide.

Managing serious or acute psychiatric conditions requires a psychiatrist's expertise. The on-site nurse practitioner handles mental health care, and a psychiatrist is available virtually. For patients who are seriously or acutely ill, virtual visits alone may be insufficient, and assessment becomes more difficult when a patient cannot be brought out of the cell because of the severity of their condition.

During patient interviews, several individuals reported experiencing anxiety and depressive symptoms related to their circumstances and the stress of their situation. They also reported that they were not receiving adequate mental health support at the facility.

Risk of Harm: Gaps in mental health care create a serious risk that patients with acute or serious psychiatric conditions go without timely, adequate treatment. Incomplete assessments, missing treatment plans, and delayed referral to a higher level of care leave these patients at risk of psychiatric decompensation, prolonged suffering, and preventable deterioration.

Assessment: Non-compliance

Recommendations:
1. Evaluate and optimize mental health staffing against the population's size and acuity.
2. Ensure each patient receives a detailed and timely mental health assessment, with follow-up at a frequency based on their condition.

3. Provide in-person psychiatric evaluation for patients with severe or acute mental illness.
4. Refer patients whose needs exceed the facility's capacity to inpatient psychiatric care in a timely manner.
5. Patients held in single cells under observation should receive periodic, substantive mental health assessments that evaluate and document their mental status and needs, not just a checkbox entry on the observation flow sheet.
6. Develop an individualized treatment plan for every patient with a mental health need. Each patient should be seen at a frequency based on clinical acuity, and the treatment plan should be updated as clinically indicated.
7. Ensure individual counseling and group or psychoeducational programming when indicated.
8. Conduct multidisciplinary rounds to discuss complex cases.
9. Continue psychotropic medications without interruption, review them at each encounter, and document response and side effects.
10. Obtain records from community mental health providers when relevant, as a standard practice. For each patient, document the disposition of community records: obtained, requested, and pending, not needed, or no outside provider. Establish a process to track each request for information through to completion.
11. Quality Assurance and Performance Improvement (QAPI)
    a. Track the timeliness of mental health assessments, follow-up visits, and psychiatric evaluations by acuity, including urgent requests.
    b. Audit documentation quality for detailed assessments and individualized treatment plans.
    c. Audit that individual counseling and group or psychoeducational programming are delivered when indicated.
    d. Audit psychotropic medication continuity, with documented response and side effects.
    e. Monitor the use of emergency psychotropic medication and any clinically ordered restraint or seclusion.
    f. Audit that community mental health records requests are tracked through to completion.
    g. Review psychiatric adverse events and act on the findings.
    h. Measure the effectiveness of care using outcome measures.

<u>Chronic Disease Management</u>

Expected Practice: Chronic diseases are long-term conditions that require ongoing care, such as diabetes, high blood pressure, heart disease, high cholesterol, asthma or COPD, seizure disorders, HIV, and hepatitis. Chronic disease management includes identifying patients with these conditions, conducting an initial assessment to develop a patient-specific treatment plan based on evidence-based clinical guidelines, and providing periodic assessments, monitoring, patient education, and follow-up to bring the condition under control, maintain that disease control over time, and prevent complications.

Patients with chronic conditions should be identified at intake or as soon as the condition is diagnosed. A patient who reports or exhibits signs of a chronic condition during intake screening should be promptly evaluated by a licensed healthcare practitioner. Each condition should be listed on the patient's problem list so any clinician providing care is aware of the condition and the current established treatment plan. Each patient should be enrolled in the chronic care program and have an individualized treatment plan developed by a provider at the initial chronic care visit and updated as the patient's condition changes.

Patients should be seen in regularly scheduled chronic care visits. The provider should set the frequency of the follow-up visits based on how well the condition is controlled. A patient with poorly controlled disease should be seen more often, and the interval can be extended once control is achieved. At each visit, the provider should assess the degree of control, document the patient's status, such as stable, improving, or deteriorating, order the monitoring tests appropriate to the condition, and adjust treatment when the condition is not at goal.

Chronic diseases should be managed proactively, not only when the patient complains of symptoms. Most conditions cause few or no symptoms until late. When inadequately managed or untreated, these conditions lead to higher rates of complications, emergency send-outs, hospitalization, and death.

Findings:
Patients with chronic disease were not clearly identified at intake and were not consistently referred to the medical provider for timely evaluation. Patients who arrive with chronic disease medications did not consistently have those medications continued. The problem list did not consistently reflect the patient's chronic conditions.

When a provider evaluated a patient with multiple chronic conditions, the encounter was documented in several separate notes, because the provider templates in use were specific to individual disease types. As a result, the provider documented the same encounter multiple times, once under each applicable template. Even when reviewed individually or together, the notes did not provide a complete assessment or address all relevant aspects of the patient's chronic disease evaluation. According to the medical director, a new comprehensive template is being developed so that a single note can capture the full encounter.

A complete chronic care evaluation requires the provider to review all relevant clinical information before making treatment decisions. At each encounter, the provider should review the patient's active medications and medication adherence, pending lab orders, unaddressed test results, relevant vital sign trends, specialist referrals, recent medical encounters, and any outstanding sick call requests related to the chronic condition. Reviewing this information together allows the provider to make an informed clinical decision and develop an appropriate treatment plan. Based on the records reviewed, this comprehensive review was not done.

Patients with foot or nail conditions do not have reliable access to clinically indicated podiatry care. During the review, markedly overgrown toenails and poor foot and nail condition were observed, raising concern that needed care had not been provided in a timely manner. For patients with diabetes or other infection risks, untreated foot and nail problems can lead to ulcers, serious infection, or amputation. Patients should receive timely foot and nail care, including referral to podiatry when clinically indicated.

The worklists in the electronic medical record system are used to pull patient lists with open medical orders, appointment requests, and off-site referrals, and they must be reviewed, prioritized, and actively monitored through completion. However, orders for patients who had already been released were not cleared from the worklists, making them unreliable. In addition, there is inadequate oversight to ensure that medical orders and appointments are completed in a timely manner.

Risk of Harm: Without reliable identification of chronic conditions, continuation of necessary medications, an accurate problem list, and a complete review at each visit, chronic diseases may go untreated or remain poorly controlled. These conditions can worsen silently over time and lead to serious complications, emergencies, hospitalization, or death.

Assessment: Non-compliance

Recommendations:
1. Identify patients with chronic disease upon arrival and have them seen by a provider in a timely manner.
2. Continue chronic disease medications on arrival without interruption.
3. List each chronic condition on the patient's problem list and keep it current.
4. Enroll each patient with a chronic condition in the chronic care program with an individualized treatment plan based on evidence-based clinical guidelines.
5. At each chronic care visit, the provider should review the patient's active medications, assess medication adherence, review pending labs, unaddressed test results, evaluate relevant vital sign trends and blood glucose levels when applicable, review specialist referrals, recent medical encounters and emergencies, and address any outstanding sick call requests related to the condition.
6. The individualized treatment plan should capture all key aspects of the patient's plan of care, including the diagnosis, degree of control, medication regimen, monitoring plan, diet and lifestyle guidance, patient education, needed referrals, and follow-up interval based on the patient's condition and disease control. Document a clinical justification for any deviation from the treatment guideline.
7. Provide timely foot and nail care for patients with chronic conditions, including referral to podiatry when clinically indicated.
8. Maintain a reliable worklist to track all open orders and referrals. Assign priorities and establish a process to review and monitor pending items daily to ensure timely completion.
9. Quality Assurance and Performance Improvement (QAPI)
    a. Track the time from the identification of a chronic condition to the initial chronic care visit.
    b. Review all pending appointment requests daily to ensure initial and follow-up visits occur on time, based on the level of urgency.
    c. Audit chronic care documentation at least monthly using a standardized tool to confirm that each evaluation is complete, aligns with applicable clinical practice guidelines, and addresses all required elements of the patient's chronic disease management plan. Provide feedback to staff based on audit findings.
    d. Track the timely completion of all medical orders, appointments, and referrals. Document and monitor the appropriate and specific reasons for any delays, cancellations, or rescheduling.

34

<u>Dental and Oral Care</u>

Expected Practice: Dental and oral care includes the prevention, examination, and treatment of dental and oral health problems. This includes urgent concerns such as toothache, infection, and trauma, as well as routine and preventive dental care.

Oral care should be provided under the direction of a licensed dentist. Every patient should receive an oral screening performed by a dentist or by a health professional trained by a dentist. Urgent conditions, including pain, trauma, or acute infection, should have immediate access to treatment.

Findings:
At this facility, dental care is available Monday through Friday during the day shift, with on-call availability for emergencies. Dental staffing consists of one dentist and two dental technicians. There is no dental hygienist. The dental clinic has three dental chairs. On-site dental services include cleaning, simple extractions, and restorations. Dental X-rays are digital. The autoclave maintenance log, monthly waterline log, spores test, and sharps count log were reviewed during the site visit.

While the dental program has good on-site capability, access to acute dental care depends on the health care request process. Patients request dental care by submitting a sick call request, the same process used for medical and mental health concerns. Patients reporting dental pain or signs of infection should be assessed by a nurse using established dental nursing guidelines. Based on that assessment, the nurse should contact a provider when pain medication or antibiotics may be clinically indicated and should prioritize the patient for evaluation by the dentist. This allows treatment to begin when appropriate while the patient waits for the dentist, helping reduce the risk of worsening pain, spreading infection, or other complications. Because the request process and nursing assessments appeared unreliable, dental concerns may not be identified or addressed in a timely manner, and patients with dental pain, infection, or other urgent needs may go untreated.

Risk of harm: When dental pain or infection is not identified and treated promptly, a manageable condition such as toothache or early infection can progress to severe pain, spreading or systemic infection, difficulty eating, and complications for other medical conditions.

Assessment: Non-compliance

35

Recommendations:
1. Address dental-related requests in a timely manner.
2. Assess patients reporting dental pain or infection using established dental nursing guidelines, contact the provider for pain medication or antibiotics when clinically indicated, and prioritize the patient to be seen by the dentist.
3. Quality Assurance and Performance Improvement (QAPI)
   a. Track the timeliness of oral screenings, dentist examinations, and urgent dental care.
   b. Audit that dental-related requests are triaged and addressed in a timely manner.
   c. Audit the documentation of dental nursing assessments and dentist treatment plans, using standardized tools, and provide feedback to staff.
   d. Track dental procedures by type, such as cleanings, restorations, extractions, and root canals.

<u>Medical care for patients with Special Needs and Disabilities</u>

Expected Practice: Special needs and Disabilities include physical, sensory, cognitive, or mental impairments that substantially limit major life activities. This covers patients with mobility, vision, hearing, speech, intellectual, developmental, serious mental health, chronic, complex, or convalescent conditions that require additional support. The facility must identify these patients, provide needed medical care, and provide reasonable accommodations.

Patients should be identified as early as possible, using specific intake questions designed to reliably identify disabilities and special needs, along with recognition of obvious impairments, especially those affecting mobility, communication, vision, hearing, or self-care. Once identified, the patient should receive an assessment by the provider and an individualized treatment plan addressing each condition. The facility should provide reasonable accommodations, modifications, and auxiliary aids or services in a timely manner so the patient can access healthcare, programs, services, and activities, and should provide an appropriate interim accommodation when a needed item is not readily available.

Communication with patients who have vision, hearing, speech, or sensory impairments must be effective, using aids or services such as sign language interpreters, written materials, or assistive devices. Other detainees should not be used to interpret except in an emergency.

36

Patients with disabilities should be housed in a safe, accessible, and integrated setting appropriate to their needs, with access to accessible toilets, showers, and telephones. They should generally be allowed to keep medically necessary assistive devices such as canes, crutches, walkers, wheelchairs, hearing aids, eyeglasses, CPAP machines, or prostheses. Disability alone should not be the basis for restrictive housing.

The facility should designate a staff member responsible for disability accommodations and use an interactive process involving healthcare and other appropriate staff, especially for complex needs or when a requested accommodation is denied.

Findings:
This facility houses patients with disabilities and special needs. Based on the assessment, several gaps were noted in how these patients are identified, tracked, and supported.

The intake health screening was not detailed enough to reliably identify all patients with disabilities or special needs. When a patient is identified, a clear action plan is not consistently documented, and the provider's evaluation and treatment plan does not adequately address the patient's special needs. The facility had no reliable way to track patients with special needs across the population. When durable medical equipment or medical supplies were provided, the record did not consistently document that the items were given to the patient, and there was no periodic check to confirm the patient still had them and could use them. No staff member was assigned to coordinate and monitor the care of these patients.

Restrictive housing is used to house patients with special needs, without clear documentation of the individualized justification for the placement.

Inspection of the housing units showed that the facility has accessible toilets and showers. Patients reported that the shower water temperature was extremely hot, which appeared to be a known issue.

A patient with a disability reported that after showering, he was left in the shower area for a long time because no one escorted him back to his room. Patients with disabilities who need help with activities of daily living require assistance from appropriate staff. This help is instead being provided by roommates and other detainees rather than by trained staff.

37

The facility reported that a Disability Accommodation Notice is completed for detainees identified as requiring accommodations.

Although the facility reported that, as a Level III facility, it does not accept detainees who are unable to independently perform activities of daily living, including bathing and toileting, it currently houses detainees who require assistance with some aspects of self-care due to their health conditions.

Risk of Harm: Failure to reliably identify, track, and support patients with disabilities or special needs creates a substantial risk of harm. Without consistent coordination and monitoring, patients may miss needed accommodation, assistive equipment, clinical follow-up, or daily support. Unsafe or improvised support arrangements, unjustified restrictive housing, and hazardous environmental conditions can further increase the risk of preventable injury or deterioration.

Assessment: Non-compliance

Recommendations:
1. Use specific intake questions and observation to identify patients with disabilities and special needs reliably.
2. For each identified patient, complete an individualized assessment by a medical provider and a treatment plan that addresses every special need.
3. Establish a reliable system to track patients with special needs and the accommodations and equipment they require.
4. Document the durable medical equipment and supplies provided to each patient, and periodically verify the patient still has the item and can use it.
5. Designate a staff member to coordinate and monitor the care and accommodation of these patients. For complex needs, or before an accommodation is denied, work through the request together with the patient and relevant staff to reach an appropriate solution.
6. Assist with activities of daily living, such as bathing, toileting, and movement, through trained staff.
7. House patients with disabilities in the least restrictive, most integrated setting appropriate to their needs. If restrictive housing is necessary for a documented safety or security reason, record an individualized justification and reevaluate periodically.
8. Evaluate the shower water temperature and check it periodically to ensure it stays at a safe level for patients.

9. Provide appropriate interim accommodation when a needed item awaits approval or availability.
10. Quality Assurance and Performance Improvement (QAPI)
    a. Maintain a current tracking system for all patients identified with special needs. Each patient should have a clear management plan that is implemented in a timely manner and as intended. Trained staff should assess these patients and document at least weekly to confirm that their needs continue to be met and that required accommodations and equipment are available, functional, and usable.

Infectious Disease

Expected Practice: Every patient should be screened for communicable diseases as part of intake health screening. All new arrivals should be screened for tuberculosis in line with current public health guidelines before being placed in the general population, and patients should be screened for infectious diseases and sexually transmitted infections when clinically indicated, with laboratory confirmation, treatment, and follow-up.

Patients found to have an infectious disease should receive timely treatment in accordance with current guidelines, and that treatment should continue without interruption. Chronic infections such as HIV and hepatitis should be managed as ongoing conditions, with the medication continuity and follow-up that is required. When a patient is contagious, the facility should promptly place them in medical isolation, house patients who require respiratory isolation in a negative pressure room, and monitor them daily.

The facility should prevent the spread of infection through standard precautions, hand hygiene, and clinically indicated immunizations, especially for high-risk patients. It should report communicable diseases to public health authorities as required by law, consult the local or state health department on conditions such as tuberculosis, and coordinate with public health to manage any outbreak, including identifying and treating exposed individuals. Patients released while still under treatment for a communicable or infectious disease should be given a community referral to continue care.

Findings:
TB screening and testing are done consistently as part of the intake health screening. Chest X-rays are done when indicated.

The Intake screening questions are not detailed or specific enough to identify patients with other infectious disease-related symptoms and conditions.

Any patient with a wound should be promptly assessed by the provider, receive appropriate wound care orders and treatment, and have the findings clearly documented at each visit to track progress. If there are signs of infection or drainage, staff should obtain a wound culture when clinically indicated and document the treatment plan. This supports appropriate antibiotic selection and wound care, helps prevent complications, and reduces the risk of spreading infections such as MRSA to other patients and staff. Patients with open wounds did not consistently receive adequate assessment, detailed wound care orders, or cultures when indicated. During the on-site visit, it was observed that a patient's culture specimen was not stored appropriately by medical staff.

It was also noted that the rape sexual assault protocol note completed by medical staff included an inadequate assessment and plan documented, and a positive syphilis test, indicating evidence of syphilis exposure or infection, was not acknowledged by the nurse or addressed during the provider evaluation.

When there is concern for an airborne infection, the patient should be placed in a negative pressure room to help prevent the infection from spreading to the rest of the facility. A negative pressure room that is not working properly should not be used for airborne isolation. During the on-site visit, it was noted that the pressure indicators for the individual cell changed from green to red when the hallway door leading to the negative-pressure area was opened, indicating a temporary change in pressure. Facility staff noted it and reported that it is being addressed.

The facility reported that it tracks infectious diseases, monitors trends, and reports infections and outbreaks to County Public Health, as applicable.

Risk of Harm: The infection prevention gaps identified above may result in serious harm. Undetected or untreated infections may progress to sepsis and other life-threatening complications, and unreliable specimen handling and unacknowledged positive results may delay treatment of serious, treatable diseases. Inadequately assessed wounds may worsen and spread infections such as MRSA to other patients and staff. When negative pressure rooms fail, airborne infections such as tuberculosis may spread through the facility and result in an outbreak affecting patients and staff.

Assessment: Non-compliance

40

Recommendations:

1. Ensure infectious diseases are identified, evaluated, and treated promptly.
2. Inspect the negative-pressure system to verify that each isolation room maintains appropriate containment and minimizes the risk of airborne transmission.
3. Update the screening tool to include common infectious disease symptoms, wound concerns, and disease conditions.
4. Ensure all wounds are promptly assessed, clearly documented, and addressed with an appropriate treatment plan, including wound cultures when clinically indicated.
5. Nurses providing wound care should receive appropriate training.
6. Ensure culture specimens are collected, labeled, stored, and transported properly to preserve specimen integrity.
7. Quality Assurance and Performance Improvement (QAPI)
   a. Track all infectious disease testing and results.
   b. Track treatment status through completion or documented resolution.
   c. Include verification of negative pressure room function as part of each shift report, with immediate notification and follow-up for any concerns.
   d. Continue to track trends in positive infectious disease results to spot possible outbreaks early.
   e. Audit wound assessments, wound care documentation, treatment plans, and wound cultures when indicated, and provide feedback to staff.


g.  <u>Timely access to prescribed medications.</u>

Expected Practice: Prescribed medications are medicines ordered by a healthcare provider. This includes medications the patient was actively taking before arrival, and medications started while at the facility. Timely access means the patient receives the correct medication at the correct dose and time, without unnecessary gaps.

When a patient arrives with current medications or an active prescription, the facility should promptly complete medication reconciliation and verification, and medications should continue without interruption when clinically appropriate. If a provider decides to change, hold, substitute, or stop a medication, the clinical reason and follow-up plan should be documented. Reconciliation should also occur at each later provider visit to confirm what the patient is taking and keep the active medication list accurate. The facility should keep commonly used medications in stock and maintain access to a local backup pharmacy for medications that are not available on site. If the regular supply is not yet available, the facility should use stock medication or another approved source, such as a

41

local pharmacy, to bridge the patient until the regular supply arrives, unless there is a documented clinical reason not to do so.

A formulary is the facility's approved list of commonly used medications that providers can order routinely. A non-formulary medication is not on that list and requires review and approval before it is provided. If a non-formulary medication is denied, a clinically appropriate alternative should be offered and documented.

Medications are given in one of two ways. Under direct observed therapy (DOT), a staff member hands the patient each dose and watches them take it. DOT is used for most medications, and especially for controlled medications, medications that can be misused or diverted, and any medication where it matters to confirm the patient actually took the dose. Under a keep-on-person (KOP) program, the patient is allowed to keep certain prescribed medications and take them themselves. KOP medications are those that a patient can safely manage without staff, such as daily maintenance medications taken on a schedule or as-needed medications like inhalers. A provider approves KOP after confirming the patient can use the medication safely. The patient is given instructions, and staff documents what was provided and how refills are obtained.

A refill is the next supply of a medication under an active order and does not require a new provider order. For example, a medication may be ordered for 90 days but dispensed 30 days at a time, and some facilities use shorter dispensing intervals for certain medications to lower the risk of overdose or diversion. A renewal is needed when the original order reaches its end date, and it requires a new provider order. Both the refill and renewal processes have to work well for medication to continue without a gap. The facility should track refill dates and expiration dates, flag upcoming needs early, and notify the provider before a medication lapses. For KOP medications, patients should have a clear process to request refills, and staff should provide approved refills on schedule.

A scheduled KOP medication is one the patient takes on a fixed, regular schedule, such as once or twice a day, every day. Because it is taken on a schedule, the supply runs down predictably and has to be refilled on time. For these medications, the refill process should be proactive. They should be tracked by their dispensing interval and refilled before the patient runs out, rather than waiting for the patient to ask. As part of this, some facilities contact the patient near the run-out date to confirm whether they still need the medication. Each time the next supply is issued, nursing staff should check and document the patient's reported adherence, any remaining supply, and any barriers to taking the medication, which helps the provider assess whether the treatment is working. If the

42

patient says they do not need a refill, staff should still check adherence, because a patient may not be taking the medication as prescribed. This is also an opportunity to educate the patient about why the medication is needed and how to take it correctly.

For as-needed KOP medications, such as rescue inhalers, the process should include a standard check to determine whether the patient needs a refill and whether the pattern of use indicates overuse, poor symptom control, nonadherence, or a need for provider reassessment. Because these medications are not taken on a fixed schedule, the process should track both the need for refills and the patient's reported use.

Medications should be given by trained staff to the correctly identified patient, and each dose, including any refusal, should be documented. Housing moves, court dates, transport, and off-site appointments should not cause missed doses. The facility should plan so that medications are available and given on time. Extra care is needed for medications where a missed or delayed dose can quickly cause harm, such as insulin or seizure medications.

Findings:
Based on the assessment, there are several serious concerns with the medication process. Patients who arrive on active medications, including those listed in a transfer summary, are not consistently continued in a timely manner. When an active, valid prescription written by another provider is stopped or changed, the on-site provider's decision should be supported by adequate clinical documentation. When a medication is not continued, the clinical reason is not consistently documented in the medical record.

When a medication prescribed by an outside provider needs to be continued at the facility, it should be reviewed and reordered by an on-site provider. However, communication between the nurse completing the intake screening and the ordering provider is not consistently documented in the medical record. Without documented communication, there is no verifiable assurance that medications received timely provider review and approval for safe continuation.

The prescription rejection report shows hundreds of rejected medication requests. Common rejection reasons include "refill too soon," "product/service not covered," and "day supply exceeds dispensing limit." Within that report, numerous "refill too soon" rejections appear for routine maintenance medications, including those used for diabetes, hypertension, heart disease, mental health conditions, anticoagulation, and HIV treatment, among other chronic conditions.

These are clinically important medications that are not typically associated with medication-seeking behavior. The pattern suggests a process issue rather than a patient-driven issue.

Based on the reviewed rejection report, the reasons given for these rejections are concerning. They do not appear to be primarily patient related. They are more likely to reflect medication access or system process issues, such as formulary restrictions, ordering errors, or supply-tracking problems. Because the report provided for the monitors review does not include individual patient identifiers, it was not possible to trace specific rejections to individual patients. Nevertheless, the patterns reflected in the report are consistent with some of the medication access concerns reported by patients.

Multiple patients reported that they do not consistently receive their prescribed medications. Patients also reported that evening medications scheduled for approximately 7:00 p.m. or 8:00 p.m. are commonly not dispensed until 1:00 a.m. or 2:00 a.m. This may be related to staffing challenges. Patients stated that they must stay awake late into the night to receive their medications, and that if they fall asleep before staff arrives, they may miss the dose entirely. This creates serious concerns about medication access and administration. Delayed administration can result in missed doses, disrupted treatment schedules, poor symptom control, and increased risk of harm, especially for medications that require consistent timing or steady blood levels.

Medication storage and pharmacy areas should have a reliable inventory management process, including routine review of medication supply, expiration dates, and timely removal of expired medications. This is necessary to ensure that medications are available when needed and that expired medications are not stored or used in patient care. A review of the pharmacy showed inadequate management of medication inventory and insufficient tracking and removal of expired medications. Loose pills were also found on the medication administration room floor, indicating that medication handling and disposal practices were not consistently maintained.

Risk of Harm: The medication gaps identified above create a significant risk of serious harm. Depending on the medication, missed or delayed doses can lead to uncontrolled blood sugar or blood pressure, worsening heart disease, psychiatric destabilization, withdrawal or rebound symptoms, bleeding or clotting complications, HIV treatment failure, or drug resistance.

44

Assessment: Non-compliance

Recommendations:
1. Medications listed in the transfer document should be carefully reviewed, recorded, and addressed during the intake health screening.
2. The details of each active medication should be recorded during health screening so they can be verified and considered by the on-site provider.
3. When a medication is stopped, changed, or not continued, document the clinical reason and the follow-up plan in the medical record.
4. Medication reconciliation should be performed, and medication adherence reviewed at each provider encounter.
5. At order entry, document the clinical indication for each medication and whether it is for short-term or long-term use so that renewal needs can be identified reliably.
6. Establish a proactive and reliable process to ensure all medications are renewed or refilled appropriately. Each medication approaching expiration should have a clearly documented disposition: renewed, no renewal needed, discontinued, or pending clinician review.
7. At KOP dispensing, teach the patient how to request refills.
8. Give medications at their scheduled times.
9. At the end of each shift, medication administration should be reconciled and supervised to confirm that all patients received their medications as ordered and on time. When a patient refuses, the refusal form should be completed and signed.
10. For patients who did not refuse, staff should make and document every effort to administer the medication.
11. For doses not given, use a standardized list of acceptable reasons that captures the actual reason a dose was not administered.
12. Administer and document insulin using a standardized process, including a double-check of the dose by a second qualified staff member.
13. Notify the provider when a critical or high-risk medication is missed, such as insulin, anticonvulsants, or anticoagulants, and document the notification.
14. The facility should implement a reliable pharmacy inventory and medication dispensing process to monitor medication supply, track expiration dates, remove expired medications, and ensure the dispensing area is routinely reconciled, clean, and free of loose or unsecured medications.
15. Quality Assurance and Performance Improvement (QAPI)
    a. Review the reasons for missed doses and create action plans to reduce avoidable missed medications.

b. Track medication administration timeliness daily and review trends monthly. Address staffing, workflow, and scheduling barriers that contribute to delayed or missed medication administration.

c. Periodically monitor the appropriateness of medication orders and the medication administration process, including adherence to the five rights of medication administration.

d. Track medications daily using reliable reports to ensure they are refilled and renewed on time. When a refill or renewal is not needed, this should be clearly documented in the medical record.

e. Create a daily report to confirm that all medication administration is completed and that no medication is left unaddressed.

h. <u>A responsive "sick call" request system.</u>

Expected Practice: A sick call request is the process by which patients request care for a health concern. A responsive system ensures that every patient can submit a request, that health staff receive it promptly, that the patient is triaged and seen within a timeframe appropriate to the urgency of the concern, and that the concern is addressed appropriately. This allows problems to be identified and treated early, before they escalate. Delays, barriers to access, or inadequate triage or assessment can leave conditions untreated and cause manageable health problems to become emergencies.

Every patient, regardless of housing assignment, should be able to submit a healthcare request each day. This includes medical, dental, and mental health requests. Requests should be accepted in writing or verbally and handled in a way that protects the patient's privacy. Health staff should collect requests each day. A qualified healthcare professional should review and prioritize them daily, classifying each request as emergent, urgent, or routine. All healthcare requests should receive a face-to-face encounter within 24 hours of receipt by health staff, and sooner when the concern is urgent.

Nurses will conduct the face-to-face encounters and use the facility's established nursing guidelines to assess all health concerns raised in the patient's healthcare request. Based on the assessment, the nurse should either refer the patient to a provider or manage the concern under the established nursing guidelines. The patient should receive follow-up to confirm whether the treatment resolved the concern.

46

Findings:

The assessment identified serious concerns with the sick call program at this facility. There is no reliable process in place, and concerns were noted at each step, all of which affect patient care.

The current sick call process lacks a reliable tracking process to confirm that requests are collected daily from every housing unit, triaged appropriately, and followed through to completion. Sick call requests are being missed or delayed, and without adequate tracking, the facility cannot reliably determine whether patients are being evaluated in a timely manner. During an interview, a patient reported having to hand their sick call request to an officer to place in the box, rather than submitting it directly, because the box was located outside the housing unit. During the visit, a sick call box in a recently opened housing unit was being labeled.

Patients reported that submitted sick call requests are often left unaddressed or delayed for an extended period before they receive a response from medical staff. This finding was supported by information obtained during the assessment. Patients also reported submitting multiple requests because they did not know whether their original request had been received or acted on.

The facility reported that detainees may hand grievance or sick call forms directly to staff. Staff should be trained to direct detainees to use the secure collection boxes to protect privacy.

The facility scans sick call requests into the medical record, but not all requests get scanned. In the medical records, staff notes refer to a sick call request submitted by the patient, but the corresponding sick call request is not found in the medical record. Having the actual sick call request during the visit is important so that every concern the patient raised is addressed during the visit.  Without it, a health concern the patient raised may go unassessed and untreated, leaving the patient to submit another request and wait longer for the care they need.

Review of sick call forms in the medical record showed a delay between the date noted by the patient and the date documented as received. While an isolated case could reflect a patient recording the wrong date, the pattern observed appears to indicate a delay in picking up the sick call requests.

The sick call form includes a triage section for the medical reviewer to assign a level of urgency based on the concern. In the forms reviewed, this field was frequently left blank.

47

The triage level determines how quickly a patient is seen. When it is left blank, the request is not prioritized, so an urgent or emergent concern may not be identified or acted on within the appropriate timeframe.

The quality of the nursing assessments reviewed is concerning. They were not comprehensive and did not consistently include the relevant history, an appropriate assessment, and a plan of care. For example, when a patient reports pain, a complete assessment should document where the pain is located, when it started, its severity, what it feels like, what makes it better or worse, and any associated symptoms, along with the relevant history, examination findings, and a plan of care. This type of standardized, complete assessment was often missing in the records reviewed. In some cases, the patient education provided was for a different condition than the one documented in the assessment and plan. Providers were not contacted when clinically indicated, and a follow-up plan was often not documented. When patients were seen by a provider, the documentation did not consistently reflect an adequate assessment.

Medical records also showed that sick call requests are being closed as already addressed on the basis that the patient was recently seen, even though the note from that earlier visit does not address the concern stated in the sick call request. When this occurs, the request should remain open rather than being closed without addressing what the patient reported.

At the time of the site visit, the facility was using the gym as a makeshift clinical space for health services. Patients waited in the gym area, and two rooms within the gym were used for nurse and provider examinations. Staff reported that the gym is being used temporarily until the construction of a satellite medical clinic is completed. According to staff, the project is expected to begin within the next few weeks, after which the gym will no longer be used for health services. During the facility walk-through, the warden showed the space being converted into the clinical area. The facility reported that the satellite medical clinic project began during the week of July 13, 2026, and is expected to be completed within approximately 60 days.

The examination rooms in the gym have doors with clear glass windows. At the time of the visit, these windows had no curtains, and there was inadequate visual privacy for patients during examinations. One room used by a provider did not have a handwashing station. The room used by nursing staff had a sink; however, it did not appear to be in use, and soap was not available. The eye exam area contained a small, photocopied Snellen chart. It did not appear that the chart was printed to scale or calibrated for the testing distance, which

48

may limit the reliability of visual acuity screening. The concern about visual confidentiality was raised during the inspection. On the second day of the inspection, blinds were installed on the windows to address the privacy concern.

Patients are submitting grievances due to delays in medical care, and there is a long delay in addressing the grievances themselves. The handling of these grievances raised several concerns. Some were classified as unfounded by citing care provided after the grievance was filed; others were rejected when the patient was released long after filing; and some were rejected as duplicates even when they were filed on different dates. Addressing a concern after the grievance was filed does not establish that the grievance was unfounded.

Risk of Harm: The sick call gaps identified above create a serious risk that patients' health concerns go unrecognized, delayed, or unaddressed. Without reliable pickup of the sick call requests, triage, assessment, and follow-up, urgent conditions may not be identified in time, and problems that could have been managed early worsen or become emergencies.

Assessment: Non-compliance

Recommendations:
1. Make sick call request forms available and easily accessible to patients in all housing units.
2. Ensure sick call boxes are accessible to all patients in every housing unit.
3. Nursing should conduct regular, documented rounds in units where patients may not have reliable access to submit sick call requests.
4. Ensure sick call requests are picked up from every sick call box daily.
5. Ensure an RN trained in sick call triage reviews each request immediately after pickup and assigns an urgency level.
6. Ensure all sick call requests are scanned into the medical record so they are available to medical staff during the assessment.
7. Patients should be seen in a clinical space that has the necessary equipment and privacy, so that a detailed and confidential assessment can be performed.
8. Ensure that nurses perform a detailed assessment that includes the relevant history, objective findings, a complete assessment of all concerns raised in the request, patient education appropriate to the condition, a plan of care, referral to a provider when clinically indicated, and a follow-up plan.
9. The patient should receive a follow-up to confirm whether the treatment resolved the concern.
10. Contact the provider immediately when clinically indicated.

11. When a provider is contacted after a sick call encounter and orders a new medication or changes the dose of an existing one, the order should include a clear follow-up plan. The patient should receive a provider evaluation or a timely clinical reassessment unless the provider documents that it is not needed. Follow-up helps confirm that the condition is improving and that the medication is appropriate and effective.

12. Address every concern raised in the request. If a concern cannot be resolved at the visit, keep the request open and schedule a follow-up rather than closing it.

13. Ensure the provider assessment addresses all concerns raised by the patient and includes a detailed plan of care and follow-up plan.

14. Consider an electronic sick call system to submit requests, which timestamps each request automatically and reduces the risk of lost or delayed requests.

15. Complete the planned satellite medical clinic and discontinue use of the gym for health services once the clinic is ready.

16. In the interim, maintain adequate privacy and ensure each examination room used for patient care has a hand-washing station and adequate storage.

17. Ensure staff perform hand hygiene between each patient encounter.

18. Ensure clinical spaces used for patient care have properly standardized examination equipment.

19. Health care grievances should be addressed in a timely manner by a qualified health care staff.

20. Grievances should be classified appropriately as founded, unfounded, or undetermined.

21. Quality Assurance and Performance Improvement (QAPI)
    a. A supervisor should verify daily that sick call requests are picked up and triaged in a timely manner.
    b. At each shift, review all pending sick call requests and assign staffing so that all sick call requests are seen in a timely manner, with urgent and emergent cases prioritized.
    c. Audit the appropriateness of triage at least monthly and provide feedback to the staff.
    d. Audit nursing assessments using a standardized tool at least monthly and provide feedback to the staff.
    e. Review provider documentation using a standardized tool at least monthly and provide feedback to the staff.
    f. Review health care grievances regularly to identify trends and recurring problems and address any gaps.

50

g.  Track timeliness from receipt to triage to the face-to-face encounter and to final disposition, monitor for missed or delayed requests, and act on the gaps identified.

_____ End of Report _____