KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
CODY S. HARRIS - # 255302
charris@keker.com
CANDICE MAI KHANH NGUYEN - # 329881
cnguyen@keker.com
CARLOS C. MARTINEZ - # 354616
cmartinez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022
tess@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
MEGHA RAM - # 325134
mram@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and

Case No. 1:26-cv-02546-JLT-CDB

**JOINT STIPULATION REGARDING ELECTRONIC DISCOVERY AND DOCUMENT PRODUCTION FORMAT**

Judge: Hon. Christopher D. Baker

Date Filed: November 12, 2025
*(transferred from Northern District of California)*

Trial Date: Not set

Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security,

Defendants.

Unless otherwise agreed in a writing signed by the Parties' counsel of record in this action, this Stipulation Regarding Electronic Discovery and Document Production Format ("Stipulation") shall govern the Parties' discovery related to Electronically Stored Information ("ESI")—as that term is defined below—as well as the form of production of hard copy documents. The discovery activities covered by this Stipulation are to be conducted as follows:

## I. DEFINITIONS:

A. "Electronically Stored Information" or "ESI" carries its broadest possible meaning consistent with Fed. R. Civ. P. 34(a) and Fed. R. Evid. 1001.

B. "Hard Copy Discovery" means any document or thing discoverable under Fed. R. Civ. P. 26(b)(1) and Fed. R. Civ. P. 34 that cannot be characterized as ESI.

C. "Loose ESI" means any ESI which does not require a targeted collection from a server or cloud-based application or service, including but not limited to, documents easily accessible from electronic systems in PDF format, as well as reports from systems containing structured data which may be output to PDF or other commonly accessible formats.

D. "Document" carries its broadest possible meaning consistent with Fed. R. Civ. P. 34 and Fed. R. Evid. 1001 and includes both ESI and Hard Copy Discovery.

E. "Email" means digital messages transmitted via email servers and are defined by a standardized set of structured metadata fields (e.g., To, From, CC, BCC, Subject, Date, Message-ID). Emails are usually packaged individually as MSG files or compiled into PST or EML container files. Attachments are embedded and clearly delineated.

F. "Chats" means sequences of time-stamped messages exchanged on platforms like Microsoft Teams, SMS. Unlike emails, chat data typically lacks a comprehensive metadata structure and is stored in formats such as RSMF, SMS, JSON, TXT, and CSV.

G. "Format" means the internal structure of a file, which defines the way it is stored and used.

H. “Native File(s)” or “Native Format” means ESI that is a file or datum created by a computer-based, cloud-based, or artificial intelligence-based application (including, by way of example, Microsoft Office, Microsoft Access, video and audio files, *.eml,* .pst, and *.pdf files).

I. “Non-custodial Data Source” means a system or container that stores ESI, but over which an individual custodian does not organize, manage or maintain the ESI in the system or container, such as an enterprise system or database.

J. “Preservation” or “Preserved” shall mean taking reasonable steps to prevent the partial or full destruction, alteration, shredding, incineration, wiping or loss, due to any reason whatsoever, of information, including ESI and hard copy documents.

K. “Producing Party” means a Party that produces documents within its possession, custody and control.

L. “Receiving Party” means a Party to whom documents are produced.

M. “Metadata” means (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

N. “Static Image(s)” means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. A Tagged Image File Format (“TIFF”) is an example of a Static Image.

O. “Tagged Image File Format” or “TIFF” refers to the CCITT Group IV graphic file format for storing bit-mapped images of ESI or paper documents.

P. “OCR” means the optical character recognition file which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

Q. “Extracted Text” means the text extracted from a Native File and includes all

header, footer, and document body information.

R. "Structured Data" means data that has been organized into a tabular format with relationships between the different rows and columns, including, but not limited to, Excel spreadsheets, SQL databases, and other relational databases.

## II. GENERAL PROVISIONS

A. This Stipulation supplements all other discovery rules and orders. It streamlines ESI production to promote a "just, speedy, and inexpensive determination" of this action, as required by Rule 1 of the Federal Rules of Civil Procedure.

B. The Parties agree to consult and cooperate reasonably as discovery proceeds regarding the collection and production of Hard Copy Discovery, Loose ESI, and ESI collected from servers/accounts pursuant to this protocol. The Parties agree to promptly alert the other Parties concerning any technical problems associated with complying with this Stipulation. To the extent compliance with this Stipulation is believed to impose an undue burden with respect to any protocol, source, or search term, the Parties shall promptly confer in an effort to resolve the issue.

C. The Parties have agreed that all electronic materials produced in this action, including electronic materials produced pursuant to the Court's March 30 External Monitor appointment order (ECF No. 112), will be exchanged electronically via secure File Transfer Protocol (FTP) or similarly secure electronic transmission. The Volume Number and Bates Number Range(s), document count, image count, and native file count of the materials should be included in the transmittal documentation (whether by letter or e-mail) for each volume. Any document production that may contain material designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL---ATTORNEYS' EYES ONLY" under the Protective Order entered by the Court (which may include information such as "non-public personal information" as defined in the Gramm-Leach-Bliley Act, "Confidential Health Information" as defined and protected under the Health Insurance Portability and Accountability Act Privacy Rule, 45 C.F.R. parts 160

and 164, or other confidential health information protected by other applicable state or federal law) shall be produced in encrypted form. For production volumes which are encrypted or "locked," instructions shall be sent under separate cover from the link or volume regarding how to decrypt the files. In the event that files are too large for an efficient FTP transmission, they may be placed on external USB drives, labeled with the volume number as well as any applicable designation that it "MAY CONTAIN CONFIDENTIAL INFORMATION"; "MAY CONTAIN NON-PUBLIC PERSONAL INFORMATION" or "MAY CONTAIN CONFIDENTIAL HEALTH INFORMATION," and sent to the Parties' respective ESI liaisons.[1][2]

D. Nothing in this order or any other document relating to discovery in this matter shall be construed or interpreted as precluding a Producing Party from performing a responsiveness review to determine if documents captured by search terms are in fact responsive to the requesting Party's request. Further, nothing in this order or any other document relating to discovery in this matter shall be construed or interpreted as requiring the production of all documents captured by any search term if that document is—in good faith—deemed not responsive to the requesting Party's request for production by the Producing Party. Nothing in this Stipulation shall be interpreted to require disclosure of materials that a Party contends are not discoverable or are protected by disclosure by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other privilege that may be applicable.

E. This Stipulation shall not enlarge or affect the proper scope of discovery in this

[1] Plaintiffs will not agree to additional terms as a condition of downloading or accessing production materials, beyond those provided by this order, the Court's protective order, the Federal Rules of Civil Procedure, the Eastern District of California local rules, and the Court's standing order. To the extent a Producing Party attempts to impose any additional conditions on downloading or accessing produced materials, those terms shall not be binding.

[2] In accordance with the DOJ Order 09094 (Cybersecurity Program) and DOJ Rules of Behavior, Defendants will continue to produce electronic materials via Department's approved solution USA File Exchange (USAfx) for file sharing.

Action, nor imply that discovery produced under the terms of this Stipulation is properly discoverable, relevant, or admissible in this Action. Nothing in this Stipulation shall be deemed to waive or limit any Party's right to move for an order to compel discovery pursuant to Fed. R. Civ. P. 37. Likewise, nothing in this Stipulation shall be deemed to waive or limit any Party's right to object to the production of certain ESI, or to move for an appropriate order pursuant to Fed. R. Civ. P. 26(c), on the ground that the sources are not reasonably accessible because of undue burden or cost.

F. Unless this Court orders otherwise, each Party shall bear the costs of producing its own documents.

G. Notwithstanding any other provision of this Stipulation, and provided that a copy of the ESI that is subject to preservation in this matter remains accessible and unaltered, or a new copy is created that preserves the ESI—including any metadata (to the extent it exists)—the Parties may:

1. Move unfiled Documents into files or folders to adhere to an organizational scheme that was created before the Complaint was filed in this matter, provided that doing so does not alter the parent-child relationship (or any other form of unitization) of the Documents. Nothing in this subparagraph prevents the Parties from implementing an organizational scheme that applies only to Documents not subject to preservation in this matter;

2. Copy data from one device to another, or from one location to another.

## III. GENERAL SPECIFICATIONS AS TO PRODUCTION OF ALL DOCUMENTS.

A. **FORMAT & FOLDER STRUCTURE**. Each production shall be provided in the following folder structure:

1. Top-level folder: This folder will indicate the production volume;

2. Sub-folders: Sub-folders should be organized as follows:

i. **DATA:** This folder will contain load files and cross-reference files as set forth below.

ii. **IMAGES**: This folder will contain multiple sub-folders with ONLY TIFF (or .jpg) files in them. No other type of file should reside in the "IMAGES" folder. Sub-folders shall not contain more than 10,000 images per folder.

iii. **NATIVES:** This folder will contain Native files that the Parties agree to produce during the course of this litigation. Sub-folders shall not contain more than 10,000 Native files per folder

iv. **TEXT:** This folder will contain the full text files in in a separate folder labeled TEXT. Sub-folders shall not contain more than 10,000 text files per folder.

B. **DATABASE LOAD FILES/CROSS-REFERENCE FILES.** A production shall be provided with (a) a delimited Concordance-format database load file (.dat) that contains the applicable fields identified in Appendix 1 for all documents and ESI. The Parties will work in good faith to produce the metadata and coding fields set forth in Appendix 1 to the extent such metadata exists, is relevant to the file type at issue, and can be automatically extracted and loaded into the Producing Party's ESI management software in the ordinary course and operations of such software. At minimum, the following information shall be produced in the .dat load file for all documents: (a) BEGDOC#, (b) ENDDOC#, (c) BEGATTACH, (d) ENDATTACH, (e) REDACTED, (f) CUSTODIAN, (g) CONFIDENTIALITY, and (h) TEXT FILEPATH. However, aside from those fields, nothing in this Stipulation shall require any Party to engage in any computer or document forensics, or manual review and data entry to extract, capture, collect, or produce such data. An Opticon (.opt) image cross-reference file shall also be produced for all images.

C. **IMAGE FORMATS.** Documents produced in image format shall be produced as single page black and white (B&W) Group IV TIFFs, created with a resolution of at least 300 dots per inch (dpi). Images should show any and all text and images which would be visible to the reader using the native software that created the document.

For example, images of e-mail messages should include the BCC line. Original images that are in color will be produced in color, and original images that are in black and white shall be produced in black and white only with no obligation on the part of the Producing Party to colorize them. Where documents are produced in color, they should be produced in .JPG format with a resolution of at least 300 dpi. Each TIFF or JPG image shall be branded with sequential production numbers and appropriate confidentiality designations.

D. **TEXT.** Wherever possible, extracted text from native ESI files should be produced. A commercially acceptable technology for optical character recognition ("OCR") shall be used for all scanned, hard copy documents, for documents redacted in image format, and for other documents without extractable text. The filename for the multi-page text file described above in III(A)(2)(iii) shall correspond to the beginning production number of the document.

E. **UNITIZING OF HARD COPY DOCUMENTS.** In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). In specific terms of this litigation, hard copy documents which are maintained as a "file" in the normal and ordinary course of business should be scanned and produced as a single document. Only if the scanned file size of a single document is greater than 35MB may the document be split into parts, which shall be produced consecutively.

## IV. PROCESSING STANDARDS AND PRODUCTION FORMATTING FOR ALL ELECTRONICALLY STORED INFORMATION (ESI)

A. **CULLING/FILTERING.** To the extent that common system files are collected, each Party will use its best efforts to de-NIST them and exclude common system files and application executable files by using a commercially reasonable hash identification process. Hash values that may be filtered out during this process are located in the National Software Reference Library ("NSRL") NIST hash set list. .

Files which contain no relevant text, including but not limited to, email attachment files containing only logo images usually associated with signature blocks or HTML mail:to links may also be culled in bulk and excluded from processing or collection requirements under this protocol.

B. **DE-DUPLICATION.** Each Producing Party shall de-duplicate ESI on a global level (across all custodians) prior to production. The basis for such de-duplication shall be the MD5 or SHA1 Hash values, or some other later agreed to de-duplication method. For generating either the MD5 or SHA1 hash values for email, the Parties shall instruct their ESI processing vendors to take attachments into account for such hash value generation. With respect to documents processed for ingestion into the Producing Party's ESI management software on or after the approval date of this protocol, the custodians of de-duplicated copies of documents should be included in the database load file in the DUPECUSTODIAN field.

C. **BACKUP DATA**. Absent a showing of good cause, no Party need restore any form of media upon which backup data is maintained in a Party's normal or allowed processes, including but not limited to backup tapes, disks, SAN, disaster recovery systems, and other forms of media, to comply with its discovery obligations in the present case.

D. **PRODUCTION FORMAT FOR ESI**. The format of productions of ESI shall comply with the following requirements:

1. **GENERAL FORMATS**. ESI, whether collected loosely or from email servers/accounts, individual devices, or network or cloud-based locations, shall be produced as images subject to above specifications, with the exception of audio or video media files and spreadsheet-type files (including but not limited to Excel or other delimited data files), PowerPoint (or similar) presentations which may contain speaker notes, and Word (or similar word processing) documents which contain comments or revision histories should be produced in native format with an

image placeholder indicating the production number, the confidentiality designation (if any), and that the file was produced natively. All files that are produced natively shall have the NATIVE PATH field in the .dat load file populated with the file name and relative path within the production volume.

2. **REDACTION OF NATIVELY PRODUCED FILES.** If a document requested or produced in native format requires redactions, the Producing Party may provide a redacted image of the document, or may elect to provide a redacted native file where such redactions may be performed more expeditiously. To the extent the Receiving Party believes that any redactions applied render a file insufficiently useable, such documents will be identified by Bates number(s), and the Parties will meet and confer regarding how to implement redactions while ensuring that the proper formatting and usability are maintained. Should any native file, including but not necessarily limited to, Audio and Video files containing privileged material that cannot be redacted in Native format be requested, the Parties shall meet and confer on the limitations of producing said files.

3. **STRUCTURED DATA.** The Parties shall meet and confer with respect to structured data sources that contain relevant information to determine what information the reports should contain. As a general rule, data that is stored in a database, whether maintained internally by the Party or through a third-party provider, shall be produced as reports in Microsoft Excel, Microsoft Access or ASCII delimited text format.

4. **iMESSAGE, SIGNAL, SHORT MESSAGE SERVICE, AND MULTIMEDIA MESSAGING SERVICE MESSAGES.** The Parties understand and acknowledge that iMessage, Signal, Short Message Service (SMS), and Multimedia Messaging Service (MMS) messages may be impractical to produce in their Native format. In such instances, the ESI

may be produced as a screenshot, exported report, or another available format, as electronic files without extractable text. Metadata will only be provided if available and if it can be automatically extracted and loaded into the Producing Party's ESI management software in the ordinary course and operation of such software.

5. **NON-RESPONSIVE DOCUMENTS ATTACHED TO PRODUCTION-ELIGIBLE E-MAIL FAMILIES.** The Parties agree that non-responsive documents attached to production-eligible documents (i.e., responsive non-privileged documents) will be produced if any member of an email family is responsive. To the extent that the Producing Party believes there is good cause to deviate from this standard, they may withhold or redact privileged information and provide a privilege log to the Receiving Party, as specified below. Notwithstanding the following, the Producing Party may withhold non-responsive attachments that contain Personal Health Information related to any non-class-member detainee on a case-by-case basis by producing a single Bates-stamped image slip-sheet containing the confidential designation and text stating "Non-Responsive Non-Class Detainee PHI withheld" provided that the Producing Party provide the name of the individual whose information has been redacted. Likewise, the Producing Party may withhold documents that contain highly security-sensitive or law-enforcement privileged information, which is unrelated to any claims in this case, by producing a single-page Bates-stamped image slip-sheet containing the confidential designation and text stating "Non-Responsive Security-Sensitive and/or Law Enforcement Information Withheld." For privileged document family members withheld, a single-page Bates-stamped image slip sheet containing the confidential designation and the text stating "Privileged Document Withheld" will be produced. For any document or family member

withheld in such manner, the Producing Party shall still provide the applicable metadata files, subject to modification, as set forth below.

6. **REQUEST(S) FOR ADDITIONAL NATIVE FILES**. If good cause exists to request production of specified files in Native format, other than those specifically set forth above, the requesting Party may request such production and provide an explanation of the need for Native file review. The parties agree that such a request shall not be unreasonably denied. Any Native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields, as well as a Bates-stamped and confidentiality-stamped TIFF placeholder. Any dispute regarding the production of documents in Native format shall be resolved by the provisions set forth in Local Rule 251 and the Court's standing order.

## V. CUSTODIAL ESI

A. **GENERAL REQUIREMENTS.** The Parties agree that responsive documents that are known to exist (as opposed to documents that would only become known to the Producing Party through an email or system search) will be produced in the normal course of discovery. For documents that would only become known to the Producing Party through an email or system search, the Parties shall meet and confer to identify custodians and search terms, as set forth below.

B. **DEFINITION.** For purposes of this Stipulation, Custodial ESI refers to ESI associated with a particular individual, such as an individual's workplace email account or loose ESI stored in the individual's assigned workplace computer or individual cloud-based storage. Custodial ESI does not include information stored in a repository not associated with a particular individual, such as shared drive, document storage system, or wiki. The Parties shall take reasonable steps to identify and preserve Custodial ESI as well as ESI stored on any network or cloud-based system relevant to the claims and defenses in this action.

C. **CUSTODIAN AND SEARCH TERM IDENTIFICATION**. After the service of any request for production which calls for production of ESI requiring collection from a server, application, or system (but not a targeted collection of loose ESI), the Requesting Party and the Producing Party shall meet and confer on custodians, search terms, custodial and non-custodial repositories at issue, and any other search methodology to be used for each such request, unless the Parties agree that certain requests may be fairly and reasonably grouped. The Parties shall have an initial mutual exchange of proposed custodians and search terms within 45 days after service of any such request calling for the production of ESI that requires collection from a server, application, or system. Following that mutual exchange, counsel for the Parties and their respective ESI liaisons shall meet and confer and attempt to reach a consensus relating to custodians and search terms. The Parties will confer until an agreement on the list of custodians, search terms, and date range for search is reached.

D. **EXCHANGE OF SEARCH TERM HITS**. The Producing Party will produce a search terms hit report that at minimum includes (1) the aggregate number of hits plus family the full report implicates, (2) the number of documents with hits for each term, (3) the number of documents with hits plus family for each term, and (4) the number of unique documents with hits for each term (*e.g.*, "unique documents with hits for each term" means the number of documents that hit on that term and no other search term). The Parties shall meet and confer on any modifications to the proposed terms needed to improve their efficacy in locating discoverable information and to reduce the number of false positives and hits for irrelevant domains (e.g., @espn.com). In the event the Parties cannot reach agreement regarding specific search terms, each Party agrees to proceed with any agreed-upon search terms, and the Requesting Party expressly reserves its right to seek the Court's assistance in resolving the matter.

E. **SUBSEQUENT SEARCHES.** While recognizing the iterative nature of

identifying custodians, search terms and strings, and exclusionary limiters may be initially time consuming, the Parties acknowledge that such foundational work will reduce resources and permit effective management of time and costs relating to collection, processing, hosting, review, and production. To the extent that either Party subsequently uncovers information that suggests additional search criteria are likely to yield responsive documents, the Parties will meet and confer about the appropriateness of including those new criteria.

F. **DISPUTES.** In the event that the Parties cannot reach agreement relating to specific search and collection criteria, each Party agrees to proceed with any agreed-upon search criteria and craft a set of disputed search criteria which is not duplicative of any agreed criteria. If the Parties dispute the inclusion of any search criteria, or do not agree to a subsequent search, they shall submit a Joint Statement re Discovery Disagreement in that comports with Local Rule 251(c) and/or any standing order of the Court regarding resolution of discovery disputes.

G. **Phasing and Rolling Productions.** The Producing Party will endeavor to produce known and responsive targeted loose ESI and hard copy documents first. The parties shall periodically communicate and meet and confer to discuss the prioritization of such processing, collection, and review of the production so that (1) the ESI is produced within a reasonable period of time as required by Fed. R. Civ. P. 34(b)(2)(B), and (2) that the ESI that is most relevant and responsive to the subject matter, claims, issues, and defenses is produced first, in proportion to the relative technical difficulty and resource burden in conducting such collection, processing, and review. ESI so collected will be produced by rolling production in phases, and the Parties will continue to meet and confer regarding the need for, and if necessary to prioritize the subsequent order of, later waves of productions until all productions are substantially complete.

H. **SUBSTANTIAL COMPLETION OF PRODUCTION.** Nothing in this Stipulation shall prevent the Producing Party from using a Technology Assisted

Review (TAR 2.0) Continuous Active Learning process to determine when to terminate the review of documents in accordance with the TAR Protocol set forth in Appendix 2. In addition, the parties may use workflow management methods, including email threading, to expedite review, provided that all collected members of the thread are produced.

I. To the extent the Producing Party determines that other advanced analytics and/or Artificial Intelligence tools and methodologies may assist the identification, searching, collection, filtering, culling, review, and/or production of ESI, it shall: (i) notify the Receiving Party that it intends to use such tool(s) and disclose the name of the tool(s); and (ii) provide a general description of the tool(s) and the method by which the tool(s) will be used. If a Party objects to the method by which the tool(s) will be used, or the use of the tool, the Parties shall meet and confer to resolve the dispute. If the Parties cannot agree on usage of the tool or method of use, the Parties shall file a Joint Notice re Discovery Dispute as outlined in Local Rule 251(c) and/or any standing order of the Court regarding resolution of discovery disputes

## VI. PRIVILEGE LOGS

A. Consistent with the Federal Rules of Civil Procedure, a party withholding or redacting any responsive document on the grounds of privilege, immunity, or any similar claim shall provide to the Receiving Party a privilege log.

B. The following privileged items need not be included in the privilege log: (1) communications undertaken in compliance with the duty to preserve information (including, but not limited to, litigation hold letters) that are protected from disclosure under Fed. R. Civ. P. 26(b)(3)(A) and (B); (2) communications or documents relating to litigating this matter post-complaint; (3) communications between counsel only (including the Department of Justice and the Department of Homeland Security and their respective sub-agencies), if the communications were created after the date when the original Complaint in this case was filed; and (4)

communications between any party and counsel for that party, whether in-house counsel (including agency counsel) or outside counsel (including the Department of Justice), if the communications were created after the date when the original Complaint in this case was filed and were made entirely for the purpose of seeking or receiving legal advice. However, otherwise responsive privileged communications that relate to the operation of California City Detention Facility and were created after the date when the original Complaint was filed must be included in the privilege log. The above-mentioned exceptions are made without prejudice to any Party's ability and right to assert that materials are discoverable and not privileged or otherwise protected.

C. The Parties agree that, for each document withheld on the basis of attorney-client privilege, work product doctrine, and/or any other applicable privilege, statutory or regulatory limitation on disclosure, or any other applicable basis under law, the parties agree to prepare a summary log containing, for each document so withheld, an export of all or a subset of the metadata fields listed below to the extent such information exists and has not been suppressed for privilege. The export should include the following information from the top line email, as those terms are specified in Appendix 1:

1. A unique privilege log identifier.
2. CUSTODIAN
3. DATE TIME SENT or DATE TIME MOD (as applicable depending on whether or not the document is an email message or other ESI)
4. FROM or AUTHOR (as applicable depending on whether the document is an email message or other ESI).
5. TO
6. CC
7. BCC
8. SUBJECT or FILENAME (as applicable depending on whether the

document is an email message or other ESI).

9. A description of the nature of the document that, without revealing information itself privileged, will enable other parties to assess the privilege claim.

10. The type(s) of privilege(s) asserted: *e.g.,* (a) AC for Attorney/Client, (b) WP for Work Product, (c) CI for Common Interest, (d) LEP for Law Enforcement Privilege, and (e) D for Deliberative Process Privilege.

D. To the extent that the Producing Party believes that any metadata field above, if provided, would reveal privileged or protected information, the Producing Party may edit or amend those metadata fields to avoid the disclosure of such information, while ensuring that, at minimum, all information required by Fed. R. Civ. P. 26(b)(5) is provided. Any such alterations made by counsel shall be enclosed in [brackets]. A Party may challenge such alteration pursuant to the dispute resolution process set forth in this Section.

E. The Party providing the Privilege Log shall keep, maintain, and provide to the Party receiving the Privilege Log, a list of attorneys with their respective component office (e.g., CBP Office of Chief Counsel) for any attorney named in any Privilege Log or any Document that is withheld or redacted on the basis of attorney-client privilege or attorney work product doctrine protections.

F. Nothing in this paragraph shall prevent the Party receiving the Privilege Log from otherwise requesting information about author(s) and recipient(s), or subject matter, or basis for privileges or protections asserted, by Bates Number or unique identifier to assess the basis or bases for withholding or redacting a Document. The Party providing the Privilege Log retains its ability to object to any such request.

G. **DEADLINE FOR FURNISHING PRIVILEGE LOGS**. Privilege logs must be produced thirty (30) days after substantial completion of production.

H. **CHALLENGES**. Nothing in this Order shall limit the Receiving Party's right to

bring a challenge as it relates to this Section of the ESI Protocol, including a challenge regarding the privilege log, or a challenge to the Producing Party's claim that a document is protected from disclosure by an applicable privilege or by the work product doctrine. If, after the Receiving Party notifies the Producing Party of specific documents for which it is challenging privilege and after undertaking a subsequent meet-and-confer process, the Parties are unable to resolve any dispute they have concerning the protection of the documents in question, the Parties shall file a Joint Notice re Discovery Dispute in accordance with Local Rule 251(c), Judge Baker's Standing Order (Doc. 162) and/or any other standing orders of the Court relating to resolution of discovery disputes. No briefing by any party shall publicly disclose the documents claimed to be privileged while the privilege claim remains unresolved or is resolved in the Producing Party's favor.

## VII. MODIFICATION

This Stipulated Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown. Nothing in this Stipulation shall be construed to prohibit the undersigned Parties from agreeing to modify any provision of this Stipulation or seeking relief from the Court. Nor shall anything in this Stipulation or any Party's compliance be construed as a waiver of any Party's rights under the Federal Rules of Civil Procedure. Nor shall anything in this Stipulation be interpreted to require disclosure of information that is not relevant to the claims or defenses in this case or that is protected by any applicable privilege. Nor shall anything in this Stipulation be construed to waive any objections as to the production, discoverability, proportionality, technical impracticality, or the protected status of ESI.

**IT IS SO STIPULATED.**

////

////

////

////

////

Dated: August 14, 2026

Respectfully submitted,

*/s/ Steven P. Ragland*
KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND
CODY S. HARRIS
CANDICE MAI KHANH NGUYEN
CARLOS C. MARTINEZ

*/s/ Margot Mendelson*
PRISON LAW OFFICE
MARGOT MENDELSON
TESS BORDEN
RANA ANABTAWI
MEGHA RAM

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
KYLE VIRGIEN
FELIPE HERNANDEZ
MARISOL DOMINGUEZ-RUIZ
CARMEN IGUINA GONZALEZ

*Attorneys for Plaintiffs*

Dated: August 14, 2026

*/s/ Brodie M. Butland*
UNITED STATES ATTORNEY
ERIC GRANT

ASSISTANT UNITED STATES ATTORNEYS
LYNN TRINKA ERNCE
BRODIE M. BUTLAND

*Attorneys for Defendants*

## Appendix 1: ESI Metadata and Coding Fields

**A. Imagebase Load File (.opt) shall be in Concordance Image/Opticon (.opt) format and include a record for each page.**

**B. Metadata Load File (.dat)** shall include a record for each document and use Concordance default delimiters, as follows:

| | | |
|---|---|---|
| Field Delimiter | = | (ASCII 020) |
| Text Delimiter | = | þ (ASCII 254) |
| Line Delimiter | = | ® (ASCII 174) |

C. The following fields will appear in the metadata load file in the order displayed below: A "✓" denotes that to the extent the indicated field exists for a Document it should be present in the load file produced. The Parties will only provide fields that can be populated automatically as described in paragraph IV(E)(7) above. A Producing Party may assert privilege over provided metadata.

| **Field Name** | **Field Description** | **Hard Copy Document** | **Email** | **Other ESI** |
|---|---|---|---|---|
| BEGDOC# | Start Bates (including prefix) – No spaces | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) – No spaces | ✓ | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent in a family | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates Number of last attachment in a family | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source – format: Last, First or ABC Dept. | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | | ✓ | ✓ |
| REDACTED | Should be populated with Y for records with redactions and N for records without redactions | ✓ | ✓ | ✓ |
| SUBJECT | Subject line of email | | ✓ | |
| DATE TIME SENT | Date and time sent (use UTC time zone) Numbers | | ✓ | |

| Field Name | Field Description | Hard Copy Document | Email | Other ESI |
|---|---|---|---|---|
| | must be populated. If date is unknown, leave blank. | | | |
| DATE TIME RCVD | Date received (use UTC time zone) Numbers must be populated. If date is unknown, leave blank. | | ✓ | |
| FROM | Sender (i.e.: Email address, Last name, First name) | | ✓ | |
| TO | Recipient (i.e. Email address, Last name, First name) | | ✓ | |
| CC | Carbon Copy Recipients (i.e.: Email address, Last name, First name) | | ✓ | |
| BCC | Blind Carbon Copy Recipients (i.e.: Email address, Last name, First name) | | ✓ | |
| CONVINDEX | Email system ID used to track replies, forwards, etc. | | ✓ | |
| AUTHOR | Creator of the document | | | ✓ |
| FILE NAME | Name of file as it appeared in its original location | | | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | | ✓ | ✓ |
| FILEPATH | Data’s original source full folder path | | ✓ | ✓ |
| FILESIZE | Native File Size in KBs | ✓ | ✓ | ✓ |
| DATE TIME MOD | Date an electronic document was last modified. (Use UTC Time zone.) Numbers must be populated. If date is unknown, leave blank. | | ✓ | ✓ |

| Field Name | Field Description | Hard Copy Document | Email | Other ESI |
|---|---|---|---|---|
| DATE TIME CRTD | Date the document was created. (Use UTC Time zone.) Numbers must be populated. If date is unknown, leave blank. | | ✓ | ✓ |
| CONFIDENTIALITY | Confidentiality designations, to the extent a document is tagged as confidential. | ✓ | ✓ | ✓ |
| PGCOUNT | The number of pages of the produced document | ✓ | ✓ | ✓ |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to the Parties. | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | ✓ | ✓ | ✓ |
| NATIVEPATH | Relative file path location to the native file | | ✓ | ✓ |

**Appendix 2: TAR Protocol**

This protocol describes Defendants' use of Technology Assisted Review (TAR) on or after the effective date of this protocol to respond to the requests for production propounded by Plaintiffs in this matter.

**A. Applicability & Scope**

1. The review population may consist of documents collected from an email or file server, application, or system (whether networked or cloud-based), as well as custodial documents of the agreed-upon custodians using agreed-upon or Court directed search criteria, and that hit on one or more of the search terms agreed upon by the parties, plus family members of those documents.

**B. Exclusions**

1. **File Types Not Suitable for TAR.** Documents of certain file types, including file types that have little-to-no textual content, corrupted textual content, or purely numerical content are not suitable for analysis using TAR—e.g., screenshots, photos, audio/video files, graphics files, system files, zero-byte files, empty container files, and corrupt files.
   i. For the avoidance of doubt, spreadsheets and presentation files containing sufficient textual content are suitable for analysis using TAR.

2. **De-Duplication; Culling; Filtering.** Pursuant to Section IV(A) and (B), in the above ESI Protocol, the Producing Party will deduplicate and conduct any culling or filtering of the ESI collection prior to beginning the Active Learning Process.

**C. Active Learning**

1. **Reviewers.** Attorneys and Paralegals representing the Producing Party who have been trained on the issues in this matter and discovery requests ("TAR Reviewers") will conduct all review necessary for training and validation.

2. **Training.**
   i. **Process.** After documents are loaded into the Active Learning platform, TAR Reviewers will review a series of documents within the Review Population for responsiveness. TAR Reviewers will code documents as responsive or non-responsive until the Active Learning model can be built. Once the Active Learning model is built, the priority review will commence. During the priority review, the Active Learning system presents the TAR Reviewers with documents to code as responsive or non-responsive. This process continues until the model reaches stability. Stability is demonstrated by consistent, high-confidence results over time where the model's responsiveness prediction consistently matches the TAR Reviewer's responsiveness determination. Once stability is reached, a Validation Test is conducted as defined in Section E(1) below.

   ii. **Termination.** Training will continue until the target Elusion Rate is reached as described in Section D(1) below.

   iii. **Quality Control.** Quality Control measures will be used to identify certain

documents within the review population that appear likely to have been coded incorrectly. TAR Reviewers will conduct a Quality Control review of select documents where the model's ranking does not match TAR reviewers coding to ensure documents are coded appropriately.

**D. Review Set**

1. **Elusion Rate.** The goal of the Active Learning process is to achieve the target Elusion Rate. The Elusion Rate measures the percentage of uncoded, predicted non-responsive documents that are in fact responsive. TAR Reviewers will continue training the model until the target Elusion Rate is met through a Validation Test. The target Elusion Rate shall be below 3% to match accepted human error rates.

2. **Scoring.** Once the TAR training commences, the Active Learning model will assign a score between 0 and 100 to each document subject to TAR and will continue to update this score as more documents are coded. A higher score reflects a higher likelihood that the document is responsive.

3. **Cutoff Rank.** Based on the distribution of scores and elusion testing, the Producing Party will determine the minimum document score necessary to achieve the Cutoff Rank. Every document on or above the Cutoff Rank receives a responsive prediction, while every document below the Cutoff Rank receives a non-responsive prediction.

4. **Review of Documents Above the Cutoff Rank.** Documents scoring at or above the Cutoff Rank, which have not previously been reviewed, plus their family members, will be reviewed for privilege. Documents identified as not responsive and/or wholly privileged will be excluded from production.

**E. Validation Process**

1. **Validation Test.** To confirm the performance of the model, the Producing Party will provide an Elusion Rate for the model. To provide this Elusion Rate, TAR Reviewers will manually review a statistically valid sample of unreviewed documents that were not identified as relevant by the model (the elusion set), which are drawn from those documents below the Cutoff Rank. A statistically valid sample will have a 95% confidence interval, with a margin of error plus or minus 5%. Defendants will provide the number of documents in this elusion set, and the number of relevant documents identified as relevant by manual review (true positives).

2. **Metrics.** At the conclusion of training and review, the Producing Party will provide following metrics: (a) number of documents subject to TAR; (b) number of documents deemed not suitable for TAR; (c) the Cutoff Rank; (d) number of documents ranked above and below the Cutoff Rank; (e) the Recall Rate; (f) the Precision Rate, and (g) the Elusion Rate.

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: August 18, 2026

[signature]

HONORABLE CHRISTOPHER D. BAKER
United States Magistrate Judge