ERIC GRANT
United States Attorney
LYNN TRINKA ERNCE
BRODIE BUTLAND
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2720
FAX: (916) 554-2900
Lynn.Trinka.Ernce@usdoj.gov
Brodie.Butland@usdoj.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FERNANDO GOMEZ RUIZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | Case No. 1:26-CV-02546-JLT-CDB<br><br>**DEFENDANTS' OBJECTIONS TO THE EXTERNAL MONITOR'S REPORT AND CONCLUSIONS** |

The U.S. District Court for the Northern District of California appointed an external monitor to provide an independent, neutral audit of health care at the California City Detention Facility ("Facility"). The external monitor has subsequently issued a report finding "non-compliance" in all aspects of the Facility's health care program.

The report is fatally flawed as written. The monitor never disclosed the methodology used to determine non-compliance, rendering it impossible to test the report's conclusions. And the monitor's conclusions were invalidly reached by running a non-representative sample of detainees through this unknown methodology. Beyond the nondescript methodology and survivorship bias infecting the monitor's conclusions, the report relies on stale, inaccurate, and unverified information, rendering its conclusions unsound. Finally, many of the monitor's recommendations were already implemented (or were in the process of being implemented), and they are based not on constitutional or industry standards, but rather the monitor's personal predilections.

At minimum, the Court should (1) require the monitor to address the shortcomings identified below by submitting an amendment limited to (a) identifying the specific detainees whose records and/or interviews support his findings of non-compliance and how, (b) identifying standards for the subjective terms in Paragraph 1 of the preliminary injunction and citing objective sources for these standards, and (c) removing recommendations that the Facility has already adopted; and (2) allow Defendants to submit objections, if any, in response to the amendment. But as discussed below, the monitor's report contains several problems that are not curable (such as extrapolation using non-representative samples or using stale data), and thus the Court should not accept the report's conclusions or bootstrap them to a finding of constitutional violations.

## I. Relevant Background.

In April 2025, CoreCivic entered into an agreement with Immigration and Customs Enforcement ("ICE") to house immigration detainees at the Facility. ECF 45-1, ¶ 3; ECF 15, ¶ 3.) After being inspected and approved by the California City Department of Public Safety, the Facility began receiving ICE detainees on August 27, 2025. ECF 45-1, ¶¶ 34, 35.

### A. Health Care.

CoreCivic's contract requires compliance with the 2025 National Detention Standards

("NDS 2025"), including standards pertaining to health care. ECF 82-1, ¶ 17; ECF 45-1, ¶ 78 n.6. CoreCivic's health care policies conform with the NDS 2025 and the standards promulgated by the National Commission on Correctional Health Care ("NCCHC") and American Correctional Association ("ACA"), the two most widely recognized accrediting bodies for detention settings. *Id.*, ¶ 20. ICE reviewed and approved CoreCivic's policies. *Id.*, ¶ 21. The Facility has an on-site health care unit, which includes a waiting area, medical exam rooms, a dental room with multiple dental chairs, a telehealth room, a lab, an x-ray room, mental health offices, four negative pressure cells, two medical observation cells, and a mental health watch cell. ECF 45-1, ¶ 146.

**1. Staffing.**

CoreCivic's contract sets forth a required health care staffing pattern, which ICE regularly monitors for compliance. ECF 82-1, ¶¶ 18-19. Medical is staffed on-site twenty-four hours a day, seven days per week. ECF 45-1, ¶ 53. Mental health staff is on-site seven days a week and available twenty-four hours a day, seven days per week. *Id.*, ¶¶ 52-53. Dental staff are on-site five days a week. *Id*. There is an on-site phlebotomist and a contracted mobile radiologist. *Id*.

**2. Intake Screening.**

The NDS 2025 requires that, within 12 hours of arrival, a detainee receive "an initial medical, dental, and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions." ECF 82-1, ¶ 25; ECF 38-2, ¶ 19. A "health care professional or a specially trained detention officer" must conduct the initial health screening. ECF 82-1, ¶¶ 35, 37; ECF 38-2, ¶ 19. The NDS 2025 defines a "health care practitioner" as "an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession." ECF 82-1, ¶ 35.

Detainees arriving at the Facility go through a Pre-Screening and an Intake Screening. ECF 45-1, ¶¶ 58, 140; ECF 38-2, ¶ 20. The Pre-Screening, conducted before a detainee is booked into the Facility, identifies emergent and urgent needs requiring either an immediate hospital transfer or an initial provider referral. ECF 38-2, ¶¶ 20-21. The Pre-Screening is conducted by a registered nurse ("RN") or Licensed Vocational Nurse ("LVN") under the supervision of an on-duty RN and

includes taking a basic medical history, observing a detainee's physical condition, and recording vital signs. (*Id.*) The Intake Screening includes a more detailed inquiry. ECF 82-1, ¶ 46; ECF 45-1, ¶¶ 142-143; ECF 38-2, ¶ 22. The Intake Screening determines whether the detainee needs an emergent, urgent, or routine referral. ECF 38-2, ¶ 23. Emergent referrals are seen immediately, urgent referrals are seen within 24 hours, and routine referrals occur within 2-14 days. *Id.*

**3. Comprehensive Assessments.**

The NDS 2025 requires that the Facility complete a comprehensive health assessment, including a physical examination and mental health screening, within 14 days of a detainee's arrival. ECF 82-1, ¶¶ 26, 38-44; ECF 38-2, ¶ 30. These assessments must be completed by a physician, physician assistant, nurse practitioner ("NP"), RN (with documented initial and annual training by a physician), or other health care practitioner. *Id.* An NP or physician performs the comprehensive health assessment at the Facility within 14 days of the detainee's arrival. ECF 82-1, ¶ 46; ECF 38-2, ¶ 31.

**4. Specialists.**

CoreCivic has contracts with off-site providers, including those affiliated with Adventist Health Tehachapi Valley and the Kern County Medical Center, for imaging and/or specialty care. ECF 38-2, ¶ 46; ECF 45-1, ¶ 56.

**5. Emergency Services.**

The NDS 2025 requires that a facility "have a written plan" for 24-hour emergency services and that staff "be trained to respond to health-related emergencies." ECF 82-1, ¶¶ 29-30. CoreCivic contracts with Hall Ambulance for emergency services, transports, and evacuations. ECF 82-1, ¶ 29 n.6; ECF 45-1, ¶ 54; ECF 38-2, ¶ 44. There are two helicopter landing areas on-site for medical evacuations. *Id.* Detainees experiencing medical emergencies are transported to a hospital. ECF 45-1, ¶ 55; ECF 38-2, ¶ 45. Detention and health services staff are trained to provide an emergency response and respond to the detainee within four minutes. ECF 38-2, ¶ 37.

**6. Continuity of Care.**

The Facility uses the Allscripts Electronic Health Record to track detainee medical history. ECF 38-2, ¶ 11. The Facility's outside laboratory provider has a direct connection to the Allscripts

system, and when laboratory results are available, they are automatically loaded into the system. *Id.*, ¶ 14. Daily tests and administered medication are also entered into the system. *Id.*, ¶¶ 16-17.

If a detainee is transferred from another facility, the detainee's records, including a summary of prior diagnoses and prescribed medications, are scanned into the Allscripts system. *Id.*, ¶¶ 13, 25. Until the detainee is seen by a provider for an intake examination and new medication is entered, the Facility continues dispensing the medications provided during transport. (*Id.*) When medications were not provided by the sending facility, the Facility will attempt to obtain them from a backup pharmacy. *Id.*, ¶ 27. With the opening of the California City Pharmacy on October 27, 2025, and an agreement to stock medications commonly prescribed at the Facility, backup prescriptions are conveniently obtained. *Id.*

Detainees with chronic medical conditions are identified through a review of intake records, intake screening, initial health appraisal, sick call, or other health encounters, and are enrolled in a Chronic Care Clinic for their respective condition(s). ECF 38-2, ¶¶ 38-40. Detainees enrolled in the Chronic Care Clinic receive an initial visit within 30 days of enrollment by a provider, who takes a targeted history and physical examination of the detainee and places necessary medication and diagnostic orders or specialty care referrals. *Id.*, ¶ 41. All detainees enrolled in the Chronic Care Clinic are required to be seen for follow-up appointments with a provider at least every six months unless needed more frequently. *Id.*, ¶¶ 42-43.

**7. Medication.**

When a formulary medication is ordered and entered into the Allscripts system, it is automatically transmitted to the Facility's contracted pharmacy provider, Clinical Solutions Pharmacy ("CSP"), to be filled. ECF 38-2, ¶ 26. CSP typically fills orders the same day they are received and transmits them via overnight shipping to the Facility. *Id.* When a non-formulary medication is ordered and entered, it is flagged for review and approval; once approved, it is fulfilled. (*Id.*) Most medications are administered by a nurse twice per day during pill call. ECF 45-1, ¶ 150; ECF 38-2, ¶ 36.

**8. Sick Call Requests.**

The NDS 2025 requires that a facility "have procedures to ensure that all request slips are

received and triaged by the medical staff within 24 hours of receipt of that request," and that a "health care practitioner" "review the request and determine when the detainee will be seen based on the acuity of the problem." ECF 82-1, ¶ 28. Detainees at the Facility may request medical, mental health, and dental care by submitting a written sick call request. ECF 45-1, ¶¶ 145, 156; ECF 38-2, ¶ 34. Secure boxes for submitting sick call requests are located inside each housing unit and are accessible to detainees on a daily basis. Ex. 6: Decl. of Warden Chestnut at ¶¶ 17–19. Written sick call requests are collected by medical each night, triaged, and prioritized to determine if a face-to-face encounter is needed. ECF 38-2, ¶ 34. Sick call requests designated as an "Emergency" are seen immediately; requests designated "Urgent" are seen within 24 hours; and requests designated "Routine" are seen within 72 hours. *Id.*, ¶¶ 34, 54. Detainees can also make verbal sick call requests. ECF 45-1, ¶ 145; ECF 38-2, ¶ 35-36.

**B. The preliminary injunction and provisional Class Certification Order.**

On December 1, 2025, just three months after the Facility reopened, Plaintiffs requested a preliminary injunction and provisional class certification. ECF 21, 22. Plaintiffs' proposed preliminary injunction sought an order requiring Defendants "to develop and submit … a detailed plan to ensure adequate medical and mental healthcare." ECF 22-38 at 3. The proposed injunction appointed an "independent, third-party monitor" to inspect the Facility, review Defendants' proposed plan, and "provide feedback to the Court" regarding the adequacy of Defendants' plan. *Id.* at 6. Defendants opposed class certification and preliminary injunctive relief and moved to transfer venue to the Eastern District of California, where the Facility and virtually all witnesses and evidence are located. ECF 37, 56.

On February 6, 2026, the Northern District court held a hearing to discuss the pending motions. ECF 75. The court acknowledged that transfer was appropriate but "wanted to see if [it] could do something" for Plaintiffs before doing so. *Id.* at 85:3–4. But the Court recognized that Plaintiff's preliminary injunction on its own was not tenable:

> I can't do this. I mean, it's got all kinds of generic things well beyond what you were doing on the medical to start with. You have things like timely and responsive emergency services. There's no way I can make an order that's just general like that. How is anybody going to know what they have to comply with?

*Id.* at 61:11–17. But, at Plaintiffs' urging, the court contemplated whether appointing a monitor to decipher compliance with the health care injunctions could cure those inadequacies:

> This can perhaps work if you have a monitor who is going to make a determination about whether they're doing it. Otherwise, I mean, there's no point in just telling someone do it right. . . . It says do it correctly. And ordinarily, that would not be a workable, in and of itself, injunctive order because then people would come back we are doing it fine. We're doing the, you know, et cetera, et cetera, and that's why I was looking for specifics. But if you have a monitor that is in a position to make determinations, possibly -- but I'm not absolutely certain about that and we'll just – we'll take it one step at a time. As I said, particularly concerned about intake and how one could tell someone how to do at intake other than just do intake right. Okay. But then you have all of these other problems that maybe you do need some kind of a referee for – that's on the scene or can be there. But, again, these are very general concepts. … So they are – they're conclusions about how something should be done, okay, timely. Timely is not get somebody there at a particular time, it's do it in, you know, proper expediency. And, again, without somebody there, you could never tell whether anybody was following it or not unless you had a giant hearing on every one of these.

*Id.* at 63:2–6, 63:10–64:6. The court also commented on specific provisions of Plaintiffs' proposed injunction, noting that "if you didn't have a monitor, there's no way this would work." *Id.* at 71.

The court ultimately appointed a monitor because that was "the only way" a preliminary injunction could hold. *Id.* at 163:7–8, 14–15, 20–21. The court ordered Defendants "to provide access to a qualified, independent, third-party monitor . . . for a period of 120 days." ECF 72 at 3. The court also certified a provisional class consisting of: "All persons who are now, or in the future will be, in the legal custody of [ICE] and detained at California City Detention Facility."

The court then directed the parties to propose potential experts to serve as an independent monitor. ECF 75 at 158:22–159:14. Plaintiffs proposed three candidates, and Defendants proposed five. ECF 76, 77. At a March 5, 2026 hearing, the Court selected and appointed one of Plaintiffs' candidates, Dr. Anandkumar. ECF 99 at 99:1–8. The court entered the Appointment Order on March 30, which directed the monitor to produce a draft report, allowed the parties fourteen days to provide comments after which the monitor could make any revisions of his choosing, and then directed the monitor file a final report by the end of his term. ECF 112 at 6–7.

The monitor disclosed his draft report to the parties on July 10, 2026. Plaintiffs provided comments on July 23, 2026, and Defendants provided comments the next day. Ex. 1: Pls'

Comments; Ex. 2: Correspondence from AUSA L. Ernce to Dr. Anandkumar. The monitor made the majority of the changes requested by Plaintiffs and addressed a few of the factual comments submitted by Defendants but did not clarify his methodology or revise his findings. The monitor's 120-day term ended July 28, 2026.

## II. Objections to monitor's report.

### A. The report is based on an undisclosed and flawed methodology.

#### 1. The monitor did not review a representative sample of detainees, and thus "findings" cannot be generalized across the Facility population.

The monitor purported to conduct a "system-level assessment," and only examined individual records "to understand how care is delivered across the facility." Report at 2. But to draw reliable conclusions about health care provided to the Facility population, the monitor must use objective data from a representative and statistically valid sample of records. *See Jimenez v. Allstate Ins. Co.*, No. 10-8486, 2019 WL 13088814, at *18 (C.D. Cal. May 13, 2019) (concluding it was not "reliable to extrapolate the results from a non-random sample of only 33% of the Class to support findings of fact as to the Class as a whole"). There is no indication this occurred. The Report does not state how the monitor selected the detainees whose medical records were reviewed. ECF 166-2 at 3. And when Defendants raised the lack of clarity regarding the monitor's methodology in their comments to the monitor, he did not make any revisions to assuage that concern. *See* Ex. 2 at 1; ECF 166-2 at 5.

Defendants' concern is not merely academic. They provided the monitor a report with the names and A-numbers of all detainees with diagnosed medical or mental health conditions from which the monitor could have selected a random sample for records review. Ex. 5: Decl. of Dr. Dauss at ¶ 9. But the monitor never did so. And more problematically, he did not specify which patient records he reviewed for each component of the injunction. Thus, for each "non-compliance" that the monitor found, Defendants do not know who specifically the monitor interviewed or reviewed records, how those individuals were selected, or what specific deficiencies were found.

Indeed, there are reasons to suspect that the monitor's sampling was not representative of the total population seeking medical care. Plaintiffs referred 32 separate individuals to the monitor

for consideration. Ex. 4 at ¶ 13. At the monitor's request, Defendants produced reports of off-site transports for emergency medical care. The monitor and his team member reviewed medical records for all but one of the 29 detainees on the most recent emergency report, as well as two additional detainees on an earlier emergency transports report—in other words, the detainees with the most serious and acute medical and mental health conditions. Ex. 4 at ¶ 16; Ex. 5 at ¶ 10. They also reviewed the five detainees who were listed on the Infirmary/Medical Housing lists as having been on suicide watch and/or mental health observation. Ex. 4 at ¶ 17. In short, while the Report does not disclose the methodology the monitor used for selecting the records they reviewed, they appear to have focused their efforts on the sickest and most acute detainees and the detainees Plaintiffs referred to them.[1] The sample is not objective or representative, and the monitor does not explain in his report how data from that sample can be generalized to the population.

### 2. The monitor employed an overly stringent compliance requirement.

The monitor assessed each of the eight subparagraphs (referred to as "components") in Paragraph 1 of the Preliminary Injunction as either "Compliance" or "Non-Compliance." ECF 166-2 at 5. The Report states that "a component is rated Compliance when the information reviewed indicates that, for each element of that component, an adequate process appears to be in place; the element appears to be carried out in practice for the patients to whom it applies; and the facility has a reliable way to identify problems and correct them promptly, as generally reflected in the available records, observations, or interviews."[2] *Id.* By contrast, "a component is rated Non-Compliance when, as to one or more elements, the information reviewed does not adequately demonstrate that an adequate process is in place, does not adequately demonstrate that the element is being carried out in practice for the patients to whom it applies, or does not adequately demonstrate that the facility has a reliable way to identify problems and correct them promptly, as

[1] The monitor and his team member spent half of their total medical records review time on Plaintiffs' referrals. Ex. 4 at ¶¶ 14–15. Adding detainees on the emergency transports report and the suicide watch/mental health observation list, they spent two-thirds of their time reviewing the sickest and most acute detainees and Plaintiffs' referrals. *Id.* at ¶¶ 14–19.

[2] The elements that were assessed under each component are not enumerated, despite Defendants' request in their comments that the monitor do so. ECF 166-2 at 5–6.

generally reflected in the available records, observations, or interviews." *Id.* at 5–6.

Thus, rather than assess whether the subparagraphs were met as a whole, the monitor found noncompliance if any aspect of a subparagraph was not "adequately" demonstrated. That is not the legal standard, and by using it, the monitor's findings of non-compliance cannot be meaningfully correlated with constitutional requirements. *See Lewis v. Casey*, 518 U.S. 343, 359-60 (1996) ("These two instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief."); *Fraihat v. ICE*, 16 F.4th 613, 647 (9th Cir. 2021) ("There is considerable distance between imperfect implementation of a policy, or even knowledge of the imperfect implementation of a policy, and deliberate indifference in the constitutional sense.").

**3. The report does not cite specific patients or quantify its findings.**

The Report repeatedly asserts that elements were "not consistently" found or documented—indeed, this phrase and variants thereof are used 52 times throughout. But the monitor does not explain what he means by "not consistently" or quantify how many instances must be found for it to apply. This issue is compounded by the monitor's omission of how many patients' records he reviewed for each element and the result of each review (discussed above). For example, does the phrase "not consistently" mean that the monitoring team reviewed ten patients and found a particular element missing for only two of them? Could "not consistently" apply if that element was missing for only a single detainee?

As currently written, the monitor's findings cannot be tested against the opaque standards he employs to evaluate whether a "finding" reflects an isolated, sporadic incident or a systemic issue. And as a corollary, the monitor's findings are not probative of a constitutional violation. *See Doe v. Kelly*, 878 F.3d 710, 724 & n.8 (9th Cir. 2017) (finding plaintiffs failed to show medical care system was inadequate or that Border Patrol was deliberately indifferent to detainee's medical needs where plaintiffs presented only "a few incidents of inappropriate action"). And that is especially true because the monitor never identified any adverse outcomes experienced by any detainees as a result of the alleged non-compliance. *See id.* at 724 ("Indeed, there is no evidence

of Defendants denying critical medical care to a detainee with dire consequences.”).[3]

**B. The report relies on unverified, inaccurate, and stale information.**

Beyond the procedural methodological problems, the monitor’s report also has substantive shortcomings. First, it relies on detainee self-reporting for multiple non-compliance findings (ECF 166-2 at 31, 38, 48) without any assurances that the monitoring team independently verified any claims for accuracy. Instead of randomly selecting detainees to interview, the monitor spoke with 43 of the 53 detainees who signed up for interviews with him. Ex. 6: Decl. of Warden Chestnut at ¶ 9. Then the monitor did not review medical records for 11 of the detainees he interviewed, thus making no attempt to verify the claims of at least a quarter of their interview sample. Ex. 4 at ¶ 20.

The monitor’s reliance on self-reported data taken at face value has led to questionable report findings. In one highly illustrative example, the report states that “[d]uring an interview, a patient reported having to hand their sick call request to an officer to place in the box, rather than submitting it directly, because the box was located outside the housing unit.” ECF 166-2 at 48. But the sick call and grievance boxes are located ***inside*** the housing unit rotundas for all general population housing units, and detainees pass by these boxes daily when they go to meals and recreation. Ex. 6 at ¶¶ 16–17. In the restrictive housing units, the sick call and grievance boxes are located ***inside*** the common area of the pod and are accessible to detainees daily when they come out of their cells. *Id.* at ¶ 18. And the monitor had access to both setups during his inspection. *Id.*








[3] A review of randomly selected detainees assessing the metrics cited by the monitor in his report came to a different conclusion. Ex. 5 at ¶ 13.

at ¶ 22–25. As shown below by Facility surveillance screen captures, the monitor (wearing a dark jacket and tan pants) inspected the secure boxes in F and M Units (both general population units), as well as in E200 Pod (restrictive housing). *Id.* at ¶¶ 23–24.

Despite the monitor viewing the areas for himself and even after Defendants submitted a comment noting that the draft report was inaccurate as to the placement of the sick call boxes (Ex. 2 at 4), the monitor still included the false information given by the detainee about the availability of sick call boxes in the Report.

Further, the injunctive relief that plaintiffs claim may only be based on current and ongoing conditions, not conditions when the Facility first reopened. *See Fraihat*, 16 F.4th at 639 ("Regardless, ICE's earlier delays in addressing COVID-19 did not demonstrate deliberate indifference on an ongoing basis. [T]o establish eligibility for an injunction, [plaintiffs] must demonstrate the continuance of [defendants'] disregard during the remainder of the litigation and into the future." (cleaned up)). But the monitor's report is based in part on stale data reflecting past conditions of the Facility. Twenty percent of the medical records reviewed by the monitoring team were of detainees who have been released from the Facility and thus are no longer class members. Ex. 4 at ¶ 23; *see also* Dkt. 72 at 4 ("[T]he Provisional Class is defined as: All persons who are now, or in the future will be, in the legal custody of [ICE] and detained at California City Detention Facility.") The health care provided to these detainees is not reflective of the current functioning of the health care system at the Facility, especially given that the Facility has been open for less than a year, is still ramping up, and has a rapid turnover of detainees.[4] The monitor cannot extrapolate current conditions from conditions of former detainees without some explanation, which he never provided in the report.

**C. The monitor does not offer definitions or standards to provide clarity to the preliminary injunction, and he relied on personal preferences and "best practices" rather than applicable industry standards or constitutional minima.**

When Plaintiffs presented the Northern District judge their proposed language for Paragraph 1 of the Preliminary Injunction, she expressed concerns over the vagueness of many of

[4] The average length of stay is currently 71.8 days, but the average is skewed by a small number of detainees who stay in the Facility for long periods of time while their cases are on appeal. Ex. 6 at ¶ 31.

its terms (e.g., "adequate," "comprehensive," "thorough," "timely," "responsive," etc.) and stated that the court could not enter such an injunction under those circumstances. Dkt. 75 at 61:11–15, 63:25–64:6, 70:25–71:6, 74:4–6, 84:4–10. The court also acknowledged that it was unable to articulate more specific standards because it was not a prison expert. *Id.* at 113:19, 147:25–148:2. Thus, as noted above, the court believed injunctive relief could only be ordered if it appointed a monitor to identify the applicable standards and evaluate health care at the Facility against them. *Id.* at 163:18–24. The report, however, does not reference any such standards or provide definitions to bring clarity to the ambiguous terms of paragraph 1 of the preliminary injunction. Instead, the monitor simply offered his subjective opinions as to what constitutes compliance.

To the contrary, the Report includes several recommendations reflecting the monitor's own subjective preferences and best practices rather than identifiable industry standards or recognized constitutional minima. Ex. 5 at ¶ 16. For example, the Report recommends requiring that all "physical examination findings be documented with the specific findings for each system, rather than recorded only as 'WNL' [within normal limits] so that the examination is verifiable and establishes a clinical baseline." ECF 166-2 at 21. The monitor provided no source, other than his personal preference, for requiring that nurses and providers specifically document every physical examination finding for every system, even when all findings are within clinically recognized normal limits. While physical examination findings outside normal limits should be specifically documented, requiring documentation of all physical examination findings, particularly involving systems for which the patient voiced no complaints, would be excessively time-consuming and not an effective use of limited health care resources. Ex. 5 at ¶ 18.

As another example, the report criticizes use of telepsychiatry, stating that "virtual visits [from a psychiatrist] alone may be insufficient" for serious or acute psychiatric conditions. ECF 166-2 at 31. While the monitor may prefer in-person visits, he cites nothing suggesting that telepsychiatry violates constitutional or industry standards. Indeed, telepsychiatry is a widely used and accepted treatment model. Ex. 5 at ¶ 20. In a 2023 survey of psychiatrists by the American Psychiatric Association, 60% of office-based respondents reported that they conduct most of their visits via telehealth. *See* https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/

telepsychiatry-during-covid-19, last accessed August 12, 2026. Likewise, the NCCHC recommends the use of telehealth services, including for treatment of mental health disorders, in carceral settings. *See* https://ncchc.org/position-statements/telehealth-in-correctional-facilities-2025/, last accessed August 12, 2026. Regardless, the Facility has a full-time, on-site Psychiatric-Mental Health Nurse Practitioner ("PMHNP") who is specifically trained to provide psychiatric evaluations and care, in addition to a psychiatrist who sees patients via telehealth. Ex. 5 at ¶ 21. The PMHNP is able to provide in-person evaluations, particularly for detainees who are experiencing acute psychiatric symptoms. *Id.*

As another example, the report finds non-compliance with Paragraph 1(b) of the preliminary injunction requiring that intake screenings be conducted by a "medical provider," and Paragraph 1(c) requiring that health appraisals be conducted by a "primary care provider." But these requirements are not based on any applicable standards, including the NDS 2025, the NCCHC Standards for Health Services in Jails, or the ACA Performance-Based Health Care Standards for Adult Local Detention Facilities. *Id.* at ¶ 22. Other than merely noting that the Preliminary Injunction requires intakes by a "medical provider" and health appraisals by a "primary care provider," the report does not justify (or even opine) that the constitutional standard of care requires the same or that these services can only be appropriately rendered at the levels indicated. Nor does the report identify any other detention facilities where intake screenings are required to be conducted by a medical provider or where health appraisals must be conducted by a primary care provider. Indeed, at the jail system run by Plaintiffs' own retained expert, Dr. Wilcox, nurses, not providers, conduct the intake screenings. Ex. 7: Decl. of D. Struck at ¶¶ 4–5.

**D. The report recommends practices already in place.**

A number of the monitor's recommendations reflect current practices or changes that are in progress, which not only further confirms many of the methodological problems described above but undermines the monitor's non-compliance findings. For example, the report recommends conducting a staffing analysis. ECF 166-2 at 13. ICE already did so when preparing the contract for the Facility, and CoreCivic internally reevaluated it in March and April 2026. Ex. 5 at ¶ 29. The report also recommends monitoring the daily work queue and adjusting staffing assignments

based on clinical priority. ECF 166-2 at 13. This is already done on-site daily by the Charge Nurse, Health Services Administrator, and Clinical Nurse Supervisor. Ex. 5 at ¶ 30.

The Report recommends assigning a priority level to specialty referrals based on the patient's clinical urgency. ECF 166-2 at 24. But the Facility already assigns a Routine, Urgent, or Emergent label to specialty referrals (although the Facility cannot dictate when a specialty provider will see a patient).[5] Ex. 5 at ¶ 31.

With respect to detainees experiencing withdrawal, the monitor recommends use of "a monitored withdrawal management protocol." ECF 166-2 at 29. The Facility has an existing policy, 13-71, which addresses the assessment and management of withdrawal symptoms, which is available in the nursing station for immediate access. Ex. 5 at ¶ 32. Had the monitor requested any policies or protocols related to withdrawal management in any of his document requests, Defendants would have provided policy 13-71 to him. But he did not do so, and then held the Facility responsible for not having one.

With respect to dental care, the Report includes the following recommendations:

> 1. Address dental-related requests in a timely manner.
>
> 2. Assess patients reporting dental pain or infection using established dental nursing guidelines, contact the provider for pain medication or antibiotics when clinically indicated, and prioritize the patient to be seen by the dentist.

ECF 166-2. at 37. These items are already occurring, and the monitor has not pointed to any examples to the contrary. The monitor's non-compliance finding is based merely on his unsupported speculation that "dental concerns ***may*** not be identified or addressed in a timely manner, and patients with dental pain, infection, or other urgent needs ***may*** go untreated." *Id.* at 36) (emphasis added). But there is not, and has never been, a dental backlog at the Facility. Ex. 5 at ¶ 33. Dental sick calls are triaged by a nurse and referred to the dentist as they are received. *Id.* at ¶ 34. If a patient reports pain or something more serious that needs to be addressed, that patient is prioritized by the dentist, who is at the Facility on the day shift Monday through Friday and on

[5] While the Report states that specialty referrals must be reviewed and approved by the Regional Medical Director (ECF 166-2 at 22), the process has been simplified, and specialty referrals are now submitted directly to MedPAR for review and approval by ICE.

call for emergencies outside his regular hours. *Id.* If a patient reports pain or infection and the dentist is not available, a medical provider is contacted for pain medication or antibiotics when clinically indicated. *Id.*

With respect to mental health, the monitor recommends that the Facility "[r]efer patients whose needs exceed the facility's capacity to inpatient psychiatric care in a timely manner." ECF 166-2 at 32. But the monitor saw this occurring during his inspection. Ex. 6 at ¶ 32.

As a final example, the report notes that two rooms located in the gym area are temporarily being used for health care until a satellite medical clinic area is completed, after which the gym will no longer be used for health services. ECF 166-2 at 49, 51. The plans were provided to the monitor during his inspection, and he was informed the project began the week of July 13, 2026, yet he still included this item in his recommendations. The report also includes a recommendation relating to privacy in the clinic rooms, even though the monitor is aware that staff installed blinds on the windows immediately after he raised a concern during his inspection. Ex. at ¶ 37. A photograph of the rooms with the blinds is shown below. *Id.* at ¶ 38.



## III. CONCLUSION

The monitor's report is methodologically problematic, and in its current form cannot establish ongoing constitutional violations at the Facility. The Court should reject its conclusions and recommendations, or at minimum require the monitor to address the shortcomings identified in these objections by submitting an amended report explaining his methodology (including identifying which detainee interviews or medical record reviews pertain to which component of the injunction), identifying standards for terms of the preliminary injunction, and removing recommendations that the Facility has already adopted.

Dated: August 21, 2026

ERIC GRANT
United States Attorney

*/s/ Brodie M. Butland*
LYNN TRINKA ERNCE
BRODIE M. BUTLAND
Assistant United States Attorneys