# EXHIBIT 5

EXHIBIT 5

**DECLARATION OF KRISTEN DAUSS, M.D.**

I, K. Dauss, M.D., state the following based upon my personal knowledge:

1. I am over the age of 18 years and competent to testify to the matters set forth in this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I can competently testify to them.

2. I am a Medical Doctor, and I am currently licensed to practice medicine in Indiana, Oklahoma, Texas, North Carolina, Alabama, Minnesota, Pennsylvania, Tennessee, New Jersey, Kansas, Ohio, Wisconsin and Illinois.

3. I hold an undergraduate degree in biology from Indiana University and a Doctor of Medicine degree from Morehouse School of Medicine. I also hold a Master of Business Administration degree from Western Governors University.

4. I am board-certified in General Psychiatry and Child and Adolescent Psychiatry. I am also a Certified Correctional Health Professional by the National Commission on Correctional Health Care.

5. I have been actively providing healthcare to inmates and detainees in jails, prisons, and detention facilities since 2015. I have held such positions as Adolescent Medical Director for the Indiana Department of Corrections' ("IDOC") Division of Youth Services; Statewide Director of Psychiatry for IDOC; and Chief Medical Officer ("CMO") for IDOC, a position I held from March 2019 to April 2023.

6. I am currently the CMO for CoreCivic, a position I have held since May 2023. As CMO, I oversee medical services at jail, detention, correctional, and re-entry facilities owned and/or operated by CoreCivic throughout the United States, including the California City Detention Facility ("Facility"), also referred to as the California City Immigration Processing Center.

7. I have reviewed the Court-appointed external monitor's report, filed with the Court on July 27, 2026 at Dkt. 166-2, as well as the monitor's draft report, provided to the parties on July 10, 2026.

8. I have also reviewed the documents provided by CoreCivic to Defendants for production to the monitor in his response to his document requests.

9. CoreCivic produced a report of all detainees with a diagnosed medical or mental health condition, from which the monitor could have selected a random sample of detainees charts to review.

10. I am aware that the monitor was provided a report of off-site emergency medical transports. Detainees are transported off-site when they are experiencing emergent or urgent medical and psychiatric events. In other words, these individuals are experiencing serious and acute medical and mental health conditions.

11. The monitor's report does not specify how many patients' records he reviewed for each component of the Injunction, or how many instances of allegedly missing or inadequate care he identified. This makes it impossible for CoreCivic to determine whether the reported findings are isolated and sporadic versus systemic.

12. The monitor also does not cite any specific patients in his report for any of the reported deficiencies, making it difficult, if not impossible, for CoreCivic, Defendants, or the Court to audit and replicate or refute his findings.

13. As a result, CoreCivic health services staff performed an audit of randomly selected detainee charts against the criteria identified by the monitor in his report to evaluate his claims of non-compliance related to Paragraph 1 of the Injunction.

14. The random audit did not identify systemic problems in any of the areas identified by the monitor relevant to Paragraph 1 of the Injunction.

15. Attachment A is a true and correct copy of the random audit.

16. The monitor's report contains a number of recommendations that reflect personal preferences and best practices, rather than accepted industry standards.

17. The monitor's report recommends requiring that all "physical examination findings be documented with the specific findings for each system, rather than recorded only as 'WNL' [within normal limits] so that the examination is verifiable and establishes a clinical baseline."

18. The monitor has provided no source, other than his own personal preference, for requiring that nurses and providers specifically document every physical examination finding for every system, even when all findings for a particular system are within clinically recognized normal limits. While I agree that physical examination findings outside normal limits should be specifically documented, requiring documentation of all physical examination findings, particularly involving systems for which the patient voiced no complaints, would be excessively time-consuming and not an effective use of limited health care resources.

19. The Report is also critical of the use of telepsychiatry, stating that "virtual visits [from a psychiatrist] alone may be insufficient" for serious or acute psychiatric conditions.

20. While the monitor may prefer in-person visits, in my experience as a Board-certified psychiatrist, telepsychiatry is a widely used and accepted treatment model.

21. The Facility has a full-time, on-site Psychiatric-Mental Health Nurse Practitioner ("PMHNP") who is specifically trained to provide psychiatric evaluations and care, as well as a psychiatrist who sees patients via telehealth. The PMHNP is able to provide in-person evaluations, particularly for detainees who are experiencing acute psychiatric symptoms. This is within the standard of care.

22. Requiring that intake screenings be conducted by a medical provider and health appraisals be completed by a primary care provider is not supported by any applicable standards, including the National Detention Standards ("NDS") 2025, the National Commission on Correctional Health Care ("NCCHC") Standards for Health Services in Jails, or the American Correctional Association ("ACA") Performance-Based Health Care Standards for Adult Local Detention Facilities.

23. I am not aware of any other detention facilities where intake screenings are required to be conducted by a medical provider or where comprehensive health appraisals must be conducted a primary care provider.

24. In my experience, intakes at detention facilities are typically conducted by nurses or even trained detention officers, which is allowed under the applicable NDS, NCCHC, and ACA standards.

25. The intake screening consists of asking a series of pre-set questions to identify whether a detainee may have any medical or mental health conditions or symptoms that should be addressed on an urgent or emergent basis. The screening is also used to identify potential victimization or suicide risk to inform initial housing decisions. The intake screening does not involve clinical evaluation or treatment.

26. The intake screening form used at the Facility was created by the ICE Health Services Corp and is used for intake screening at all ICE detention facilities nationwide, not just California City.

27. All detainees are provided a comprehensive health appraisal by a medical provider within 14 days of intake, during which the provider will follow-up on any issues identified during the intake and perform a physical examination. If a detainee is identified during intake as potentially having a medical or mental health issue that should be addressed more than quickly than the typical 14-day period, the detainee is referred to a provider on an urgent or emergent basis.

28. Although many of our providers are from disciplines that would be considered "primary care," I am not aware of any applicable standard that requires this. Completing a comprehensive health appraisal is within the scope of practice of any licensed medical provider.

29. While the monitor recommends performing a staffing analysis for the Facility, the contract with ICE already includes a staffing pattern that was reviewed and approved by ICE. CoreCivic performed an updated staffing analysis for the Facility in March and April 2026.

30. Staffing assignments at the Facility are reviewed on-site daily by Charge Nurse, Health Services Administrator, and Clinical Nurse Supervisor and adjusted as needed based on the daily work queue and clinical priority.

31. Existing CoreCivic policy assigns a Routine, Urgent, or Emergent label to specialty referrals.

32. Existing CoreCivic Policy 13-71 addresses the assessment and management of withdrawal symptoms, and a copy is maintained in the nursing station for immediate access.

33. There is no dental backlog at the Facility.

34. Dental sick calls are triaged by a nurse and referred to the dentist as they are received. If a patient reports pain or something more serious that needs to be addressed, that patient is prioritized by the dentist, who is at the Facility on the day shift Monday through Friday and on call for emergencies outside his regular hours. If a patient reports pain or infection and the dentist is not available, a medical provider is contacted for pain medication or antibiotics when clinically indicated.

35. During the term of his appointment, the monitor requested to be provided with access to the Worklist function in Allscripts, the electronic health record used by CoreCivic. This feature is not included with read-only accounts. This feature is available only with the highest level of access granted and is typically reserved for corporate-level health services staff and Facility Health Administrators due to the ability to make significant changes to the electronic health record system. We do not provide this level of access to third parties.

36. Dr. Patterson, the Regional Medical Director who oversees the Facility, had a lengthy meeting with the monitor over Teams, during which she shared her screen, showed him every available report in the Worklist function, and answered his questions.

37. I am aware that the monitor expressed frustration with connectivity issues he experienced with VOYCE, the remote language interpretation service provided used by ICE at its detention facilities, which he acknowledged appeared to be on the vendor's side, rather than a Facility issue. He also noted some extended wait times to obtain an interpreter.

38. CoreCivic had a meeting with the vendor following his inspection regarding these issues, which have been resolved. As of June 8, 2026, there is now a direct language-selection option for the most frequently utilized languages, which allows staff to select the language from the menu rather than waiting to first connect with an operator. There is also a quicker way to address issues in real time as a result of the meeting.

39. The monitor's report does not include a source for the following statement: "When the facility opened, it was intended to house individuals in good health and was staffed accordingly. In practice, however, the facility received a large volume of patients, including patients with complex medical conditions, and the medical team was not adequately prepared to manage this

population." This is not accurate. The Facility is designated as a Level III medical facility and the staffing pattern was developed accordingly.

40. There are currently 25 medical and mental health hires that are awaiting completion of the required background clearances by ICE. Once cleared, these individuals will undergo training and onboarding and then be available to provide health care services to the population.

41. In addition to on-site supervision by the Facility Medical Director, Facility Health Administrator, and Clinical Nurse Supervisor, there is also a dedicated Regional Medical Director, Regional Health Services Director, and Managing Director for Health Services, all of whom visit the facility regularly and participate in Teams meetings each weekday with the Facility regarding provision of health care.

42. There is an existing daily health services shift report that includes review of nursing and provider coverage; key metrics; any detainees in medical observation, medical overflow, suicide or mental watch, hunger strike watch, and quarantine; any hospital send-outs and returns; off-site appointments scheduled; projected intakes and transfers out; and items requiring follow-up. The Facility Health Services Administrator also monitors a daily report of statistics for sick calls, on-site provider referrals, chronic care, labs, mental health referrals, health appraisals, and mental health evaluations, as well as a weekly report including the same items plus radiology, optometry, and off-site appointments.

43. The Facility tracks infectious diseases, identifies trends, and reports infections and any outbreaks to Kern County Public Health when applicable. The monitor did not request data pertaining to infectious diseases in any of his document requests.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 28, 2026.



Kristen Dauss, M.D.

# ATTACHMENT A

ATTACHMENT A

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6629348 | 6612149 | 6616537 | 6615791 | 661468 | 6624606 | 6387526 | 6361329 | 6596197 | 6620787 | |
| Ensure initial appraisals address all findings from intake screening and available outside records | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |
| Document a complete history, review of systems, physical exam, clinical assessment, priority level, and management for each condition during the initial appraisal | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |
| Use of clinical data, such as labs, vital signs, blood glucose readings, during the initial health appraisal (where clinically appropriate) | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |
| Assignment of a clinical priority level to specialty referrals | NA | NA | NA | NA | NA | YES | YES | YES | YES | YES | 100.00% |
| Document the reason for denial or deferral of specialty referrals and any ATPs | NA | NA | NA | NA | NA | YES | NA | YES | YES | YES | 100.00% |
| Ensure specialist recommendations are obtained, reviewed, acknowledged, and either implemented or declined with documented clinical justification | NA | NA | NA | NA | NA | YES | NA | YES | YES | YES | 100.00% |
| Referrals of patients whose needs exceed the facility's capacity to inpatient psychiatric care | NA | NA | NA | NA | NA | NA | NA | NA | YES | YES | 100.00% |
| Identify chronic conditions at intake and ensure timely provider evaluation | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |
| Continue chronic disease medications without interruption | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |
| Maintain accurate problem lists | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |
| Enroll patients in chronic care when clinically appropriate | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |
| Development individualized treatment plans based on clinical guidelines for chronic conditions | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6629348 | 6612149 | 6616537 | 6615791 | 661468 | 6624606 | 6387526 | 6361329 | 6596197 | 6620787 | |
| Reconcile medications at intake | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |
| Continue active medications unless a documented clinical reason supports stopping or changing them | YES | YES | YES | YES | YES | NA | NA | YES | YES | YES | 100.00% |

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5832562 | 6615099 | 6640394 | 6479806 | 6607313 | 6586043 | 6521884 | 6470343 | 6607241 | 6641897 | |
| For emergency care, notify providers when clinically indicated and document treatment, reassessment, transport decisions, and rationale | NO | YES | YES | YES | YES | YES | YES | YES | YES | YES | 90.00% |

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6571844 | 6389331 | 6491496 | 6531304 | 6592695 | 6551460 | 6234579 | 6640467 | 6587526 | 6624608 | |
| Development of individualized treatment plans for detainees on the mental health caseload | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6567919 | 6616549 | 6629308 | 1544290 | 6589958 | 6528144 | 6625343 | 6615777 | 6638510 | 6519131 | |
| Timely triage and treatment of dental requests | YES | YES | YES | NO | NO | YES | YES | YES | YES | YES | 80.00% |
| Use of established dental nursing guidelines for pain, infection, and urgent concerns | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |

| Audit Question | MRN | | | | | | | | | | Compliance % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6556700 | 6564319 | 6596241 | 6601482 | 59799113 | 6607313 | 6615773 | 6559917 | 6617815 | 6632493 | |
| Prompt evaluation, treatment, and follow-up for infectious diseases and wounds | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | 100.00% |