**EXHIBIT 6**

**EXHIBIT 6**

**DECLARATION OF CHRISTOPHER CHESTNUT**

I, Christopher Chestnut, state the following based upon my personal knowledge.

1. I am over the age of 18 and am competent to testify to the matters set forth in this Declaration.

2. I am currently the Warden at CoreCivic's California City Correctional Facility[1] ("Cal City" or "the facility"), located at 22844 Virginia Boulevard, California City, a position I have held since June 2025.

3. The facility currently houses federal immigration detainees pursuant to a contract with Immigration and Customs Enforcement ("ICE"). The facility was recently sold by CoreCivic to ICE but is still operated by CoreCivic.

4. Prior to transferring to Cal City, I was the Warden at Nevada Southern Detention Center and the Assistant Warden at the Northeast Ohio Correctional Center.

5. I have been employed by CoreCivic since 1995 and have more than 31 years of corrections and detention experience, including supervisory positions at multiple facilities utilized by ICE to house civil immigration detainees.

6. I make this Declaration regarding the Court-appointed external monitor's report, filed with the Court on July 27, 2026 at Dkt. 166-2.

7. I have reviewed both the monitor's draft report, which was provided to the parties on July 10, 2026, and his final report.

8. I was present during the monitor's inspection at the facility on May 18–20, 2026.

9. Fifty-three detainees signed up to speak with the monitor using sign-up sheets posted in the housing units at the facility. The monitor spoke with 43 of them during his inspection.

10. While the monitor is critical of the acoustics of the room that was used for his interviews during the inspection, he did not address these concerns with me or my staff while on-

---

[1] The facility has also been variously referred to as the California City Correctional Center, California City Immigration Processing Center, and California City Detention Facility.

site, despite me providing him with my cell phone number and the cell phone numbers of key staff in the event he encountered any issues during the inspection.

11. After the inspection, I was asked to set up an additional virtual interview between the monitor and a detainee.

12. The facility's IT specialist facilitated the interview due to Plaintiffs' counsel reporting that the detainee preferred to have a Spanish language interpreter, which involved using the VOYCE remote video interpreting service.

13. When the monitor indicated that he was dissatisfied with the room, staff arranged to have the detainee moved to another room for the remainder of the interview.

14. The monitor did not articulate any additional concerns with the virtual interview.

15. The monitor visited the intake area during his inspection, where he observed the private rooms in which intake health screenings are performed. He did not identify any concerns with this area.

16. During the inspection, the monitor visited multiple housing units, including both general population and restrictive housing units.

17. Locked drop boxes for detainees to submit outgoing mail, sick call requests, grievances, requests to ICE, and requests to CoreCivic staff are located inside each of the housing units at the facility.

18. In the general population housing units, the boxes are located inside the housing unit rotundas. Detainees pass by these boxes multiple times a day on their way to meals at the dining hall and recreation.

19. In the restrictive housing units, the boxes are located inside the pod, where they can be accessed by the detainees daily when they leave their cells for recreation, dayroom time, and showers.

20. Detainees may also hand sick call requests and health care grievances to medical staff, who are present in the housing units multiple times daily for pill call. In the restrictive housing units, a nurse visits each cell on each shift.

21. There is no need for a detainee to hand a grievance or sick call request to an officer, as the secure boxes are readily accessible to them.

22. The monitor personally viewed the secure boxes in both general population and restrictive housing units during his inspection.

23. I captured screen shots from the facility's video surveillance system showing the monitor (who was wearing a dark jacket and tan pants) inspecting the boxes in F unit and M unit (both general population housing units) and in E200 pod (a restrictive housing unit) on May 18, 2026.

24. Below is a screen shot showing the monitor on the first day of his inspection.




25. The following screen shots accurately depict the placement of the boxes In F unit, M unit, and E200 pod and the monitor's inspection of them:










26. These screen shots demonstrate that the monitor is aware that the boxes are located inside the housing units, not outside as he states in his report.

27. I also captured a screen shot of a group of detainees walking by the boxes in M Unit about an hour after the monitor viewed them. This photograph is shown below:




28. A close-up of the boxes in another of the restrictive housing units is shown below.



29. Medical staff collect sick call requests from the boxes daily during the night shift.

30. Below is a screen capture of a CoreCivic nurse collecting the sick call requests from the M Unit boxes the first day of the monitor's inspection.




31. The unlabeled box the monitor refers to in his report had been taken down to paint the wall behind it and was being reinstalled at the time of his tour, which was explained to him.

32. The average length of stay at the facility is 71.8 days, although many detainees stay for significantly shorter periods. The average is skewed upwards by a small number of detainees who remain at the facility for longer periods of time pending appeals of their immigration cases.

33. If a detainee needs a higher level of mental health care than can be provided at the facility, the detainee is referred to ICE for transfer to facilities that can provide appropriate services. The monitor witnessed this occurring at the facility during his inspection.

34. The facility has multiple negative pressure rooms for housing detainees with suspected or confirmed infections that need to be isolated. During his inspection, the monitor noted that the light in the antechamber outside the negative pressure rooms changed from green to red when the outer door leading into the antechamber opened. The monitor believed that indicated the negative pressure system was malfunctioning. Although he was provided an explanation of how the system works, and was assured that the system was functioning properly, he nonetheless stated in his draft report that it was malfunctioning during his inspection.

35. After receiving comments from Defendants that his account of the negative pressure system in his draft report was inaccurate, he revised his commentary in his final report, but it is still not accurate.

36. Additionally, the monitor included a recommendation for inspection of the negative pressure system, despite receiving the explanation from staff and personally viewing logs of daily negative pressure system checks.

37. The facility is currently using two private rooms located on the side of the gym for health care encounters until a satellite medical clinic area can be completed.

38. On the first day of the inspection, the monitor stated he was concerned with visual privacy in the rooms. By the next day, my staff had installed blinds on the windows to address his concerns. I showed him the blinds, and he did not articulate any additional concerns with this area during his inspection, or we would have addressed them immediately.

39. A photograph of the area, including the blinds, is included below.



40. I showed the monitor the location and plans for the satellite medical clinic.

41. This project kicked off the week of July 13, 2026 and is anticipated to take approximately 60 days to complete, at an estimated cost of $400,000.

42. As a Level III facility, we do not accept detainees who are unable to independently perform activities of daily life, including bathing and toileting.

43. A Disability Accommodation Notice ("DAN") is completed for detainees who need accommodations and lists the approved accommodations and any auxiliary aids or medical equipment.

44. We track auxiliary aids and medical equipment provided to detainees and also maintain a supply of items, such as wheelchairs, crutches, and canes. If we do not have an item that a provider determines is clinically indicated, we can order it.

45. I personally directed my staff to order a new rolling ball cane for the detainee who was virtually interviewed by the monitor when Plaintiffs' counsel reported that he was in need of a new one and ensured that he received it.

46. Shower water temperature at the facility is thermostatically controlled and checked daily by maintenance and unit staff to ensure compliance with applicable temperature standards.

47. We also have an ongoing project to replace all the boilers throughout the facility. This project is completed as of August 2026.

48. The monitor did not notify staff of any concerns he personally observed with shower water temperature during his inspection but appears to rely on unsubstantiated reports of unidentified detainees in stating that shower temperatures are too high.

49. The Facility Health Administrator is the designated Disability Coordinator for the facility and has been since the facility reopened.

[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on August 21, 2026.

____________________________
Christopher Chestnut