KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
CODY S. HARRIS - # 255302
charris@keker.com
CARLOS C. MARTINEZ - # 354616
cmartinez@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

PRISON LAW OFFICE
MARGOT MENDELSON - # 268583
mmendelson@prisonlaw.com
TESS BORDEN - MJP # 805022
tess@prisonlaw.com
RANA ANABTAWI - # 267073
rana@prisonlaw.com
MEGHA RAM - # 325134
mram@prisonlaw.com
1917 Fifth Street
Berkeley, California 94710-1916
Tel.: (510) 280-2621

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
KYLE VIRGIEN - # 278747
kvirgien@aclu.org
FELIPE HERNANDEZ - # 338468
npp_fhernandez@aclu.org
MARISOL DOMINGUEZ-RUIZ - # 345416
mdominguez-ruiz@aclu.org
425 California Street, 7th Floor
San Francisco, CA 94104
Tel.: (415) 343-0770

CARMEN IGUINA GONZALEZ - # 277369
ciguinagonzalez@aclu.org
915 15th Street, NW, 7th Floor
Washington, DC 20005
Tel.: (202) 393-4930

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FERNANDO GOMEZ RUIZ; FERNANDO VIERA REYES; JOSE RUIZ CANIZALES; YURI ALEXANDER ROQUE CAMPOS; SOKHEAN KEO; GUSTAVO GUEVARA ALARCON; and ALEJANDRO MENDIOLA ESCUTIA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; SERGIO ALBARRAN, Acting Director of San Francisco Field Office, Enforcement and

Case No. 1:26-cv-02546-JLT-CDB

**NOTICE OF MOTION AND MOTION TO ENFORCE THE COURT'S ORDER REGARDING CONSTITUTIONALLY ADEQUATE HEALTH CARE (DOC. 72); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Date: November 30, 2026
Time: 9:00 a.m.
Dept.: Courtroom 4, 7th floor
Judge: Hon. Jennifer L. Thurston

Date Filed: November 12, 2025
*(transferred from Northern District of California)*

Removal Operations, U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security,

Defendants.

Trial Date: Not set

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 30, 2026, at 9:00 a.m., or as soon thereafter as may be heard before the Honorable Jennifer L. Thurston in Courtroom 4 of the United States District Court for the Eastern District of California, 2500 Tulare Street, Fresno, CA 93721, Plaintiffs Fernando Gomez Ruiz, Fernando Viera Reyes, Yuri Alexander Roque Campos, Jose Ruiz Canizales, Sokhean Keo, Gustavo Guevara Alarcon, and Alejandro Mendiola Escutia (collectively, "Plaintiffs") hereby move the Court to enforce the preliminary injunction order issued on February 10, 2026 at Docket 72 because Defendants are noncompliant with all eight healthcare requirements of the Court's preliminary injunction, as documented by the Court-appointed External Monitor. Plaintiffs seek continued monitoring and remedial measures to secure compliance and protect class members from serious harm.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the accompanying supporting declaration of Tess Borden and exhibits thereto, the Proposed Order filed herewith, the Court's preliminary injunction and preliminary class certification order (Doc. 72), the concurrently filed Notice of a request for sealing, the Request for sealing, proposed order, and exhibits submitted under seal, the prior briefing and record on Plaintiffs' motions for preliminary injunction and for preliminary class certification, the papers, evidence and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

Pursuant to the Court's Standing Order, Plaintiffs' counsel certify that meet-and-confer efforts have been exhausted. Plaintiffs provided Defendants a letter outlining the grounds for this motion and proposed relief on September 24, 2026, and counsel met by Zoom on September 30, October 6, and October 19, 2026. Despite these efforts, the parties were unable to resolve the issues presented by this motion.

////

////

## TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....... 7

I. INTRODUCTION ....... 7

II. PROCEDURAL HISTORY ....... 8

III. FACTS ....... 11

A. Medical staffing is grossly inadequate. ....... 12

B. Medical intake is deficient. ....... 13

C. Initial Appraisals are incomplete and lack documentation. ....... 13

D. Specialty care is delayed or nonexistent. ....... 14

E. Emergency services are disorganized and delayed. ....... 15

F. Significant gaps in continuity of care exist at intake and beyond. ....... 16

G. Medication administration is delayed or missed entirely. ....... 17

H. The sick call request system is broken. ....... 18

IV. ARGUMENT ....... 19

A. The Court should extend the External Monitor's term and ensure his ability to assess compliance and make recommendations. ....... 19

1. The Court should issue an enforcement order. ....... 19

2. The Court should order the specific terms of the Proposed Order. ....... 21

a. Monitoring Term ....... 21
b. 120-Day Compliance Reports ....... 22
c. Remedial Plan ....... 22
e. External Monitor's Team ....... 24
f. Plaintiffs' Access to Class Member Medical Records ....... 24
g. *Ex Parte* Discussions ....... 25

B. The Court retains jurisdiction to enforce the PI Order despite the pending appeal, including by ordering a remedial plan or additional relief. ....... 25

V. CONCLUSION ....... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*, 284 F.3d (9th Cir. 2002) ....29

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014) ....20, 27

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ....20

*Brown v. Plata*, 563 U.S. 493 (2011) ....22

*Cal. Coal. for Women Prisoners v. U.S. Bureau of Prisons*, No. 4:23-cv-04155-YGR (N.D. Cal. Feb. 27, 2025) ....24

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ....20

*Coleman v. Brown*, 2017 WL 4511064 (E.D. Cal. Oct. 10, 2017) ....20, 22

*Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025) ....19

*Franco-Gonzalez v. Holder*, No. 2:10-cv-02211-DMG (C.D. Cal. March 2, 2015) ....24

*Hook v. Ariz., Dept. of Corr.*, 972 F.2d 1012 (9th Cir. 1992) ....19, 20

*Hutto v. Finney*, 437 U.S. 678 (1978) ....20

*Jensen v. Thornell*, No. 2:12-cv-00601-ROS (D. Ariz. April 7, 2023) ....24

*L.T. v. U.S. Immigr. & Customs Enf't*, 2026 WL 2131142 (C.D. Cal. July 16, 2026) ....22

*L.T., et al., v. U.S. Immigr. & Customs Enf't*, 2026 WL 2338452 (C.D. Cal. Aug. 12, 2026) ....21

*Mayweathers v. Newland*, 258 F.3d 930 (9th Cir. 2001) ....28

*Meinhold v. U.S. Department of Defense*,
34 F.3d 1469 (9th Cir. 1994) ....................28, 29

*Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
536 F.2d 1268 (9th Cir. 1976) ....................27, 29

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*,
242 F.3d 1163 (9th Cir. 2001) ....................26, 28

*Nat'l Grange of the Ord. of Patrons of Husbandry v. Cal. State Grange*,
182 F. Supp. 3d 1065 (E.D. Cal. 2016)....................26, 27, 29

*Sekaquaptewa v. MacDonald*,
544 F.2d 396 (9th Cir. 1976) ....................27

*Sequen v. Albarran*,
814 F. Supp. 3d 1068 (N.D. Cal. 2025) ....................28

*Sys. Fed'n No. 91, Ry. Emps. Dep't, AFL-CIO v. Wright*,
364 U.S. 642 (1961)....................20

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
768 F.2d 1001 (9th Cir. 1985) ....................21

*Youngberg v. Romeo*,
457 U.S. 307 (1982)....................18

**Federal Rules**

Fed. R. Civ. P. 62....................26, 27, 28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION[1]

Almost a year ago, Plaintiffs filed this action and sounded the alarm on egregious denials of medical care at California City Detention Facility ("California City"). Doc. 1. The Court granted Plaintiffs' preliminary injunction in February 2026 and ordered Defendants to provide eight basic components of a functional health care system at the facility, and to permit a neutral, Court-appointed External Monitor to assess Defendants' compliance with those components. Doc. 72 ("PI Order"). Now, the External Monitor has completed his review and found California City's health care system violates the PI Order at every step, placing class members at immediate and long-term risk of serious harm. Based on those findings, Plaintiffs respectfully ask this Court to enforce the PI Order.

The External Monitor's 51-page Final Report (Doc. 166-2, Ex. A ("Report")) paints a grim picture of health care at California City. The Report reflects a "system-level assessment" based on review of 141 individual patient medical records, 40 patient interviews, interviews with California City staff covering 19 different roles in the facility, thousands of pages of documents related to health care policies, procedures, patient lists, and other records, and a three-day onsite inspection of the facility. Report at 3, 8–9. Based on this abundant evidence—the vast majority of which consist of Defendants' own documents and/or their contractor's statements—the External Monitor determined that Defendants still fail to comply with *any* of the eight fundamental components ordered by the Court. *Id.* at 10. The findings are stark: "the facility lacks a reliable system to consistently provide adequate health care, placing individuals at serious risk of both immediate and long-term harm." *Id.* at 3. In particular, "[t]he clinical documentation reflected a recurring pattern of delayed identification of patient needs, delayed or missed assessments, delayed or inadequate treatment, missed or delayed medication administration, and gaps in follow-up care." *Id.* As the External Monitor detailed, it is not just isolated incidents, but instead "[t]his pattern indicates broader problems in the facility's health care delivery system rather than

[1] In all quotations, all internal quotation marks, citations, and alterations have been omitted, and all emphases added, unless noted.

occasional lapses in care." *Id*. And those "substantial gaps" in care "contribute to an unsafe environment." *Id*.

To remedy this unsafe environment and the "serious risk of both immediate and long-term harm" identified by the External Monitor, Plaintiffs ask the Court to enforce the PI Order by entering the accompanying Proposed Order that:

1) Renews the External Monitor's appointment for the duration of this litigation, or until terminated by court order;

2) Orders the External Monitor to issue a report every 120 days for the duration of his term, assessing compliance with paragraph one of the PI Order;

3) Orders the parties to work with the External Monitor to develop, and implement, a remedial plan;

4) Orders Defendants to provide the External Monitor the necessary access and support to carry out his work, including two team members to assist and regular site visits that counsel for both parties may attend;

5) Ensures that Plaintiffs' counsel can timely access their clients' medical records; and

6) Allows counsel for the parties and the External Monitor to engage in limited *ex parte* discussions.

As detailed below, the Court has ample authority and jurisdiction to order this relief, which is aimed directly at preventing health crises, illness, and death at California City while this litigation continues.

## II. PROCEDURAL HISTORY

In November 2025, Plaintiffs sued ICE and other relevant government agencies and officials in the Northern District of California seeking, among other things, preliminary injunctive relief concerning the provision of constitutionally adequate health care at California City. Doc. 1. On December 1, 2025, Plaintiffs moved for class certification and a preliminary injunction,

seeking facility-wide relief relating to medical care, among other issues. Docs. 21–22.[2]

On February 10, 2026, following extensive briefing and a full-day hearing, Judge Chesney provisionally certified the class and granted the motion in part, ordering Defendants to provide constitutionally adequate health care. PI Order ¶ 1. In particular, the Court ordered Defendants to ensure eight components of a functional health care system: (1) adequate health care staffing; (2) comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival; (3) thorough Initial Appraisals performed timely by a primary care provider; (4) timely approval and access to medical specialists; (5) timely and responsive emergency services; (6) continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to scheduled provider appointments, and consistent provision of medication; (7) timely access to prescribed medications; and (8) a responsive "sick call" request system. *Id.*

To assess compliance with the healthcare provisions of the PI Order and monitor their implementation, the Court ordered that Defendants provide access to a qualified, independent, External Monitor. *Id.* ¶ 2. On March 5, 2026, the Court held a status conference regarding the selection of the External Monitor and appointed Dr. Muthusamy Anandkumar—a medical doctor with decades of experience in correctional healthcare, including serving as a court-appointed monitor and as a contractor for Defendant Department of Homeland Security. Docs. 96, 77, Ex. C.

On March 27, 2026, the Court issued a Memorandum of Decision explaining in detail the basis for its PI Order and the likelihood of "continuing irreparable harm to detainees at CCDF" absent an injunction. Doc. 111 at 13. On March 30, 2026, the Court issued an order enumerating the terms of the External Monitor's appointment. Doc. 112 ("Monitor Order"). In particular, the Monitor Order set the External Monitor's term at 120 days subject to renewal; laid out the various records and electronic systems Defendants were required to ensure the External Monitor could

---

[2] Also in December 2025, Plaintiffs filed a temporary restraining order concerning two Named Plaintiffs who were at immediate risk of serious harm or death, which was resolved via stipulation. Doc. 36. Plaintiffs subsequently filed two Notices of Noncompliance with that Court Order. Docs. 62, 80.

access; and called for a three-day in-person inspection of the facility, at which he was permitted to interview, among others, "custody and medical staff" and "patients of his choosing." *Id.* ¶ 5. The External Monitor was ordered to produce a report at the conclusion of the 120-day term "assessing Defendants' compliance with the [PI] Order and the provision of constitutionally adequate health care and making recommendations for remedial actions." *Id.* at ¶ 7.

Throughout the External Monitor's 120-day term, the parties and the External Monitor corresponded multiple times a week via email, conducted regular meetings via Zoom, coordinated remote access to the California City electronic health records system, produced more than four thousand additional pages of Defendants' documents in response to the External Monitor's requests, and discussed specific patients of concern. Doc. 139 at 12.

Meanwhile, Intervenor CoreCivic, Inc. ("CoreCivic")—the private, for-profit prison corporation that operates California City pursuant to a contract with ICE—appealed the PI Order and sought to stay it in the district court, thereby delaying the External Monitor in conducting his on-site inspection. *See, e.g.*, Docs. 135, 143. The district court denied CoreCivic's motion to stay the PI Order on May 14, 2026. Doc. 145. CoreCivic's appeal of the PI Order remains pending. Defendants filed a "protective" notice of appeal, but have not determined whether or not they will in fact appeal the PI Order and have not filed an opening brief or taken any other action to pursue the appeal.

The External Monitor eventually conducted his site visit on May 18, 19, and 20, 2026. *See* Report at 7. Counsel for Plaintiffs and Defendants were barred from attending, while CoreCivic personnel were present. Doc. 183 at 7, 11, 18. Following the site visit, the parties and External Monitor continued their regular communications, emailing multiple times a week, meeting via Zoom, and discussing specific patients of concern. Doc. 183-1 at ¶¶ 9–11.

In accordance with the Monitor Order, the External Monitor transmitted a draft of his report on July 10, 2026, and the parties submitted comments for his consideration. Docs. 183-1 at ¶ 16, 180-1, 180-2. After reviewing and incorporating those comments as he saw fit, the External Monitor circulated his final report, which was filed on the docket on July 27. *See* Report. The Report found noncompliance in each of the eight areas the PI Order addressed. PI Order ¶ 1.

At this Court's invitation, Defendants submitted additional comments and objections to the Report on August 21, 2026. Doc. 180. Plaintiffs responded. Doc. 184. The External Monitor reviewed the new filings and concluded on August 31, 2026 that he "stands by the Final Report as filed." Doc. 185.

On September 22, 2026, having already notified Defendants and the Court of their intention to move to enforce based on the External Monitor's Report, Doc. 175, Plaintiffs' counsel contacted counsel for Defendants to begin their meet and confer efforts pursuant to this Court's Standing Order. Decl. of Tess Borden ("Borden Decl.") ¶ 2. Plaintiffs have spent a month meeting and conferring with Defendants, via email and videoconference, to try to reach a stipulation, whether in whole or part, to the relief requested herein. *Id.* ¶¶ 2–9. Unfortunately, the meet-and-confer efforts have failed to bear fruit. Because they can wait no longer before seeking relief, Plaintiffs respectfully move this Court to enforce the PI Order.

## III. FACTS

Defendants are under a Court order to provide constitutionally adequate health care to the people detained at California City. PI Order. Eight months after that order's issuance, it is clear that Defendants are failing to abide by it. Based on extensive review of medical records and other documents, an in-person site visit, and numerous patient and staff interviews, the Court-appointed External Monitor found "Non-Compliance" in all eight health care components of the PI Order, concluding that California City "lacks a reliable system to consistently provide adequate health care, placing individuals at serious risk of both immediate and long-term harm." Report at 3, 10.[3]

In particular, the External Monitor's "system-level assessment" found "a recurring pattern of delayed identification of patient needs, delayed or missed assessments, delayed or inadequate treatment, missed or delayed medication administration, and gaps in follow-up care." *Id.* at 2–3. These deficiencies were the result of "broader operational limitations," including lack of

[3] The External Monitor found "Non-Compliance" where "the information reviewed" failed to: (a) "adequately demonstrate that an adequate process is in place"; (b) "adequately demonstrate that the element is being carried out in practice for the patients to whom it applies"; or (c) "adequately demonstrate that the facility has a reliable way to identify problems and correct them promptly, as generally reflected in the available records, observations, or interviews." Report at 4–5.

"adequate staffing, stable on-site management, sufficient clinical and operational oversight, or an effective quality assurance process to identify and promptly address care-related problems." *Id.* For each area of noncompliance, the External Monitor identified the risk of harm and made detailed clinical recommendations Defendants could implement to address the dangerous gaps in care. His recommendations provide a roadmap for Defendants to comply with the PI: they are precise and aimed at corrective action and sustained improvement, reflecting the External Monitor's extensive clinical knowledge as well as operational judgment consistent with his expert background. *See* Doc. 77. While the Report speaks for itself, Plaintiffs highlight some of its key findings and recommendations in each of the areas below.

**A. Medical staffing is grossly inadequate.**

The PI Order first orders Defendants to ensure "adequate health care staffing." PI Order ¶ 1(a). This makes good sense because, as the External Monitor explained, "[a]dequate staffing is the foundation for safe and effective healthcare delivery." Report at 11. In finding Defendants noncompliant with this critical requirement, the External Monitor described persistent staffing shortages, limited oversight from supervisory staff, and unaddressed concerns related to staff performance, "creating a serious risk of delayed clinical care and increasing the likelihood of preventable harm." *Id.* at 10–12.

The External Monitor explained that adequate staffing requires not only "enough qualified staff and appropriate coverage to meet patients' clinical needs," but staff that is "prepared, supported, and monitored in delivering the care patients require." *Id.* at 11. California City is lacking in each of these respects. It fails to employ an adequate number of personnel and the severity of the staff shortages result in "some staff [being] moved to clinical duties before finishing orientation." *Id*. Shockingly, "staff who were not yet fully trained" were somehow permitted to train others. *Id*. And the facility has no "sustained staffing solution" to address these problems. *Id*. Making matters worse, supervisory coverage is "limited and inconsistent," such that staff lack the "guidance, oversight, and support" they need. *Id*. In sum, the medical team is simply "not adequately prepared to manage" California City's patient population. *Id*. Accordingly, the External Monitor recommended that Defendants "[c]onduct a staffing analysis right away to

determine how many staff are needed and what types of staff are needed to provide timely and adequate care for the current patient population," in addition to other operational, reporting and quality assurance improvements. *Id.* at 12–13.

**B. Medical intake is deficient.**

The PI Order next required "comprehensive, documented medical intake screening, performed by a qualified medical provider within 12 hours of a person's arrival." PI Order ¶ 1(b). This is an important requirement. Not only does intake screening identify those who will require care in the facility; it also is the primary safeguard against letting someone with a highly contagious disease into the general population at the facility. In finding noncompliance, the External Monitor described a litany of problems, including poor documentation of active medications and prescriptions, inconsistent escalation to a higher level of care when clinically indicated, and woefully incomplete screening documents that left questions unanswered. Report at 14–16. These failures, the External Monitor explained, "create[] a risk that significant positive findings will be overlooked by other clinical staff who rely on the screening record to make subsequent clinical decisions." *Id.* at 15. Moreover, the External Monitor found that staff members who lack the proper licensure to conduct intake screenings are allowed to do so anyway, in direct violation of the PI Order. *Id.* at 14.

Overall, the External Monitor found that intake was far from comprehensive and could not "reliably identify the range of conditions relevant to the patient population." *Id*. This can "result in serious medical problems being missed and can delay or interrupt needed care, increasing the risk that a person's condition worsens or that preventable harm occurs." *Id.* at 16. Accordingly, the External Monitor provided detailed recommendations, including that intake screening be "performed by a qualified medical provider as required by the Order" and that the intake screening be revised "so it is comprehensive and assesses each relevant condition through specific, targeted questions . . . ensuring that all conditions relevant to the patient population are directly addressed and documented." *Id.* at 16.

**C. Initial Appraisals are incomplete and lack documentation.**

The PI Order also required "thorough Initial Appraisals performed timely by a primary

care provider." PI Order ¶ 1(c). As the External Monitor explained, these appraisals are supposed to "build[] on the intake screening" by "following up on identified needs" and determining the treatment plan. Report at 17. But that is not what happens at California City. *Id*. at 18.

As the External Monitor detailed, California City's Initial Appraisals are flawed in fundamental ways. For example, "the most basic step" in evaluating a medical complaint is to examine the involved body part, but medical records revealed that in many cases, "no examination was documented for the area related to the patient's reported symptom." *Id*. at 19. The External Monitor methodically documented other areas in which Initial Appraisals fell short. *See id*. at 18–19 (noting failures to address medical history, record clinical findings, and assess critical physiological systems). Put simply, patients did not receive "the level of evaluation needed to guide safe and timely treatment," which "increase[d] the risk of clinical deterioration and preventable harm." *Id*. at 18–19.

To address this risk of harm, the External Monitor made recommendations that provide a framework for the "thorough" and "timely" appraisals required by the PI Order. He explained that appraisals must be completed by primary care providers and that they should be "prioritized according to the urgency of the patient's clinical condition." *Id*. at 20. He recommended changing documentation practices by requiring providers to document "specific findings," rather than describing findings as "within normal limits," so that "the examination is verifiable and establishes a clinical baseline." *Id*. at 19–20. And he identified the required components of an appraisal, including "a documented clinical assessment," "an assigned level of priority," and "a management plan for each condition, addressing diagnostic testing, referrals, continuation or change of medications, special needs and accommodations, an updated problem list, follow-up, and any interim monitoring indicated." *Id*.

**D. Specialty care is delayed or nonexistent.**

The PI Order mandated "timely approval and access to medical specialists." PI Order ¶ 1(d). In finding noncompliance, the External Monitor identified problems with "most steps" of the specialty care process. Report at 21. The myriad "[d]elays and breakdowns … create a serious risk" for some of the most vulnerable patients. *Id*. at 23. Without necessary specialty care, their

"conditions may go undiagnosed or untreated, prescribed treatment and medications may not be started or continued, and [they] may experience avoidable complications and clinical deterioration." *Id*.

The External Monitor identified specialty care failures at every step. To start, missed appointments are "not consistently communicated to the treating provider" such that patients end up waiting "extended periods for needed care" and "time-sensitive problems go unaddressed." *Id*. at 22. This issue is compounded because there are already delays in referring patients to specialists when referrals are "clinically indicated." *Id*. at 21. And even when patients are seen by specialists, there is poor follow-up, creating "a risk that specialist recommendations are not carried out and that prescribed treatments and medications are not implemented." *Id*. at 23.

The systems for documenting and tracking key information related to specialty care are also broken. Key pieces of information, including the clinical basis for denied care and reasons for delayed care, are simply not documented in the medical record at all. *Id*. at 21–22. And there is no effective tracking mechanism for leadership to see information as basic as "which referrals are active and pending, which have been completed, canceled, rescheduled, or closed, and which are no longer applicable because the patient was released or transferred." *Id*. at 22.

Accordingly, the External Monitor provided recommendations to help California City prioritize patients based on clinical urgency, revamp the referral and documentation processes, and ensure patients are promptly referred to specialists. *Id.* at 23–24. Without enforcement of the PI Order, "a serious risk" of preventable harm will persist. *Id*. at 23.[4]

**E. Emergency services are disorganized and delayed.**

The next component of the PI Order requires "timely and responsive emergency services." PI Order ¶ 1(e). In finding noncompliance with this provision, the External Monitor noted significant gaps across the emergency care process including "[i]ncomplete assessments, missed provider notification, transport that does not match a patient's acuity, and failure to act on

[4] Recent correspondence by Class Counsel raising yet more unaddressed urgent medical needs affecting multiple class members, Borden Decl. Ex. 4, just further demonstrates the desperate and dangerous conditions at California City and lack of specialty care.

hospital recommendations." Report at 27. These failures create "a serious risk" of acute conditions going "unrecognized or untreated." *Id*.

California City is a "considerable distance from the nearest hospital," *id.* at 26, meaning on-site care and off-site transportation practices are crucial to patient health and safety. Yet, the facility's medical records do not consistently show "what care was provided while a patient was awaiting hospital transport" or "the mode of transport" used to take them offsite. *Id*. at 25. This creates the obvious risk that "patients may be transported in a manner that does not match their acuity" and, as a result, "may deteriorate en route without medical monitoring, equipment, or [staff with] the ability to intervene." *Id*. at 26. The problems continue when patients return to the facility. At that point, the medical records do not consistently show that hospital records were reviewed by the facility's medical team, thereby increasing "the risk of missed diagnoses, medication errors, delayed follow-up, clinical deterioration, avoidable hospital readmissions, and preventable harm." *Id*. Meanwhile, for patients managed on site, medical records "do not consistently show follow-up reassessments" until the patient is stable. *Id*. at 25.

To rectify these dangerous conditions, the External Monitor made recommendations to improve emergency services across the board. These include changes to patient assessments and re-assessments at regular intervals, reforms to transportation practices, and improvements to follow-up care. *Id*. at 27–28.

### F. Significant gaps in continuity of care exist at intake and beyond.

The Court further ordered that the facility provide "continuity of medical care upon intake and thereafter, including timely completion of active medical orders, access to scheduled provider appointments, and consistent provision of medication." PI Order ¶ 1(f). The External Monitor's findings reflect ongoing continuity-of-care gaps across clinical service areas, including mental health care, chronic disease management, dental care, medical care for patients with special needs and disabilities, and infectious disease. His findings were stark: The facility's medical team is unable to deliver "even basic mental health care," Report at 29, fails to consistently provide medication, *id.* at 32, struggles to complete comprehensive chronic care evaluations, *id*. at 33, has no plans for patients with disabilities, *id*. at 37, and botches infectious disease protocols, *id*. at 40.

The External Monitor's findings on these issues spanned more than a dozen pages and resulted in a combined 40 recommendations. *Id*. at 28–41. As the External Monitor explained, these failures can have devastating effects. Patients with mental health conditions are at risk of "psychiatric decompensation, prolonged suffering, and preventable deterioration." *Id*. at 30. Those with chronic conditions may have "complications, emergencies, hospitalization, or death." *Id*. at 33. Others may experience "severe pain," *id*. at 35, and "preventable injury," *id*. at 38. Finally, the facility's failures in infectious disease management puts everyone at risk: airborne infections "may spread through the facility and result in an outbreak affecting patients and staff." *Id*. at 40.

**G. Medication administration is delayed or missed entirely.**

The PI Order required "timely access to prescribed medications." PI Order ¶ 1(g). In finding non-compliance, the External Monitor expressed "serious concerns with the medication process." Report at 43. He found medications were improperly delayed or discontinued and that the onsite pharmacy showed signs of mismanagement. *Id.* at 43–44.

Specifically, the External Monitor found that patients who arrive with active medications, including medications from other ICE facilities, do not consistently receive those medications at California City. *Id.* at 43. He also reviewed a prescription rejection report showing "hundreds of rejected medication requests," including "for routine maintenance medications, including those used for diabetes, hypertension, heart disease, mental health conditions, anticoagulation, and HIV treatment." *Id*. The External Monitor noted that "[t]hese are clinically important medications that are not typically associated with medication-seeking behavior" and the fact that they were rejected "suggests a process issue rather than a patient-driven issue." *Id.* That is, in his view, the rejections are "likely to reflect" systems-level issues, such as "formulary restrictions, ordering errors, or supply-tracking problems." *Id*. at 44. The External Monitor also found the onsite pharmacy suffered from "inadequate management of medication inventory." *Id*. Outside of the pharmacy area, "[l]oose pills were also found on the medication administration room floor, indicating that medication handling and disposal practices were not consistently maintained." *Id.* The risk of harm stemming from these failures is serious: "missed or delayed doses can lead to

uncontrolled blood sugar or blood pressure, worsening heart disease, psychiatric destabilization, withdrawal or rebound symptoms, bleeding or clotting complications, HIV treatment failure, or drug resistance." *Id*. Accordingly, the External Monitor made recommendations to bring California City's medication practices into compliance, including that medications listed in transfer documents be carefully reviewed and addressed at intake; that clinical reasons be documented when medications are stopped or changed; that medication reconciliation be performed at each provider encounter; and that the facility establish reliable tracking to ensure all medications are timely refilled, renewed, and administered. *Id.* at 45–46.

**H. The sick call request system is broken.**

The PI Order's final medical care provision requires "a responsive 'sick call' request system." PI Order ¶ 1(h). Because detained people are "wholly dependent" on their custodians for care, *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982), it is important to ensure that they can reliably seek and obtain that care. Outside of detention, people experiencing a medical issue might turn to a nurse advice line, a primary care doctor, urgent care, or an emergency room. In detention, these functions all fall to the sick call system, which is supposed to triage requests and ensure prompt evaluation. This is not happening at California City. The External Monitor reported "serious concerns with the sick call program at this facility." Report at 47. He explained that "[t]here is no reliable process in place," that "concerns were noted at each step," and that all those concerns "affect patient care." *Id*. These failures mean "problems that could have been managed early worsen or become emergencies." *Id*. at 49.

Indeed, the External Monitor described a dysfunctional sick call system from start to finish. He found that there is a consistent delay in picking up sick call requests. *Id*. at 47. He further observed that not all requests submitted by patients are scanned into the medical record and that the facility lacks a "reliable tracking process to confirm that requests are collected daily from every housing unit, triaged appropriately, and followed through to completion." *Id*. The predictable result of this broken system is that sick call requests are often left unaddressed or are delayed for an extended period. *Id.*

The sick call system is riddled with problems even when a request is received and

evaluated. The medical team "frequently" fails to fill out the triage level on the form, meaning "an urgent or emergent concern may not be identified or acted on within the appropriate timeframe." *Id*. at 48. And the quality of the assessments done in response to sick call requests is "concerning." *Id*. The External Monitor explained that they "did not consistently include the relevant history, an appropriate assessment, and a plan of care." *Id*. Sometimes, the care provided in response to a sick call request reflected truly fundamental failures: "patient education [] was for a different condition than the one documented in the assessment," "[p]roviders were not contacted when clinically indicated," and "a follow-up plan was often not documented." *Id*.

To address these myriad failures, the External Monitor recommended a step-by-step framework to address the grave risk of harm occasioned by the existing system. Without further monitoring to ensure these changes are implemented, the "serious risk that patients' health concerns go unrecognized, delayed, or unaddressed" will only continue. *Id*. at 49.

## IV. ARGUMENT

### A. The Court should extend the External Monitor's term and ensure his ability to assess compliance and make recommendations.

#### 1. The Court should issue an enforcement order.

District courts have wide latitude to determine whether an order has been substantially complied with. *See Coleman v. Newsom*, 131 F.4th 948, 955–56 (9th Cir. 2025). Where it finds noncompliance, this Court has inherent authority to "enforce its judgments." *Hook v. Ariz., Dept. of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992). Here, the evidence of noncompliance is overwhelming: the External Monitor's findings establish without question that Defendants are violating each of the PI Order's healthcare provisions. *See* Report at 10. While Defendants have objected to certain aspects of the Report, they have put forward no meaningful evidence to contravene its findings.[5]

[5] Defendants completed an after-the-fact "audit" of ten patients to purportedly show improvement. *See* Doc. 180-5 ¶ 13. This so-called "audit" bears no resemblance to the Final Report in substance or credibility. The Final Report was drafted by a neutral, independent, court-appointed third party while Defendants' "audit" was performed solely to support their objections to the Monitor's report. Moreover, the unidentified "health services staff" who performed the audit, *id.*, are presumably the same staff at the same facility that the External Monitor found lacked "an effective quality assurance process," Report at 3.

Indeed, Defendants would be hard pressed to dispute their lack of compliance with the PI Order. Their own admissions in communications with Plaintiffs' counsel show continued violations. For example, Defendants concede that a patient who arrived at California City in September 2025 with lesions and a pending specialist referral to surgery to rule out cancer has not seen the specialist more than a year after his arrival. Borden Decl. ¶ 14, Ex. 4 ("The facility has experienced difficulty securing [the relevant surgical specialist]."). Defendants also admit that it took them over a year to schedule a class member with a specialist, despite his dramatic vision loss and a provider order noting the patient "cant see needs surgery." *Id.* ¶ 15, Ex. 3. In yet another case, Defendants concede that they did not diagnose a patient with an infection, prescribe her antibiotics, and refer her to a gastroenterologist until October 2026, five months after lab results showed signs of an infection and blood in her urine and stool. *Id.* ¶ 16; *see also* Ex. 5 at 7. Thus, Defendants admit recent and ongoing failures of medical care.

This Court should exercise its inherent authority to "enforce its judgments," *Hook*, 972 F.2d at 1014, through the sort of relief Plaintiffs seek here.[6] Enforcement powers include finding a party in contempt of court. *Hutto v. Finney*, 437 U.S. 678, 690–91 (1978). Less severe sanctions are "undoubtedly within a court's inherent power as well." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). A district court can do more than simply order compliance with an existing preliminary injunction: this Court has "considerable discretion in fashioning relief" to enforce the PI Order. *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014). For example, the Court can issue an order directing a party to develop a plan to achieve compliance; it can also "give some guidance . . . and set some deadlines for compliance," along with instructions as to what elements need to be in the remedial plan. *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001); *see also Coleman v. Brown*, 2017 WL 4511064, at *1, 16 (E.D. Cal. Oct. 10, 2017). Indeed, as the Supreme Court has instructed, "an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emps. Dep't, AFL-CIO v. Wright*, 364

[6] The Court also has jurisdiction to enforce pending appeal, as discussed in Section IV.B below.

U.S. 642, 647–48 (1961). Similarly, the Ninth Circuit has long held that "[u]nder its continuing jurisdiction, the district court must supervise the injunctive relief granted" and that "[w]hen dealing with its equitable powers, a court possesses the intrinsic power to adapt the injunction to meet the needs of a 'new day.'" *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1030 (9th Cir. 1985).

**2. The Court should order the specific terms of the Proposed Order.**

The PI Order and initial monitoring term have clearly proven insufficient to provide relief to Plaintiffs and the Class. Plaintiffs now seek additional modest relief to enforce the PI Order and to ensure the External Monitor has sufficient powers to assess and report back to the Court on Defendants' compliance with it.

The External Monitor's ability to review medical records, visit the facility, interview patients and staff, and apply his extensive knowledge and expertise in this area as a Court-appointed neutral has provided invaluable insight into what is happening on the ground in California City. His continued monitoring will allow the parties and the Court to meaningfully address emergent issues as discovery proceeds. For example, despite Plaintiffs having served discovery requests on June 6, 2026, Defendants have provided a paltry production to a small subset of requests that is itself full of unjustifiable redactions, while simply refusing to provide their position on myriad other requests that remain outstanding. The External Monitor, however, can act as the Court's eyes and ears at the facility while the case proceeds. His mere presence observing and reporting to the Court may well save lives. *See L.T., et al., v. U.S. Immigr. & Customs Enf't*, 2026 WL 2338452, at *17 (C.D. Cal. Aug. 12, 2026) ("Defendants have not taken reasonable measures despite obvious, widespread risks in Adelanto's medical system. Proper monitoring would likely have identified and corrected these issues."). Accordingly, Plaintiffs request that this Court reappoint the External Monitor essentially along the same lines as the Monitor Order, with a handful of enhanced provisions to ensure his ability to comprehensively fulfill his charge.

**a. Monitoring Term**

Plaintiffs ask the Court to renew the External Monitor's appointment for the duration of

the litigation, unless terminated by the Court. The Central District recently appointed *two* monitors for the duration of the litigation as preliminary injunction relief in a case involving conditions at an immigration detention facility. *See L.T. v. U.S. Immigr. & Customs Enf't*, 2026 WL 2131142, at *2 (C.D. Cal. July 16, 2026) (ordering a remedial plan). Plaintiffs propose the same duration provision here. Of course, Defendants could seek to terminate or modify the appointment if they demonstrate compliance. But given the systemic and ongoing nature of the failures, an appointment term that is coextensive with the duration of this litigation is reasonable and prudent and will facilitate the development of durable solutions that keep individuals detained at California City alive and safe.

**b. 120-Day Compliance Reports**

The Monitor Order set the External Monitor's initial term at 120 days. That term appears to have been sufficient for a single monitoring cycle: to assess policies, practices and improvements, review records, conduct a site visit, interview patients and staff, and finalize a report and recommendations. Plaintiffs therefore suggest retaining the 120-day period as the length of each monitoring cycle, culminating in a report on compliance.

**c. Remedial Plan**

Remedial plans are a common way to ensure compliance. *E.g.*, *L.T.*, 2026 WL 2131142, at *3 (ordering a "Remedial Plan"); *Coleman v. Brown*, 2017 WL 4511064, at *2 (discussing a "staffing plan" developed by defendants in response to an earlier order). In an effort at collaboration, Plaintiffs propose that the parties and External Monitor meet and confer to develop a Corrective Action Plan ("CAP") that addresses the noncompliance issues the External Monitor identified in his Report. Such a process would ensure that Defendants work toward correcting the issues identified and provide a detailed roadmap for them to come into compliance. Subsequent monitoring reports would consider implementation of the CAP in assessing whether Defendants were compliant with each of the eight components of the PI Order.

Under Plaintiffs' Proposed Order, if the parties and External Monitor can reach agreement on such a CAP, they will present that plan to the Court and seek modifications as necessary during the course of the litigation. *See Brown v. Plata*, 563 U.S. 493, 542 (2011) (affirming a

court's inherent power to order a party to develop a remedial plan while retaining "the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion."). If the parties and the External Monitor are unable to reach agreement on such a CAP, Plaintiffs ask that the Court make clear that Defendants' implementation of the recommendations set forth in the Report will inform the External Monitor's further compliance assessments.

**d. Access to Documents and Site Visit.**

To perform his work, the External Monitor needs fulsome and appropriate access to California City records, including remote, read-only access to the facility's electronic health record system (EHRS), subject to the Protective Order entered in this action. Plaintiffs ask this Court to re-issue the document requests and EHRS provisions of the Monitor Order. Doc. 112 ¶¶ 3–4. Additionally, during the External Monitor's first term of appointment, Defendants and CoreCivic prevented the External Monitor from running reports and produced documents and records in non-standard and cumbersome formats. *See* Docs. 183-1 ¶ 13 (Defendants prohibiting access to report function); 183-2 ¶ 6 (Defendants failing to provide searchable-format documents). So that he can meaningfully assess the facility's ability to provide and track patient care, the External Monitor must be able to observe and test the tracking functions that medical staff purport to use. This Court can remedy these issues now with an order clarifying that the External Monitor shall have access to all EHRS functionality available to medical staff at the facility, except that he shall not be able to enter or edit any patient information or otherwise modify or alter patient records or reports.

Given the scope of inspection, interviews, and observation covered in a site visit, Plaintiffs ask the Court to allow the External Monitor and his team to perform one site visit each 120-day monitoring cycle of up to five business days, with at least 48 hours' notice. This process tracks that provided in the Monitor Order. It is possible that the External Monitor will require less time, or that his schedule will dictate a shorter visit. But site visits lasting up to five days is reasonable and sustainable for the pace of both the External Monitor's and Defendants' operations.

Plaintiffs ask that up to two people from each of Plaintiffs' and Defendants' counsel teams be permitted to attend the site visits. Defendants' counsel have ready access to these site visits through CoreCivic personnel, who have gone so far as to surveil and record the External Monitor's site inspection using closed-circuit cameras. *See* Docs. 180, 180-4. Plaintiffs, meanwhile, were left entirely in the dark during the prior inspection. The Court should address this fundamental disparity by permitting a limited number of counsel from each party to be present at the site visits.

**e. External Monitor's Team**

Given the scale and importance of the External Monitor's work, the External Monitor should be permitted to supplement his staff with one additional team member, so that two staff members may assist in his work. Plaintiffs also ask that the two team members be permitted to receive document productions and attend the site visit in addition to EHRS access. Courts frequently permit monitors to select multiple team members. *See, e.g., Cal. Coal. for Women Prisoners v. U.S. Bureau of Prisons*, No. 4:23-cv-04155-YGR (N.D. Cal. Feb. 27, 2025), Dkt. 473-1 at 20 ("The Monitor shall be permitted to hire a reasonable number of staff to assist the Monitor in performing the duties outlined in this Agreement."); *Jensen v. Thornell*, No. 2:12-cv-00601-ROS, 2023 WL 2838040 at *3 (D. Ariz. April 7, 2023) (court-appointed monitor granted authority to identify additional staff needed to assist in monitoring); *Franco-Gonzalez v. Holder*, No. 2:10-cv-02211-DMG (C.D. Cal. March 2, 2015), Dkt. 810 at 16 ("The Monitor may … seek assistance from others")

**f. Plaintiffs' Access to Class Member Medical Records**

Since April 2026, Defendants have instructed Plaintiffs' counsel to request medical records directly from CoreCivic's counsel. Plaintiffs have followed this process, but without the Court's imprimatur, it remains subject to CoreCivic's discretion. Sometimes CoreCivic's counsel provides records within days; at other times, Plaintiffs' counsel must wait weeks, despite multiple email inquiries and reminders. Borden Decl. ¶¶ 19–20. Plaintiffs use these medical records to identify concerning issues in class members' medical care and then refer those concerns to the External Monitor. *Id.* ¶ 21. The most efficient way of remedying this imbalance would be to order

Defendants provide EHRS access to Plaintiffs' counsel, which counsel would review subject to the terms of the protective order. *See* Borden Decl. ¶ 22 (listing other cases with Plaintiffs' counsel EHRS access). Short of that, Plaintiffs ask that the Court order Defendants to ensure Plaintiffs are provided class member medical records within three business days of a request (so long as not more than ten class members' records are requested at one time), or within one business day if Plaintiffs identify the request as urgent and provide the reason for the urgency.

**g. *Ex Parte* Discussions**

Each party should be allowed to communicate *ex parte* via email and video- or teleconference with the External Monitor. This is standard practice in cases with court-appointed medical monitors. *See* Doc. 77, Ex. E (citing cases). Both parties—and the Court—benefit from the candid exchange of relevant information with the External Monitor. By facilitating the free exchange of information, it makes the External Monitor's report to the Court more accurate. It allows Defendants to answer questions candidly without fear that Plaintiffs will use it in a dispositive motion and even to seek guidance or help problem-solving issues. In other words, it enables Defendants to rely on the External Monitor for his expertise and as a resource to help them actually achieve and sustain compliance. It also allows Plaintiffs to raise individual class member concerns to the External Monitor without the class member fearing retaliation or other exposure from having their name given to ICE.

* * *

The relief Plaintiffs seek through this motion is modest yet crucial. The External Monitor's review, inspection, and report provided the Court with much-needed transparency into what is happening on the ground in California City, as well as concrete, doable, and necessary recommendations to remedy the dire situation unfolding at ICE's remote detention facility. The Court should grant this motion.

**B. The Court retains jurisdiction to enforce the PI Order despite the pending appeal, including by ordering a remedial plan or additional relief.**

Recognizing that Plaintiffs would likely seek further relief to enforce the PI Order, this Court previously asked the parties to submit briefs on the Court's "jurisdiction related to the

preliminary injunction while the appeals remain pending." Doc. 167; *see also* Doc. 176 (ordering the parties to brief the issue in the instant motion). The question arises from the fact that third party CoreCivic has intervened for the limited purpose of appealing the PI Order and the order appointing the External Monitor, and that appeal remains pending in the Ninth Circuit. Docs. 144, 148. This Court has already declined to stay the orders pending appeal, *see* Doc. 145, and neither CoreCivic nor Defendants have asked the Ninth Circuit for a stay.

The existence of CoreCivic's pending appeal in no way divests this Court of jurisdiction to supervise, implement, or enforce the PI Order. Indeed, the Court's power to grant or modify injunctive relief to ensure compliance with earlier orders—even if those orders are the subject of a pending appeal—is well-established in the law.

"Although an appeal ordinarily divests the district court of jurisdiction over matters on appeal, Federal Rule of Civil Procedure 62(c) creates an exception to the rule." *Nat'l Grange of the Ord. of Patrons of Husbandry v. Cal. State Grange*, 182 F. Supp. 3d 1065, 1072 (E.D. Cal. 2016). That rule provides: "While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). The rule codifies the court's inherent power "to preserve the status quo during the pendency of an appeal." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). It does so by "authoriz[ing] the court to grant or modify injunctive relief to preserve the status quo or ***ensure compliance with its earlier orders***." *Nat'l Grange*, 182 F. Supp. 3d at 1073.

To be sure, a district court cannot "adjudicate anew the merits of the case" while an appeal is pending. *Nat. Res. Def. Council.*, 242 F.3d at 1166. Nor can it take any action that would "materially alter the status of the case on appeal." *Id.* But where, as here, a further order would do nothing more than implement or enforce an existing preliminary injunction, the core issues on appeal would remain undisturbed. That is because "[t]he status quo is measured at the time the appeal is filed." *Nat'l Grange*, 182 F. Supp. 3d at 1072. If that status quo includes an unstayed order requiring or prohibiting certain conduct, then the district court is free to enforce or ensure

compliance with that order without altering the status of the appeal. In *National Grange*, the court put it this way:

> Where the court supervises a continuing course of conduct pursuant to an injunction, and new facts develop that require additional action by the court to ensure compliance with its order, an appeal from the original order "does not divest the district court of jurisdiction to continue its supervision, even though in the course of that supervision the court acts upon or modifies the order from which the appeal is taken."

*Id.* (quoting *Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 536 F.2d 1268, 1276 (9th Cir. 1976)). That is so because a court is always empowered to issue "an enforcement order" commanding compliance with a "previous order" that "had not been stayed on appeal." *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976). "To hold otherwise," the Ninth Circuit has noted, "would deny the District Court the power to enforce its unstayed orders while they were on appeal." *Id.*

Accordingly, while an appeal is pending, a court "may modify or broaden the scope of its injunction under its continuing duty to supervise the relief granted if it is informed of new facts that require additional supervisory action." *Nat'l Grange*, 182 F. Supp. 3d at 1073. Courts have often applied this general principle in the detention context. For example, in *Armstrong v. Brown*, the state refused to implement a plan designed to protect the rights of people with disabilities held in county jails. 732 F.3d 955, 957 (9th Cir. 2013). The state appealed the injunction and sought a stay, which was denied. *Id.* at 958. While the appeal was pending, the plaintiffs "filed an emergency motion to enforce the district court's order." *Id.* at 959. Acting under Rule 62(c)[7] to "preserve the status quo," the district court issued new orders "essentially requir[ing] defendants to disseminate and implement the Plan." *Id.* On appeal, the defendants argued "that the district court lacked subject matter jurisdiction to issue the [new] orders" due to the pending appeal. *Id.* at 959 n.6. The Ninth Circuit expressly rejected that argument. *Id.* Referencing Rule 62(c), the court held that "[t]he district court acted to preserve the status quo and protect plaintiffs' rights in direct

[7] The relevant subsection had been Rule 62(c) until the Rule was reorganized in 2018. It is now Rule 62(d).

response to defendants' repeated and willful non-compliance with its earlier orders." *Id.* The court viewed the orders as appropriate and justified in light of a "continuous course of conduct marked by the development of new facts." *Id.* The Ninth Circuit likewise rejected the defendants' argument that the new orders had "materially alter[ed] the status of the case on appeal," reasoning that the ultimate legal question before the court "remain[ed] unchanged." *Id.*

Similarly, in *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir. 2001), a court in this District had entered an injunction regarding the treatment of Muslim prisoners at the Solano state prison, which the defendants appealed. *Id.* at 933–34. During the pendency of that appeal, the original injunction expired on its terms, but the district court imposed a new one. *Id.* at 934. The defendants objected, arguing that any new injunction had to "preserve their rights" as the "adverse party." *Id.* at 935. The Ninth Circuit rejected that argument, explaining that Rule 62(c) allowed the district court to take further action with respect to the injunction under appeal, even if such action "inure[d] to the benefit of plaintiffs." *Id.* The court expressly relied on precedent allowing a district court, during the pendency of an appeal, to lift a stay and make an injunction's provisions "more onerous." *Id.* (citing *Nat. Res. Def. Council*, 242 F.3d at 1165).

More recently, in the immigration detention context, a court in the Northern District of California issued a preliminary injunction regarding conditions of confinement in temporary ICE holding rooms. *Sequen v. Albarran*, 814 F. Supp. 3d 1068, 1070 (N.D. Cal. 2025). When ICE took the position (after filing an appeal) that the injunction was limited to certain rooms in a certain building, the court clarified and extended its existing preliminary injunction to cover all holding rooms, emphasizing that the court "retains jurisdiction to clarify and enforce the preliminary injunction and to modify it pending appeal as needed to preserve the status quo." *Id.* at 1072 n.2.

Courts routinely issue similar orders to enforce and supervise compliance with an unstayed injunction while an appeal of that injunction is pending. For example, in *Meinhold v. U.S. Department of Defense*, the district court enjoined the Navy from discharging or denying enlistment based on sexual orientation. 34 F.3d 1469, 1472 (9th Cir.1994). The Defense Department appealed and sought a stay, which was denied. *Id.* at 1473. While the appeal was

pending, the plaintiff sought a contempt order from the district court based on the Navy transferring two gay servicemembers to the standby reserves. *Id.* The district court amended and broadened its previous inunction to "restrain DOD from creating or maintaining files based on sexual orientation and from taking any actions against gay or lesbian servicemembers based on their sexual orientation." *Id.* The Defense Department argued that "the district court lacked jurisdiction to issue its amended order, which broadened the scope of injunctive relief, because an appeal had already been taken from the original order." *Id.* at 1480 n.14. Expressly rejecting that argument, the Ninth Circuit explained that the district court had properly "issued the amended order to clarify its original injunction and to supervise compliance" with it. *Id.* Other examples abound. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d at 1091, 1098–99 (9th Cir. 2002) (affirming district court's decision to modify its injunction to require a complete shutdown of Napster's file transferring service in order to enforce a prior order preventing copyright infringement); *Hoffman*, 536 F.2d at 1276 (affirming district court's decision to amend injunction to impose additional compliance fines); *Nat'l Grange*, 182 F. Supp. 3d at 1074–75 (enforcing prior trademark injunction by requiring defendant to remove a word from its corporate name).

The rule makes good sense. If a court remained powerless to enforce an injunction merely because the defendant had appealed it, there would be no point in granting or denying stays of those injunctions pending appeal. The appeal itself would function as a *de facto* stay, preventing the district court from ensuring that its orders are followed until the appeal has run its course. That is not the law.

Here, CoreCivic's appeal in no way affects, much less precludes, the relief Plaintiffs now seek. Issuing that relief would in no way re-adjudicate the merits of the case or materially alter the status of the case on appeal. Rather, the Court would merely be "supervis[ing] a continuing course of conduct pursuant to an injunction" and addressing "new facts" that have developed, which "require additional action by the court to ensure compliance with its order." *Nat'l Grange*, 182 F. Supp. 3d at 1072. Such actions undoubtedly include extending and enhancing the External Monitor's role (indeed, the Monitor Order expressly contemplates extending his term, *see* Doc. 112 ¶ 2), allowing further reports to the Court on California City's troubled health care system,

and urging the parties to develop a CAP that will help the Court further implement the PI Order.

Simply put, CoreCivic failed to stay the PI Order in this Court and never asked the Ninth Circuit to stay the order pending appeal. It cannot now obtain an effective stay merely by having filed its appeal. The External Monitor's Report makes abundantly clear that Defendants are noncompliant with every single health care provision of the PI Order. This Court has all the jurisdiction and authority it needs to address that blatant noncompliance, enforce the PI Order, and issue whatever orders it deems necessary and appropriate to remedy the dangerous, life-threatening, and unconstitutional conditions at California City.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court GRANT this motion and enter the Proposed Order attached hereto.

Dated: October 26, 2026

Respectfully submitted,

*/s/ Cody S. Harris*
KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND
CODY S. HARRIS
CARLOS C. MARTINEZ

*/s/ Tess Borden* (as authorized on 10/26/26)
PRISON LAW OFFICE
MARGOT MENDELSON
TESS BORDEN
RANA ANABTAWI
MEGHA RAM

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
KYLE VIRGIEN
FELIPE HERNANDEZ
MARISOL DOMINGUEZ-RUIZ
CARMEN IGUINA GONZALEZ

*Attorneys for Plaintiffs*