**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

FERNANDO GOMEZ RUIZ, et al.,

Plaintiffs,

v.

U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, et al.,

Defendants.

Case No. 1:26-cv-02546-JLT-CDB

ORDER REQUIRING THE EXTERNAL MONITOR TO SUPPLEMENT HIS REPORT

(Doc. 166)

Before the Court is Plaintiffs' motion to enforce the Court's preliminary injunction entered February 10, 2026, which ordered the Defendants, in relevant part, to provide constitutionally adequate health care to immigrant detainees held at the California City Detention Facility. (Doc. 188; *see also* Doc. 72, ¶ 1(a)–(h).) In their motion to enforce, Plaintiffs rely on the External Monitor's July 2026 Report ("Report") as evidence of Defendants' noncompliance with each of the eight health care requirements imposed by the PI. (Doc. 188 at 19.) On August 21, 2026, Defendants filed objections to the Monitor's Report, arguing *inter alia* that the report is unreliable because it is based on undisclosed, flawed methodology, fails to cite specific patients or quantify its findings, and relies on unverified and stale data. (Doc. 180 at 8–9, 10–12.) On August 28, 2026, Plaintiffs filed a reply arguing that the monitor's methodology is sound and well-accepted. (Doc. 184 at 10–15, 17–18.)

In his report, the External Monitor explains that he conducted a "system-level assessment" based on a review of 141 individual patient medical records; 40 patient interviews; and interviews with California City medical staff from various departments where some individuals were assigned to multiple roles. (Doc. 166-2 at 8–10.) He also reviewed ample documents related to CCDF's health care policies and practices. (*Id*. at 6–7.) These documents include general information on the facility and health care program; CCDF's health care policies and procedures including standard operating procedures/ guidelines used by staff; patient lists related to particular diagnoses and detainees enrolled in chronic care clinics; prescriptions administered; list of critical lab results in the last six months; detainees in medical observation/ housing; pending lab, diagnostic, appointment, referral orders; emergency room visits; specialty care visits, off-site visits, and returns; rosters of health care staff and current schedules by position; the facility's medication/ drug formulary and documentation of non-formulary requests and approvals/ denials; list of medications ordered and denied in the last six months; utilization management logs or other records documenting approval, denials, and deferrals (including alternate treatment plans); logs of suicide watch placements, attempted suicides, and self-harm incidents; sick call requests and health care grievance/ appeals, facility responses; updated budgeted versus actual staffing by position, including current vacancies, recent staffing changes; list of all current detainees including date and time of arrival at the facility; updated standard operating procedures/ policies with their effective dates; and updated specialty referral list. (*Id*. at 6–7.) According to the parties, the Monitor reviewed approximately 4,800 pages worth of health care files and conducted 416 discrete record-access events spanning 141 detainee records, spending no fewer than 92 hours reviewing these medical charts. (Doc. 180-4, ¶ 9; Doc. 184 at 10–11.)

Defendants raise concerns regarding a potential sampling bias and present data to that effect. (Doc. 180 at 8–9; *see* Doc. 180-4, ¶¶ 6–24.) In their response, Plaintiffs present additional data regarding the Monitor's sampling practices. (*See* Doc. 183-2, ¶¶ 24–29.) As explained above, the Monitor indicates in his report that he reviewed 141 medical records which he provided to the parties as a confidential Appendix to his report. (Doc. 166-2 at 8.) Apart from referencing these 141 files, the Monitor provides no information regarding how he selected these

files, why he chose to select them in such manner, and why these specific files speak to the inadequacies of CCDF's overall health care system. (*Id.*) Together, the parties present the Court with the following information regarding the Monitor's review of these 141 patient files:

- 32 of the 141 patient files were selected by the Plaintiffs. (Doc. 180-4, ¶¶ 8(b), 13; Doc. 183-2, ¶ 24.)
    - According to Plaintiffs:
        - "Some of these referrals concerned serious medical or mental health issues, including referrals of patients with uncontrolled chronic conditions and patients experiencing extensive delays getting specialty care. Other referrals concerned broader health care system deficiencies, including health care records with missing offsite or ER visit notes, untimely PCP appointments after an RN referral, and late medication distribution times." (Doc. 183-2, ¶¶ 24–25.)
        - 26 of the 32 patients selected by Plaintiffs were on the list of detainees who had a medical, dental, or mental health diagnosis. (Doc. 183-2, ¶ 27.)
        - 6 of the 32 patients selected by Plaintiffs were on the list of detainees who appeared on the Medical Intake Report (*produced to the Monitor on July 27, 2026, after he had transmitted his proposed final report to the parties on July 26, 2026*). (Doc. 183-2, ¶¶ 7, 29.)
    - According to Defendants:
        - Although the Monitor and his colleague reviewed the medical records for all 32 detainees referred to them by Plaintiffs, he only listed 30 of these detainees in his patient appendix. (Doc. 180-4, ¶ 13.)
        - 5 of the 32 patients selected by Plaintiffs were on the off-site transport for emergency medical care list. (Doc. 180-4, ¶ 17 n.1.)
        - 3 of the 32 patients selected by Plaintiffs were on the infirmary, mental health observation, suicide watch list. (Doc. 180-4, ¶ 18 n.2.)
- 30 of the 141 patient files included detainees on off-site transport for emergency medical care list. (Doc. 180-4, ¶ 17.)
- 9 of the 141 patient files included detainees on the infirmary, mental health observation, suicide watch list. (Doc. 180-4, ¶ 18.)
- Of the remaining 81 patient files reviewed, it is unclear whether those files involved critically ill patients or patients

with minimal health problems. (*See* Doc. 180-4, ¶ 20.)

- 8 of the 141 patient files included in the appendix appeared twice (*suggesting possible duplication of the same patient file for review*). (Doc. 180-4, ¶ 11.)

- The Monitor reviewed at least 8 patient files which *were not* included in the final appendix produced to the parties. (Doc. 180-4, ¶¶ 11, 12.)

- The Monitor reviewed records of 4 patients who had already left CCDF *before* his appointment began on March 30, 2026, with his term ending on July 28, 2026. (*See* Doc. 180-4 at 26–29; Doc. 183-2, ¶ 20.)

    - 3 of the 4 patients appeared on the infirmary, mental health observation, suicide watch list provided by Defendants, which was valid through the end of March 2026. (Doc. 183-2, ¶ 21.)

    - 1 of the 4 patients is a named Plaintiff in this action. (Doc. 183-2, ¶ 22.)

In his report, the Monitor also indicates that he spoke with 40 patients "who wished to speak with" him during his three-day site inspection of CCDF and spoke to 1 patient virtually after his site visit. (Doc. 166-2 at 9.) Defendants provide additional information regarding how these patients were selected for interviews and whether the Monitor reviewed their patient files. According to Defendants:

- 53 detainees signed up to speak with the monitor using sign-up sheets posted in the housing units at the facility. The Monitor spoke with 43 of them during his inspection. After the inspection, the Monitor spoke to another detainee virtually. (Doc. 180-6, ¶¶ 9, 11; Doc. 180-4, ¶ 21.)

- 11 of the 43 detainees interviewed were on Plaintiffs' referral list (Doc. 180-4, ¶ 21.)

- The Monitor reviewed patient files for 33 of the 43 detainees (*including the 11 on Plaintiffs' referral list*) he interviewed. He did not review the patient files for the remaining 10 detainees he interviewed. (Doc. 180-4, ¶ 22.)

Furthermore, although the Monitor's Report does not specifically indicate which

methodology he used to *analyze* the data gathered,[1] Plaintiffs explain that the Monitor conveyed to the parties that he used the "Tracer Methodology." (Doc. 184 at 15.) According to Plaintiffs, this is "a well-accepted methodology that traces patients with serious needs through the health care process" and "is a systems approach to evaluation used by the 'Joint Commission for Accreditation of Health Care Organizations.'" (*Id.*)

Considering the above-mentioned data, the Court requires additional information to assess the Monitor's sampling methods and methodology. The Court also requires additional information regarding the discrepancies highlighted above regarding the final Appendix the Monitor produced to the parties. As such, the Court sets forth the following clarifying questions:

<u>Clarifying Questions Regarding the 141 Patient Appendix</u>

1. Did you review the at least 8 patient files that were not included in the final appendix produced to the parties? If so, did you rely on these files in reaching your ultimate conclusions? If not, why not?
2. Are there 8 patient files duplicated in the final appendix produced to the parties?
    a. If yes, is that a typographical error?
    b. If yes, does that mean you only reviewed 133 patient files, instead of 141, as stated in your report?

<u>Clarifying Questions Regarding Methodology Used to Analyze the Data You Collected</u>

1. What methodology did you use to analyze and interpret the various medical files you requested?
    a. Did you use the Tracer Methodology?
        i. If yes, please describe the Tracer Methodology in detail and explain why it is appropriate for reaching a reliable conclusion in this case?

---

[1] The Monitor provides an "Assessment Methodology" in his Report, which states: "Health care in a correctional facility should be aligned with sound clinical practice and delivered through a reliable system that identifies, assesses, treats, monitors, and follows up on immediate serious health needs, as well as conditions capable of escalating into a significant risk of harm, pain, or suffering. Healthcare decisions must be made by qualified healthcare professionals based on clinical need and independent professional judgment." (*See* Doc. 166-2 at 5.) However, this methodology describes a correctional medical standard upon which the Monitor *measured his findings against*, as opposed to the methodology he employed to *analyze* the data he gathered.

Clarifying Questions Regarding Sampling Methods of the 141 Patient Files

1. What sampling methods did you use when reviewing the 141 patient files?
   a. Did you use "random sampling," where you select a random group of patients from the various patient lists (e.g., off-site emergency transport list, diagnosis list, medical observations list, etc.) provided to you by the Defendants?
   b. Did you use "judgment sampling" or "purposeful sampling" using your expertise and judgment, based on what you deemed to be most representative of CCDF's health care system as a whole?
      i. Did you purposefully select files of patients who appeared more critically ill?
      ii. What criteria do you use to distinguish a more critically ill patient from a less critically ill patient?
      iii. Out of the 141 patient files you reviewed, what percentage of files reflect critically ill patients versus other categories of patients you reviewed?
      iv. Please provide a breakdown by percentage based on the category of patient files (e.g., critically ill, healthy, pre-existing conditions, etc.) you reviewed.
   c. Please explain why you believe the sampling method used was most appropriate for this case?
2. Why is review of 141 patient files an appropriate sample size for reaching conclusions about the larger detention population?
   a. Did you use other types of medical files in conjunction with the 141 patient files when reaching your conclusions?
      i. If yes, can you explain how the Tracer Methodology comes into play here?
   b. How did you ultimately select these 141 patient files?

i. Did you derive these patient files from specific lists provided by Defendants? (e.g., list of detainees with medical diagnoses, list of detainees with prior off-site emergency room visits, etc.)

ii. If yes, please describe how many patients you selected from each list and the sample selected from each list.

1. EX: Out of a list of 50 detainees with known medical diagnoses, you selected 25 detainee charts for review.

3. Did you review 32 patient files referred to you by the Plaintiffs?

a. Did the Plaintiffs explain how and why they selected these patients for review?

b. Would you have otherwise selected these files for review?

c. Did you select these patients solely because they were referred to you by the Plaintiffs?

d. Have you employed this method of patient review in past court-appointed monitor terms?

e. Were Defendants aware that Plaintiffs referred 32 patient files to you for review?

i. If yes, did Defendants attempt to do the same, or did they raise any objections at that time?

f. Why is this a reliable method for reaching your conclusions about the larger healthcare system at CCDF?

<u>Clarifying Questions Regarding Detainee Interviews</u>

1. How did you select which detainees to interview?

2. How did these interviews fit into your overall analysis and conclusions regarding CCDF's healthcare system?

3. How many detainees did you interview during your three-day site visit to the facility?

a. Did you interview a total of 41 patients (*one of which occurred remotely*),

or did you interview a total of 43 patients?

4. Are you aware that 11 of the detainees you interviewed were also on Plaintiff's patient file referral list?
5. Did you intend to review patient files for the detainees you interviewed?
   a. If not, did you only *coincidentally* review patient files for 33 detainees you interviewed?
   b. If yes, why did you not review patient files for the remaining 10 detainees you interviewed?

<u>Clarifying Questions Regarding Findings and Conclusions</u>

1. For each of the eight health care components you reviewed, please specify the following:
   a. Where patient medical records were reviewed and where possible, please provide a ratio to quantify your findings that identifies a numerator and denominator and specifies the level of noncompliance? (EX: "finding significant problems with timely access to, and/or quality of care, related to specialist services in 12 out of 18 patient records reviewed")
      i. If a specific case you reviewed exemplifies the severity of noncompliance, please provide a detailed description of the medical case and the deficiencies in how the case was handled. Please be sure to exclude any confidential patient identifiers from your description.
   b. Which additional health care records, if any, did you rely on in reaching your conclusion?
      i. How did the additional health records help guide your findings and conclusions?

The Court **ORDERS** the External Monitor's appointment be extended for the limited purpose of answering these clarifying questions. The External Monitor is **ORDERED** to file a supplemental report with the Court answering these clarifying questions **<u>no later than Friday,</u>**

**December 11, 2026**. If the External Monitor needs additional time, he **SHALL** file a request for an extension **no later than Friday, December 4, 2026**.

To the extent necessary, Defendants **SHALL** provide the External Monitor, Dr. Anandkumar, and his colleague Dr. Boddu (who assisted Dr. Anandkumar with the preparation of his underlying report and review of patient files) with remote read-only access to California City Detention Facility's Electronic Health Record System, and any other requested documentation, as needed, for purposes of completing this supplemental report. The External Monitor and his team member **SHALL** fully comply with all of Defendants' and CoreCivic's applicable security protocols and system configurations.

IT IS SO ORDERED.

Dated: November 13, 2026

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE